No. 23-50669

# In the United States Court of Appeals for the Fifth Circuit

---

JOSEPH VAN LOON; TYLER ALMEIDA; ALEXANDER FISHER;
PRESTON VAN LOON; KEVIN VITALE; NATE WELCH,
PLAINTIFF-APPELLANTS

*v.*

DEPARTMENT OF THE TREASURY;
OFFICE OF FOREIGN ASSETS CONTROL; JANET YELLEN,
SECRETARY, U.S. DEPARTMENT OF TREASURY,
IN HER OFFICIAL CAPACITY; ANDREA M. GACKI,
IN HER OFFICIAL CAPACITY AS DIRECTOR
OF THE OFFICE OF FOREIGN ASSETS CONTROL,
DEFENDANT-APPELLEES

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS (CIV. NO. 23-312)
(THE HONORABLE ROBERT L. PITMAN, J.)*

---

**RECORD EXCERPTS**

---

CHARLES LEWIS AINSWORTH
PARKER, BUNT & AINSWORTH, P.C.
*100 East Ferguson, Suite 418
Tyler, TX 75702*

KANNON K. SHANMUGAM
BRIAN M. LIPSHUTZ
MATTEO GODI
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
 *2001 K Street, N.W.
 Washington, DC 20006
 (202) 223-7300*

# TABLE OF CONTENTS

Page

1.  Docket sheet.................................................................ROA.1-23

2.  Notice of appeal ...................................................ROA.1519-1520

3.  District court order ............................................ROA.1492-1516

4.  Excerpts from Office of Foreign Assets Control,
    Designation and Blocking Memorandum
    (Nov. 8, 2022)......................................................ROA.902, 910-915,
    ......................................................................... 933-936, 951,
    ......................................................................... 960-961, 964-965

5.  Excerpts from *How Does Tornado.Cash Work?*,
    Coin Center (Aug. 25, 2022) ................................ROA.1080-1085,
    ......................................................................... 1089-1093, 1096-1101

6.  Excerpts from *Tornado Cash Governance Proposal*,
    Medium (Dec. 18, 2020) .......................................ROA.1063-1065,
    ......................................................................... 1070-1071

7.  Excerpts from *Tornado Cash DAO Votes to Take
    Partial Control Over Treasury Funds*,
    The Block (Aug. 12, 2022) .....................................ROA.1482-1483

8.  Certificate of service

# TAB 1

APPEAL,DH

# U.S. District Court [LIVE]
# Western District of Texas (Austin)
# CIVIL DOCKET FOR CASE #: 1:23-cv-00312-RP

Joseph Van Loon et al v. Department of the Treasury et al
Assigned to: Judge Robert Pitman
 Related Case: 6:22-cv-00920-ADA
 Case in other court:  USCA Fifth Circuit, 23-50669
Cause: 05:702 Administrative Procedure Act

Date Filed: 09/08/2022
Date Terminated: 08/17/2023
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Joseph Van Loon**

represented by **Brian M. Lipshutz**
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
2001 K Street, N.W.
Washington, DC 20006
202-223-7379
Email: blipshutz@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer K. Corcoran**
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
2001 K Street, N.W.
Washington, DC 20006
202-223-7300
Email: jcorcoran@paulweiss.com
*TERMINATED: 07/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kannon K. Shanmugam**
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
2001 K Street, N.W.
Washington, DC 20006
202-223-7325
Fax: 202-204-7397
Email: kshanmugam@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matteo Godi**
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
2001 K Street, N.W.

Washington, DC 20006
202-223-7300
Email: mgodi@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles L. Ainsworth**
Parker, Bunt & Ainsworth, P.C.
100 East Ferguson, Suite 418
Tyler, TX 75702
(903) 531-3535
Email: charley@pbatyler.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Tyler Almeida** | represented by | **Brian M. Lipshutz** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kannon K. Shanmugam**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matteo Godi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles L. Ainsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Alexander Fisher** | represented by | **Brian M. Lipshutz** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer K. Corcoran**
(See above for address)
*TERMINATED: 07/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kannon K. Shanmugam**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matteo Godi**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles L. Ainsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Preston Van Loon**                    represented by    **Brian M. Lipshutz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer K. Corcoran**
(See above for address)
*TERMINATED: 07/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kannon K. Shanmugam**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matteo Godi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles L. Ainsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kevin Vitale**                    represented by    **Brian M. Lipshutz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer K. Corcoran**
(See above for address)
*TERMINATED: 07/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kannon K. Shanmugam**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matteo Godi**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles L. Ainsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nate Welch**                                    represented by   **Brian M. Lipshutz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer K. Corcoran**
(See above for address)
*TERMINATED: 07/17/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kannon K. Shanmugam**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matteo Godi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles L. Ainsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Department of the Treasury**         represented by   **Christopher R. Healy**
DOJ-Civ
Civil Division, Department of Justice
1100 L St. NW
Washington, DC 20530
202-514-8095
Email: christopher.healy@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen J. Elliott**
DOJ-Civ
1100 L St., N.W.
Washington, DC 20530
202-353-0889

Email: stephen.m.elliott@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
U.S. Department of Justice
Federal Programs Branch, Civil Division
1100 L St. NW
Washington, DC 20005
202-880-0282
Email: christine.l.coogle@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Liane Ngin Noble-AUSA**
U.S. Attorney's Office
903 San Jacinto Blvd., Suite 334
Austin, TX 78701
512-370-1252
Email: liane.noble@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Office of Foreign Assets Control**     represented by     **Christopher R. Healy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen J. Elliott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Liane Ngin Noble-AUSA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Janet Yellen, in her official capacity as**     represented by     **Christopher R. Healy**
**Secretary of the Treasury**                      (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen J. Elliott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Liane Ngin Noble-AUSA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Andrea M. Gacki, in her official capacity**          represented by    **Christopher R. Healy**
**as Director of the Office of Foreign**                                  (See above for address)
**Assets Control**                                                        *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Stephen J. Elliott**
                                                                          (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Christine L. Coogle**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Liane Ngin Noble-AUSA**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**Blockchain Association**          represented by    **Alexis Zhang**
                                                     Jones Day - Washington
                                                     51 Louisiana Avenue NW
                                                     Washington, DC 20001
                                                     202-879-3478
                                                     Email: alexiszhang@jonesday.com
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Eric Tung**
                                                     Jones Day
                                                     555 South Flower Street, 50th Floor
                                                     Los Angeles, CA 90071
                                                     213-243-2151
                                                     Fax: 213-243-2539
                                                     Email: etung@jonesday.com
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **James M. Burnham**
                                                     DOJ-Civ
                                                     King Street Legal, P.L.L.C.
                                                     800 Connecticut Avenue NW

Suite 300
Washington, DC 20006
602-501-5469
Email: james@kingstlegal.com
*TERMINATED: 07/06/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan David Guynn**
Jones Day
2727 N. Harwood Street
Ste 600
Dallas, TX 75201
214-969-3793
Email: jguynn@jonesday.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Defi Education Fund**                          represented by  **Alexis Zhang**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric Tung**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James M. Burnham**
(See above for address)
*TERMINATED: 07/06/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan David Guynn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Paradigm Operations LP**                       represented by  **Alexis Swartz**
Lehotsky Keller LLP
919 Congress Ave. Ste. 1100
Austin, TX 78701
512-693-8350
Email: alexis@lehotskykeller.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Katherine Yarger**
Lehotsky Keller LIP
700 Colorado Blvd. # 407
Denver, CO 80220
303-717-4749
Email: katie@lehotskykeller.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rodrigo Seira**
Paradigm Operations LP
548 Market St.
San Francisco, CA 94104
303-718-1999
Email: rodrigo@paradigm.xyz
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Andreessen Horowitz**                represented by    **Alessio Evangelista**
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
202-371-7170
Email: alessio.evangelista@skadden.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessie K. Liu**
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005
202-371-7000
Fax: 202-661-2340
Email: jessie.liu@skadden.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel S. Mayerfeld**
Skadden Arps Slate Meagher &Flom LLP
1000 Louisiana Street
Suite 6800
Houston, TX 77002
713-655-5141
Fax: 713-483-9141
Email: daniel.mayerfeld@skadden.com
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Electronic Frontier Foundation** | represented by | **Cindy Cohn**<br>Electronic Frontier Foundation<br>815 Eddy Street<br>San Francisco, CA 94109<br>415-436-9333<br>Email: cindy@eff.org<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Peter B. Steffensen**<br>SMU Dedman School of Law<br>First Amendment Clinic<br>P.O. Box 750116<br>Dallas, TX 75275-0116<br>214-768-4077<br>Fax: 214-768-1611<br>Email: psteffensen@smu.edu<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Thomas S. Leatherbury**<br>Thomas S. Leatherbury Law, PLLC<br>1901 N. Akard St.<br>Dallas, TX 75201<br>(214) 213-5004<br>Fax: (214) 999-7792<br>Email: om@tsleatherburylaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **The Bank Policy Institute as Amicus Curiae** | represented by | **John B. Kinchen**<br>Hughes Arrell Kinchen LLP<br>2211 Norfolk<br>Suite 405<br>Houston, TX 77098<br>(713) 403-2064<br>Fax: (713) 583-8877<br>Email: jkinchen@skv.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 09/08/2022 | 1 (p.24) | COMPLAINT ( Filing fee $ 402 receipt number ATXWDC-16497696), filed by Nate Welch, Alexander Fisher, Tyler Almeida, Joseph Van Loon, Preston Van Loon, Kevin Vitale. (Attachments: # 1 (p.24) Civil Cover Sheet, # 2 (p.47) Civil Cover Sheet Attachment)(Ainsworth, Charles) (Entered: 09/08/2022) |

| 09/08/2022 | 2 (p.47) | REQUEST FOR ISSUANCE OF SUMMONS by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Ainsworth, Charles) (Entered: 09/08/2022) |
|---|---|---|
| 09/08/2022 | | All parties shall flatten all documents before e-filing. All parties shall comply with the Standing Orders located at https://www.txwd.uscourts.gov/judges-information/standing-orders/ (Entered: 09/08/2022) |
| 09/08/2022 | | Case assigned to Judge Alan D Albright and Judge Jeffrey C. Manske. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (sv) (Entered: 09/08/2022) |
| 09/08/2022 | 3 (p.55) | Summons Issued as to All Defendants, U.S. Attorney and U.S. Attorney General (sv) (Entered: 09/08/2022) |
| 09/09/2022 | 4 (p.63) | MOTION to Appear Pro Hac Vice by Charles L. Ainsworth *on behalf of Brian M. Lipshutz* ( Filing fee $ 100 receipt number ATXWDC-16507131) by on behalf of Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Exhibit Attachment to PHV, # 2 (p.47) Proposed Order). Motions referred to Judge Jeffrey C. Manske. (Ainsworth, Charles) (Entered: 09/09/2022) |
| 09/09/2022 | 5 (p.68) | MOTION to Appear Pro Hac Vice by Charles L. Ainsworth *on behalf of Jennifer K. Corcoran* ( Filing fee $ 100 receipt number ATXWDC-16507197) by on behalf of Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch.. Motions referred to Judge Jeffrey C. Manske. (Ainsworth, Charles) (Entered: 09/09/2022) |
| 09/09/2022 | 6 (p.71) | MOTION to Appear Pro Hac Vice by Charles L. Ainsworth *on behalf of Kannon K. Shanmugam* ( Filing fee $ 100 receipt number ATXWDC-16507225) by on behalf of Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Exhibit Attachment to PHV, # 2 (p.47) Proposed Order). Motions referred to Judge Jeffrey C. Manske. (Ainsworth, Charles) (Entered: 09/09/2022) |
| 09/09/2022 | 7 (p.76) | MOTION to Appear Pro Hac Vice by Charles L. Ainsworth *on behalf of Matteo Godi* ( Filing fee $ 100 receipt number ATXWDC-16507258) by on behalf of Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Exhibit Attachment to PHV, # 2 (p.47) Proposed Order). Motions referred to Judge Jeffrey C. Manske. (Ainsworth, Charles) (Entered: 09/09/2022) |
| 09/12/2022 | 8 (p.81) | ATTACHMENT *[Proposed Order]* to 5 (p.68) MOTION to Appear Pro Hac Vice by Charles L. Ainsworth *on behalf of Jennifer K. Corcoran* ( Filing fee $ 100 receipt number ATXWDC-16507197) by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Ainsworth, Charles) (Entered: 09/12/2022) |
| 09/13/2022 | 9 (p.82) | ORDER GRANTING 5 (p.68) Motion to Appear Pro Hac Vice for Attorney Jennifer K. Corcoran for Alexander Fisher,Jennifer K. Corcoran for Joseph Van Loon,Jennifer K. Corcoran for Preston Van Loon,Jennifer |

| | | |
|---|---|---|
| | | K. Corcoran for Kevin Vitale,Jennifer K. Corcoran for Nate Welch. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Alan D Albright. (sv) (Entered: 09/13/2022) |
| 09/13/2022 | 10 (p.83) | ORDER GRANTING 4 (p.63) Motion to Appear Pro Hac Vice for Attorney Brian M. Lipshutz for Tyler Almeida,Brian M. Lipshutz for Alexander Fisher,Brian M. Lipshutz for Joseph Van Loon,Brian M. Lipshutz for Preston Van Loon,Brian M. Lipshutz for Kevin Vitale,Brian M. Lipshutz for Nate Welch. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Alan D Albright. (sv) (Entered: 09/13/2022) |
| 09/13/2022 | 11 (p.84) | ORDER GRANTING 7 (p.76) Motion to Appear Pro Hac Vice for Attorney Matteo Godi for Tyler Almeida,Matteo Godi for Alexander Fisher,Matteo Godi for Joseph Van Loon,Matteo Godi for Preston Van Loon,Matteo Godi for Kevin Vitale,Matteo Godi for Nate Welch. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Alan D Albright. (sv) (Entered: 09/13/2022) |
| 09/13/2022 | 12 (p.85) | ORDER GRANTING 6 (p.71) Motion to Appear Pro Hac Vice for Attorney Kannon K. Shanmugam for Tyler Almeida,Kannon K. Shanmugam for Alexander Fisher,Kannon K. Shanmugam for Joseph Van Loon,Kannon K. Shanmugam for Preston Van Loon,Kannon K. Shanmugam for Kevin Vitale,Kannon K. Shanmugam for Nate Welch. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Alan D Albright. (sv) (Entered: 09/13/2022) |
| 10/13/2022 | 13 (p.86) | NOTICE *of Filing Affidavit of Service* by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch (Attachments: # 1 (p.24) Exhibit A)(Ainsworth, Charles) (Entered: 10/13/2022) |
| 10/13/2022 | | Remark: Plaintiff's counsel was contacted by the Clerk's Office informing them that document 13 (p.86) NOTICE of Filing Affidavit of Service is filed incorrectly and will need to be refiled using the correct event entry of Summons Returned Executed or Summons Returned Executed to USA. (zv) (Entered: 10/14/2022) |
| 10/14/2022 | 14 (p.105) | NOTICE of Attorney Appearance by Christopher W. Healy on behalf of Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury (Healy, Christopher) (Entered: 10/14/2022) |

| 10/14/2022 | 15 (p.106) | MOTION to Transfer Case *to the Austin Division of the Western District of Texas* by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury. (Attachments: # 1 (p.24) Proposed Order). Motions referred to Judge Jeffrey C. Manske. (Healy, Christopher) (Entered: 10/14/2022) |
|---|---|---|
| 10/21/2022 | 16 (p.110) | Response in Opposition to Motion, filed by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch, re 15 (p.106) MOTION to Transfer Case *to the Austin Division of the Western District of Texas* filed by Defendant Office of Foreign Assets Control, Defendant Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Defendant Department of the Treasury, Defendant Janet Yellen, in her official capacity as Secretary of the Treasury (Attachments: # 1 (p.24) Exhibit A)(Ainsworth, Charles) (Entered: 10/21/2022) |
| 10/28/2022 | 17 (p.119) | REPLY to Response to Motion, filed by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury, re 15 (p.106) MOTION to Transfer Case *to the Austin Division of the Western District of Texas* filed by Defendant Office of Foreign Assets Control, Defendant Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Defendant Department of the Treasury, Defendant Janet Yellen, in her official capacity as Secretary of the Treasury (Healy, Christopher) (Entered: 10/28/2022) |
| 11/03/2022 | 18 (p.122) | NOTICE of Attorney Appearance by Christine Coogle on behalf of Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury. Attorney Christine Coogle added to party Department of the Treasury(pty:dft), Attorney Christine Coogle added to party Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control(pty:dft), Attorney Christine Coogle added to party Office of Foreign Assets Control(pty:dft), Attorney Christine Coogle added to party Janet Yellen, in her official capacity as Secretary of the Treasury(pty:dft) (Coogle, Christine) (Entered: 11/03/2022) |
| 11/10/2022 | 19 (p.123) | Consent MOTION for Extension of Time to File Answer by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury. (Attachments: # 1 (p.24) Proposed Order). Motions referred to Judge Jeffrey C. Manske. (Healy, Christopher) (Entered: 11/10/2022) |
| 11/10/2022 | | Text Order GRANTING 19 (p.123) Motion for Extension of Time to Answer re 19 (p.123) Consent MOTION for Extension of Time to File Answer entered by Judge Jeffrey C. Manske. The deadline for Defendants Gacki and Yellen is now December 5, 2022. (This is a text-only entry generated by the court. There is no document associated with this entry.) (MQlc) (Entered: 11/10/2022) |

| 11/10/2022 | | Reset Deadlines: Department of the Treasury; Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control; Office of Foreign Assets Control; Janet Yellen, in her official capacity as Secretary of the Treasury answer due 12/5/2022. (zv) (Entered: 11/10/2022) |
| 11/21/2022 | 20 (p.126) | SUMMONS Returned Executed (Corrected) re 13 (p.86) Notice by Nate Welch, Alexander Fisher, Tyler Almeida, Joseph Van Loon, Preston Van Loon, Kevin Vitale. All Defendants. (Attachments: # 1 (p.24) Exhibit A)(Ainsworth, Charles) Modified on 11/21/2022 to add text to docket text per Plaintiff's Counsel request (zv). (Entered: 11/21/2022) |
| 11/22/2022 | 21 (p.145) | AMENDED COMPLAINT re 1 (p.24) against Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury amending, filed by Nate Welch, Alexander Fisher, Tyler Almeida, Joseph Van Loon, Preston Van Loon, Kevin Vitale.(Ainsworth, Charles) Modified on 11/22/2022 to link to original complaint (zv). (Entered: 11/22/2022) |
| 12/01/2022 | 22 (p.173) | Consent MOTION for Extension of Time to File Answer by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury. (Attachments: # 1 (p.24) Proposed Order). Motions referred to Judge Jeffrey C. Manske. (Coogle, Christine) (Entered: 12/01/2022) |
| 12/02/2022 | | Text Order GRANTING 22 (p.173) Motion for Extension of Time to Answer re 22 (p.173) Consent MOTION for Extension of Time to File Answer entered by Judge Jeffrey C. Manske. Defendant's Response to Plaintiff's Amended Complaint is due on December 9, 2022. (This is a text-only entry generated by the court. There is no document associated with this entry.) (MQlc) (Entered: 12/02/2022) |
| 12/02/2022 | | Reset Deadlines: Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, and Janet Yellen, in her official capacity as Secretary of the Treasury answer due 12/9/2022. (zv) (Entered: 12/02/2022) |
| 12/08/2022 | 23 (p.176) | Joint MOTION *for Entry of Scheduling Order* by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Proposed Order). Motions referred to Judge Jeffrey C. Manske. (Ainsworth, Charles) (Entered: 12/08/2022) |
| 12/09/2022 | 24 (p.179) | ORDER GRANTING 23 (p.176) Joint Motion for Entry of Scheduling Order. Signed by Judge Jeffrey C. Manske. (zv) (Entered: 12/09/2022) |
| 12/09/2022 | 25 (p.180) | ANSWER to 21 (p.145) Amended Complaint, by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury.(Healy, Christopher) (Entered: 12/09/2022) |
| 01/13/2023 | 26 (p.206) | NOTICE *of Service of Certified Administrative Record* by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the |

| | | Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury (Attachments: # 1 (p.24) Certification, # 2 (p.47) Index)(Healy, Christopher) (Entered: 01/13/2023) |
|---|---|---|
| 02/10/2023 | 27 (p.224) | Joint MOTION *for Entry of Scheduling Order* by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Proposed Order). Motions referred to Judge Jeffrey C. Manske. (Ainsworth, Charles) (Entered: 02/10/2023) |
| 02/16/2023 | 28 (p.229) | REPORT AND RECOMMENDATIONS re 15 (p.106) Motion to Transfer Case, filed by Office of Foreign Assets Control, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Department of the Treasury, Janet Yellen, in her official capacity as Secretary of the Treasury. For the reasons outlined above, the undersigned RECOMMENDS that the Defendants Motion (ECF No. 15) be GRANTED, and that this matter be transferred from the Waco Division to the Austin Division. Signed by Judge Jeffrey C. Manske. (zv) (Entered: 02/16/2023) |
| 02/16/2023 | | CASE NO LONGER REFERRED to Magistrate Judge Jeffrey C. Manske. (zv) (Entered: 02/16/2023) |
| 02/27/2023 | 29 (p.238) | OBJECTION to 28 (p.229) Report and Recommendations by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch.. (Ainsworth, Charles) (Entered: 02/27/2023) |
| 02/28/2023 | 30 (p.245) | STIPULATION *Proposed Stipulated Protective Order* by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury. (Healy, Christopher) (Entered: 02/28/2023) |
| 02/28/2023 | 31 (p.256) | DEFICIENCY NOTICE: re 30 (p.245) Stipulation, (lad) (Entered: 02/28/2023) |
| 02/28/2023 | 32 (p.257) | Joint MOTION for Protective Order *, Stipulated Proposed Order* by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury. (Healy, Christopher) (Entered: 02/28/2023) |
| 03/01/2023 | 33 (p.268) | ORDER GRANTING 32 (p.257) Joint Motion for Protective Order. Signed by Judge Alan D Albright. (zv) (Entered: 03/01/2023) |
| 03/13/2023 | 34 (p.279) | RESPONSE *in Opposition to* to 29 (p.238) Objection to Report and Recommendations by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury. (Healy, Christopher) (Entered: 03/13/2023) |
| 03/20/2023 | 35 (p.286) | ORDER ADOPTING REPORT AND RECOMMENDATIONS for 15 (p.106) Motion to Transfer Case, filed by Office of Foreign Assets Control, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Department of the Treasury, Janet Yellen, in her official capacity as Secretary of the Treasury, 28 (p.229) |

| | | |
|---|---|---|
| | | Report and Recommendations. IT IS THEREFORE ORDERED that this matter be transferred from the Waco Division to the Austin Division. Signed by Judge Alan D Albright. (zv) (Entered: 03/20/2023) |
| 03/20/2023 | | Case transferred in from Waco Division on 03/20/2023 Case Number 6:22-cv-920., filed by Nate Welch, Alexander Fisher, Tyler Almeida, Joseph Van Loon, Preston Van Loon, Kevin Vitale.(cr5) (Entered: 03/23/2023) |
| 03/20/2023 | | Case assigned to Judge Robert Pitman. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (cr5) (Entered: 03/23/2023) |
| 03/20/2023 | | If ordered by the court, all referrals and consents in this case will be assigned to Magistrate Judge Howell. (cr5) (Entered: 03/23/2023) |
| 03/23/2023 | 36 (p.288) | Case Transfer and Opening Letter sent to all Counsel. (cr5) (Entered: 03/23/2023) |
| 03/24/2023 | 37 (p.289) | Joint MOTION *for Entry of Scheduling Order* by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Proposed Order)(Shanmugam, Kannon) (Entered: 03/24/2023) |
| 03/29/2023 | 38 (p.294) | ORDER SETTING Initial Pretrial Conference for 4/25/2023 at 09:20 AM before Judge Robert Pitman. Signed by Judge Robert Pitman. (jv2) (Entered: 03/29/2023) |
| 04/05/2023 | 39 (p.295) | NOTICE of Attorney Appearance by Liane Ngin Noble-AUSA on behalf of Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury. Attorney Liane Ngin Noble-AUSA added to party Department of the Treasury(pty:dft), Attorney Liane Ngin Noble-AUSA added to party Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control(pty:dft), Attorney Liane Ngin Noble-AUSA added to party Office of Foreign Assets Control(pty:dft), Attorney Liane Ngin Noble-AUSA added to party Janet Yellen, in her official capacity as Secretary of the Treasury(pty:dft) (Noble-AUSA, Liane) (Entered: 04/05/2023) |
| 04/05/2023 | 40 (p.297) | Unopposed MOTION for Leave to Exceed Page Limitation by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Plaintiffs' Motion for Partial Summary Judgment, # 2 (p.47) Proposed Order)(Shanmugam, Kannon) (Entered: 04/05/2023) |
| 04/05/2023 | 41 (p.331) | MOTION for Partial Summary Judgment by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Exhibit A - Declaration of Joseph Van Loon, # 2 (p.47) Exhibit B - Declaration of Tyler Almeida, # 3 (p.55) Exhibit C - Declaration of Alexander Fisher, # 4 (p.63) Exhibit D - Declaration of Preston Van Loon, # 5 (p.68) Exhibit E - Declaration of Kevin Vitale, # 6 (p.71) Exhibit F - Declaration of Nate Welch, # 7 (p.76) Proposed |

| | | Order)(Shanmugam, Kannon) (Entered: 04/05/2023) |
|---|---|---|
| 04/12/2023 | 42 (p.381) | NOTICE of Attorney Appearance by Jonathan David Guynn on behalf of Blockchain Association, Defi Education Fund. Attorney Jonathan David Guynn added to party Blockchain Association(pty:am), Attorney Jonathan David Guynn added to party Defi Education Fund(pty:am) (Guynn, Jonathan) (Entered: 04/12/2023) |
| 04/12/2023 | 43 (p.382) | Unopposed MOTION for Leave to File Amicus Brief *in Support of Plaintiffs' Motion for Partial Summary Judgment* by Jonathan Guynn. by Blockchain Association, Defi Education Fund. (Attachments: # 1 (p.24) Brief Amici Curiae in Support of Plaintiffs' Motion for Partial Summary Judgment, # 2 (p.47) Proposed Order)(Guynn, Jonathan) (Entered: 04/12/2023) |
| 04/13/2023 | | **VACATED pursuant to the Court's Order at Dkt. 44** Text Order GRANTING IN PART AND DENYING IN PART 40 (p.297) Motion for Leave to File Excess Pages entered by Judge Robert Pitman. For good cause shown, IT IS ORDERED that Plaintiffs' motion to file excess pages for their motion for summary judgment is GRANTED. IT IS FURTHER ORDERED that Defendants shall file their combined cross-motion and opposition on or before May 4, 2023. IT IS FURTHER ORDERED that Plaintiffs' motion to file excess pages is DENIED without prejudice to refiling. (This is a text-only entry generated by the court. There is no document associated with this entry.) (lolc) Modified on 4/13/2023 (jv2). (Entered: 04/13/2023) |
| 04/13/2023 | 44 (p.415) | ORDER VACATING the Court's Text Order on 04/13/2023 granting in part and denying in part Plaintiff's motion (Dkt. 40). FURTHER ORDER GRANTING 40 (p.297) Plaintiff's Motion for Leave to File Motion for Summary Judgment in Excess Pages. Defendants shall file their combined cross-motion and opposition by 05/04/2023. Defendants' motion to file excess pages for their cross-motion and opposition is DENIED without prejudice. Signed by Judge Robert Pitman. (jv2) (Entered: 04/13/2023) |
| 04/14/2023 | 45 (p.416) | NOTICE of Attorney Appearance by Alexis Swartz on behalf of Paradigm Operations LP. Attorney Alexis Swartz added to party Paradigm Operations LP(pty:am) (Swartz, Alexis) (Entered: 04/14/2023) |
| 04/14/2023 | 46 (p.417) | Unopposed MOTION for Leave to File Amicus Brief*in Support of Plaintiffs' Motion for Partial Summary Judgment* by Alexis Swartz. by Paradigm Operations LP. (Attachments: # 1 (p.24) Brief, # 2 (p.47) Proposed Order)(Swartz, Alexis) (Entered: 04/14/2023) |
| 04/14/2023 | 47 (p.442) | MOTION to Appear Pro Hac Vice by Alexis Swartz *on behalf of Katherine Yarger* ( Filing fee $ 100 receipt number ATXWDC-17320192) by on behalf of Paradigm Operations LP. (Swartz, Alexis) (Entered: 04/14/2023) |
| 04/14/2023 | 48 (p.447) | MOTION to Appear Pro Hac Vice by Alexis Swartz *on behalf of Rodrigo Seira* ( Filing fee $ 100 receipt number ATXWDC-17320201) by on behalf of Paradigm Operations LP. (Swartz, Alexis) (Entered: 04/14/2023) |
| 04/18/2023 | | Text Order GRANTING 43 (p.382) Motion for Leave to File Amici Curiae Brief entered by Judge Robert Pitman. The Court finds that |

| | | |
|---|---|---|
| | | BLOCKCHAIN ASSOCIATION AND DEFI EDUCATION FUND have "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." In re Halo Wireless, Inc., 684 F.3d 581, 596 (5th Cir. 2012). Accordingly, IT IS ORDERED that the motion is GRANTED. IT IS FURTHER ORDERED that the Clerk of Court shall file the Amici Curiae Brief, (Dkt. 43-1). (This is a text-only entry generated by the court. There is no document associated with this entry.) (lolc) (Entered: 04/18/2023) |
| 04/18/2023 | | Text Order GRANTING 46 (p.417) Motion for Leave to File Amici Curiae Brief entered by Judge Robert Pitman. The Court finds that PARADIGM OPERATIONS LP has "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide. In re Halo Wireless, Inc., 684 F.3d 581, 596 (5th Cir. 2012). Accordingly, IT IS ORDERED that the motion is GRANTED. IT IS FURTHER ORDERED that the Clerk of Court shall file the Amici Curiae Brief, (Dkt. 46-1). (This is a text-only entry generated by the court. There is no document associated with this entry.) (lolc) (Entered: 04/18/2023) |
| 04/18/2023 | 49 (p.452) | BRIEF of Blockchain Association and DEFI Education Fund as Amici Curiae in Support of 41 (p.331) Plaintiffs' MOTION for Partial Summary Judgment. (jv2) (Entered: 04/18/2023) |
| 04/18/2023 | 50 (p.478) | BRIEF of Amicus Curiae Paradigm Operations LP in Support of 41 (p.331) Plaintiffs' MOTION for Partial Summary Judgment. (jv2) (Entered: 04/18/2023) |
| 04/18/2023 | 51 (p.496) | ORDER GRANTING 47 (p.442) Motion to Appear Pro Hac Vice for Attorney Katherine Yarger for Paradigm Operations LP. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 04/18/2023) |
| 04/18/2023 | 52 (p.497) | ORDER GRANTING 48 (p.447) Motion to Appear Pro Hac Vice for Attorney Rodrigo Seira for Paradigm Operations LP. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 04/18/2023) |
| 04/18/2023 | 53 (p.498) | Pro Hac Vice Letter directed to James M. Burnham and Alexis Zhang. (jv2) (Entered: 04/18/2023) |
| 04/18/2023 | 54 (p.499) | Pro Hac Vice Letter directed to Eric Tung. (jv2) (Entered: 04/18/2023) |
| 04/20/2023 | 55 (p.500) | MOTION to Appear Pro Hac Vice by Noelle M. Reed *on behalf of Jessie K. Liu* ( Filing fee $ 100 receipt number CTXWDC-17337706) by on behalf of Andreesen Horowitz. (Reed, Noelle) (Entered: 04/20/2023) |
| 04/20/2023 | 56 (p.505) | MOTION *to Preclude Filing of Untimely Amicus Brief* by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet |

| | | |
|---|---|---|
| | | Yellen, in her official capacity as Secretary of the Treasury. (Healy, Christopher) (Entered: 04/20/2023) |
| 04/20/2023 | 57 (p.508) | MOTION to Appear Pro Hac Vice by Noelle M. Reed *on behalf of Alessio Evangelista* ( Filing fee $ 100 receipt number BTXWDC-17342477) by on behalf of Andreesen Horowitz. (Reed, Noelle) (Entered: 04/20/2023) |
| 04/21/2023 | 58 (p.513) | NOTICE of Attorney Appearance by Daniel S. Mayerfeld on behalf of Andreesen Horowitz *as Amicus Curiae*. Attorney Daniel S. Mayerfeld added to party Andreesen Horowitz (pty:am) (Mayerfeld, Daniel) (Entered: 04/21/2023) |
| 04/21/2023 | 59 (p.514) | Unopposed MOTION for Leave to File Amicus Brief *in Support of Plaintiffs' Motion for Partial Summary Judgment* by Daniel S. Mayerfeld. by Andreesen Horowitz. (Attachments: # 1 (p.24) Exhibit A - Amicus Brief on Behalf of Andreessen Horowitz as Amicus Curiae in Support of Plaintiffs' Motion for Partial Summary Judgment, # 2 (p.47) Exhibit B - Proposed Order)(Mayerfeld, Daniel) (Entered: 04/21/2023) |
| 04/24/2023 | 60 (p.548) | Response in Opposition to Motion, filed by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch, re 56 (p.505) MOTION *to Preclude Filing of Untimely Amicus Brief* filed by Defendant Office of Foreign Assets Control, Defendant Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Defendant Department of the Treasury, Defendant Janet Yellen, in her official capacity as Secretary of the Treasury (Shanmugam, Kannon) (Entered: 04/24/2023) |
| 04/24/2023 | 61 (p.551) | REPLY to Response to Motion, filed by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury, re 56 (p.505) MOTION *to Preclude Filing of Untimely Amicus Brief* filed by Defendant Office of Foreign Assets Control, Defendant Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Defendant Department of the Treasury, Defendant Janet Yellen, in her official capacity as Secretary of the Treasury (Healy, Christopher) (Entered: 04/24/2023) |
| 04/25/2023 | 62 (p.554) | MOTION to Appear Pro Hac Vice by Jonathan David Guynn *on behalf of James M. Burnham* ( Filing fee $ 100 receipt number ATXWDC-17355170) by on behalf of Blockchain Association, Defi Education Fund. (Attachments: # 1 (p.24) Proposed Order Order for Admission Pro Hac Vic)(Guynn, Jonathan) (Entered: 04/25/2023) |
| 04/25/2023 | 63 (p.560) | MOTION to Appear Pro Hac Vice by Jonathan David Guynn *on behalf of Eric Tung* ( Filing fee $ 100 receipt number ATXWDC-17355253) by on behalf of Blockchain Association, Defi Education Fund. (Attachments: # 1 (p.24) Proposed Order Order for Admission Pro Hac Vic)(Guynn, Jonathan) (Entered: 04/25/2023) |
| 04/25/2023 | 64 (p.566) | MOTION to Appear Pro Hac Vice by Jonathan David Guynn *on behalf of Alexis Zhang* ( Filing fee $ 100 receipt number ATXWDC-17355303) by on behalf of Blockchain Association, Defi Education Fund. (Attachments: |

| | | |
|---|---|---|
| | | # 1 (p.24) Supplement Order for Admission Pro Hac Vic)(Guynn, Jonathan) (Entered: 04/25/2023) |
| 04/25/2023 | 65 | Minute Entry for proceedings held before Judge Robert Pitman: Initial Pretrial Conference held on 4/25/2023 (Minute entry documents are not available electronically.) Written order forthcoming. (Court Reporter Lily Reznik.)(jv2) (Entered: 04/25/2023) |
| 04/26/2023 | 66 (p.571) | ORDER GRANTING 37 (p.289) Joint Motion for Entry of Scheduling Order. Signed by Judge Robert Pitman. (jv2) (Entered: 04/26/2023) |
| 04/26/2023 | 67 (p.573) | ORDER DENYING 56 (p.505) Defendants' Motion to Preclude Filing of Untimely Amicus Brief. Signed by Judge Robert Pitman. (jv2) (Entered: 04/26/2023) |
| 04/27/2023 | 68 (p.574) | NOTICE of Attorney Appearance by Thomas S. Leatherbury on behalf of Electronic Frontier Foundation. Attorney Thomas S. Leatherbury added to party Electronic Frontier Foundation(pty:am) (Leatherbury, Thomas) (Entered: 04/27/2023) |
| 04/27/2023 | 69 (p.575) | NOTICE of Attorney Appearance by Thomas S. Leatherbury for Peter B. Steffensen on behalf of Electronic Frontier Foundation (Leatherbury, Thomas) Modified on 4/28/2023 (jv2). (Entered: 04/27/2023) |
| 04/27/2023 | 70 (p.576) | MOTION for Leave to File Amicus Brief *of Electronic Frontier Foundation in Support of Plaintiff's Motion for Partial Summary Judgment* by Thomas S. Leatherbury. by Electronic Frontier Foundation. (Attachments: # 1 (p.24) Brief, # 2 (p.47) Proposed Order)(Leatherbury, Thomas) (Entered: 04/27/2023) |
| 04/27/2023 | 71 (p.605) | MOTION to Appear Pro Hac Vice by Thomas S. Leatherbury *(Cindy Cohn)* ( Filing fee $ 100 receipt number ATXWDC-17376401) by on behalf of Electronic Frontier Foundation. (Attachments: # 1 (p.24) Proposed Order)(Leatherbury, Thomas) (Entered: 04/27/2023) |
| 04/28/2023 | 72 (p.611) | NOTICE *of Errata re: Truncated Exhibit* by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury (Attachments: # 1 (p.24) Exhibit)(Healy, Christopher) (Entered: 04/28/2023) |
| 04/28/2023 | 73 (p.619) | Consent MOTION *for Further Extension of Pages* by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury. (Elliott, Stephen) (Entered: 04/28/2023) |
| 05/01/2023 | | Text Order GRANTING 73 (p.619) Motion to Exceed Page Limit entered by Judge Robert Pitman. In light of the consent motion and for good cause shown, IT IS ORDERED that Defendants' Opposition and Cross-Motion for Summary Judgment shall not exceed 43 pages. (This is a text-only entry generated by the court. There is no document associated with this entry.) (lolc) (Entered: 05/01/2023) |
| 05/01/2023 | 74 (p.621) | ORDER GRANTING 62 (p.554) Motion to Appear Pro Hac Vice for Attorney James M. Burnham for Blockchain Association and for Defi |

| | | |
|---|---|---|
| | | Education Fund. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 05/01/2023) |
| 05/01/2023 | 75 (p.622) | ORDER GRANTING 63 (p.560) Motion to Appear Pro Hac Vice for Attorney Eric Tung for Blockchain Association and for Defi Education Fund. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 05/01/2023) |
| 05/01/2023 | 76 (p.623) | ORDER GRANTING 64 (p.566) Motion to Appear Pro Hac Vice for Attorney Alexis Zhang for Blockchain Association and for Defi Education Fund. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 05/01/2023) |
| 05/02/2023 | | Text Order GRANTING 59 (p.514) Motion for Leave to File Amicus Curiae Brief entered by Judge Robert Pitman. The Court finds that Andreessen Horowitz ("a16z") has "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide. In re Halo Wireless, Inc., 684 F.3d 581, 596 (5th Cir. 2012). Accordingly, IT IS ORDERED that the motion is GRANTED. IT IS FURTHER ORDERED that the Clerk of Court shall file the Amicus Curiae Brief, (Dkt. 59-1). (This is a text-only entry generated by the court. There is no document associated with this entry.) (lolc) (Entered: 05/02/2023) |
| 05/02/2023 | 77 (p.624) | BRIEF of Andreessen Horowitz as Amicus Curiae in Support of 41 (p.331) Plaintiffs' Motion for Partial Summary Judgment. (jv2) (Entered: 05/02/2023) |
| 05/02/2023 | 78 (p.649) | ORDER GRANTING 55 (p.500) Motion to Appear Pro Hac Vice for Attorney Jessie K. Liu for Andreessen Horowitz. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 05/02/2023) |
| 05/02/2023 | 79 (p.650) | ORDER GRANTING 57 (p.508) Motion to Appear Pro Hac Vice for Attorney Alessio Evangelista for Andreessen Horowitz. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 05/02/2023) |
| 05/03/2023 | 80 (p.651) | MOTION for Summary Judgment by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign |

| | | Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury. (Attachments: # 1 (p.24) Exhibit A)(Healy, Christopher) (Entered: 05/03/2023) |
|---|---|---|
| 05/03/2023 | 81 (p.707) | Memorandum in Opposition to Motion, filed by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury, re 41 (p.331) MOTION for Partial Summary Judgment filed by Plaintiff Nate Welch, Plaintiff Preston Van Loon, Plaintiff Alexander Fisher, Plaintiff Kevin Vitale, Plaintiff Joseph Van Loon, Plaintiff Tyler Almeida (Attachments: # 1 (p.24) Exhibit A)(Healy, Christopher) (Entered: 05/03/2023) |
| 05/08/2023 | | Text Order GRANTING 70 (p.576) Motion for Leave to File Amicus Brief entered by Judge Robert Pitman. The Court finds that Electronic Frontier Foundation ("EFF") has "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." In re Halo Wireless, Inc., 684 F.3d 581, 596 (5th Cir. 2012). Accordingly, IT IS ORDERED that EFF's motion for leave to file an amicus brief is GRANTED. IT IS FURTHER ORDERED that the Clerk of Court shall file the Amicus Curiae Brief, (Dkt. 70-1). (This is a text-only entry generated by the court. There is no document associated with this entry.) (lolc) (Entered: 05/08/2023) |
| 05/08/2023 | 82 (p.763) | BRIEF of Amicus Curiae Electronic Frontier Foundation in Support of 41 (p.331) Plaintiff's MOTION for Partial Summary Judgment (jv2) (Entered: 05/08/2023) |
| 05/09/2023 | 83 (p.783) | ORDER GRANTING 71 (p.605) Motion to Appear Pro Hac Vice for Attorney Cindy Cohn for Electronic Frontier Foundation. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 05/09/2023) |
| 05/17/2023 | 84 (p.784) | NOTICE of Attorney Appearance by John B. Kinchen on behalf of The Bank Policy Institute as Amicus Curiae. Attorney John B. Kinchen added to party The Bank Policy Institute as Amicus Curiae(pty:dft) (Kinchen, John) (Entered: 05/17/2023) |
| 05/17/2023 | 85 (p.785) | MOTION for Leave to File Amicus Brief by John Kinchen. by The Bank Policy Institute as Amicus Curiae. (Attachments: # 1 (p.24) Brief, # 2 (p.47) Proposed Order)(Kinchen, John) (Entered: 05/17/2023) |
| 05/18/2023 | | Text Order GRANTING 85 (p.785) Motion for Leave to File Amicus Brief entered by Judge Robert Pitman. The Court finds that the Bank Policy Institute ("BPI") has "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." In re Halo Wireless, Inc., 684 F.3d 581, 596 (5th Cir. 2012). Accordingly, IT IS ORDERED that BPI's motion for leave to file an amicus brief is GRANTED. IT IS FURTHER ORDERED that the Clerk of Court shall file the Amicus Curiae Brief, (Dkt. 85-1). (This is a text-only entry generated by the court. There is no document associated with this entry.) (lolc) (Entered: 05/18/2023) |

| | | |
|---|---|---|
| 05/18/2023 | 86 (p.817) | BRIEF of Amicus Curiae The Bank Policy Insitute in Support of 80 (p.651) Defendants' MOTION for Summary Judgment. (jv2) (Entered: 05/18/2023) |
| 05/24/2023 | 87 (p.842) | REPLY to Response to Motion, filed by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch, re 41 (p.331) MOTION for Partial Summary Judgment filed by Plaintiff Nate Welch, Plaintiff Preston Van Loon, Plaintiff Alexander Fisher, Plaintiff Kevin Vitale, Plaintiff Joseph Van Loon, Plaintiff Tyler Almeida *and Response to 80 (p.651) Defendants' Cross-Motion for Summary Judgment* (Shanmugam, Kannon) (Entered: 05/24/2023) |
| 06/14/2023 | 88 (p.866) | REPLY to Response to Motion, filed by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury, re 80 (p.651) MOTION for Summary Judgment filed by Defendant Office of Foreign Assets Control, Defendant Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Defendant Department of the Treasury, Defendant Janet Yellen, in her official capacity as Secretary of the Treasury (Elliott, Stephen) (Entered: 06/14/2023) |
| 06/14/2023 | 89 (p.891) | MOTION for Hearing / *Oral Argument on Cross-Motions for Summary Judgment* by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Proposed Order)(Shanmugam, Kannon) (Entered: 06/14/2023) |
| 06/21/2023 | 90 (p.895) | NOTICE *of Classified Lodging* by Department of the Treasury, Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control, Office of Foreign Assets Control, Janet Yellen, in her official capacity as Secretary of the Treasury (Elliott, Stephen) (Entered: 06/21/2023) |
| 06/21/2023 | 91 (p.897) | APPENDIX to 80 (p.651) MOTION for Summary Judgment , 41 (p.331) MOTION for Partial Summary Judgment by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Volume I, # 2 (p.47) Volume II, # 3 (p.55) Volume III)(Shanmugam, Kannon) (Entered: 06/21/2023) |
| 06/28/2023 | 92 (p.1485) | MOTION to Withdraw as Attorney *by James M. Burnham on behalf of* by Blockchain Association, Defi Education Fund. (Attachments: # 1 (p.24) Proposed Order on Withdrawal of James M. Burnham)(Guynn, Jonathan) (Entered: 06/28/2023) |
| 07/05/2023 | 93 (p.1489) | MOTION to Withdraw as Attorney by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. (Attachments: # 1 (p.24) Proposed Order)(Corcoran, Jennifer) (Entered: 07/05/2023) |
| 07/06/2023 | | Text Order GRANTING 92 (p.1485) Motion to Withdraw as Attorney. entered by Judge Robert Pitman. For good cause shown, IT IS ORDERED that James M. Burnham is WITHDRAWN as counsel of record for Amici Blockchain Association and DeFi Education Fund. (This is a text-only entry generated by the court. There is no document associated with this entry.) (lolc) (Entered: 07/06/2023) |

| 07/17/2023 | | Text Order GRANTING 93 (p.1489) Motion to Withdraw as Attorney entered by Judge Robert Pitman. For good cause shown, IT IS ORDERED that Jennifer K. Corcoran is WITHDRAWN as counsel of record for Plaintiffs. (This is a text-only entry generated by the court. There is no document associated with this entry.) (lolc) (Entered: 07/17/2023) |
| --- | --- | --- |
| 08/17/2023 | 94 (p.1492) | ORDER DENYING 41 (p.331) Plaintiffs' Motion for Partial Summary Judgment; GRANTING 80 (p.651) Defendants' Motion for Summary Judgment; and DENYING 89 (p.891) Plaintiffs' Motion for Oral Argument. Signed by Judge Robert Pitman. (jv2) (Entered: 08/17/2023) |
| 08/17/2023 | 95 (p.1517) | FINAL JUDGMENT. Signed by Judge Robert Pitman. (jv2) (Entered: 08/17/2023) |
| 09/18/2023 | 96 (p.1519) | Appeal of Final Judgment 95 (p.1517) by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. ( Filing fee $ 505 receipt number ATXWDC-17893577) (Shanmugam, Kannon) (Entered: 09/18/2023) |
| 09/18/2023 | | NOTICE OF APPEAL following 96 (p.1519) Notice of Appeal (E-Filed) by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch. Filing fee $ 505, receipt number ATXWDC-17893577. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out a (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (jv2) (Entered: 09/19/2023) |
| 09/25/2023 | 97 (p.1521) | TRANSCRIPT REQUEST by Tyler Almeida, Alexander Fisher, Joseph Van Loon, Preston Van Loon, Kevin Vitale, Nate Welch for dates of 09/18/2023. Proceedings Transcribed: No Hearings. Court Reporter: Lily Reznik.. (Shanmugam, Kannon) (Entered: 09/25/2023) |

# TAB 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| Joseph Van Loon; Tyler Almeida;<br>Alexander Fisher; Preston Van Loon;<br>Kevin Vitale; and Nate Welch,<br><br>       Plaintiffs,<br><br>    - against -<br><br>Department of the Treasury;<br>Office of Foreign Assets Control; Janet Yellen,<br>in her official capacity as Secretary of the Treasury; and<br>Andrea M. Gacki, in her official capacity as<br>Director of the Office of Foreign Assets Control,<br><br>       Defendants. | No. 1:23-cv-312-RP |

## PLAINTIFFS' NOTICE OF APPEAL

  Plaintiffs Joseph Van Loon, Tyler Almeida, Alexander Fisher, Preston Van Loon,

Kevin Vitale, and Nate Welch hereby appeal to the United States Court of Appeals for

the Fifth Circuit from the final judgment entered in this action on August 17, 2023 (Dkt.

95).

          Respectfully submitted,

          /s/ Kannon K. Shanmugam

CHARLES LEWIS AINSWORTH
PARKER, BUNT & AINSWORTH, P.C.
 *100 East Ferguson, Suite 418*
 *Tyler, TX 75702*
 *(903) 531-3535 (telephone)*
 *charley@pbatyler.com*

*Attorneys for Plaintiffs*
 *Joseph Van Loon, Tyler Almeida,*
 *Alexander Fisher, Preston Van Loon,*
 *Kevin Vitale, and Nate Welch*

KANNON K. SHANMUGAM*
BRIAN M. LIPSHUTZ*
MATTEO GODI*
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
 *2001 K Street, N.W.*
 *Washington, DC 20006*
 *(202) 223-7300 (telephone)*
 *kshanmugam@paulweiss.com*

*\* Admitted pro hac vice*

23-50669.1519

## CERTIFICATE OF SERVICE

I hereby certify that, on this 18th day of September, 2023, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record. The document is available for viewing and downloading from the ECF system.

/s/ *Kannon K. Shanmugam*
Kannon K. Shanmugam

# TAB 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JOSEPH VAN LOON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:23-CV-312-RP |
| | § | |
| DEPARTMENT OF TREASURY, et al., | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court are cross-motions for summary judgment filed by Plaintiffs Joseph Van

Loon, Tyler Almeida, Alexander Fisher, Preston Van Loon, Kevin Vitale, and Nate Welch (together,

"Plaintiffs"), (Dkt. 41), and Defendants Department of Treasury (the "Department"), Office of

Foreign Assets Control ("OFAC"), Janet Yellen, and Andrea M. Gacki (together, "Defendants" or

"government"), (Dkt. 80). Having considered the parties' arguments, the evidence, and the relevant

law, the Court will deny Plaintiffs' motion and grant Defendants' motion for summary judgment.

**I. BACKGROUND**

This case is about Tornado Cash—but the parties disagree on how to characterize Tornado

Cash. Plaintiffs contend that Tornado Cash is a decentralized, open-source software project

comprised of a subset of smart contracts, or "pools," on the Ethereum blockchain. (Pls.' Mot.

Summ. J., Dkt. 41, at 10). In contrast, the government argues that Tornado Cash is an organization

that runs a cryptocurrency mixing service. (Def.'s Mot. Summ. J., Dkt. 80, at 10). It is undisputed

that the Department of Treasury's Office of Foreign Assets Control added Tornado Cash to the

Specially Designated Nationals and Blocked Persons ("SDN") List. Plaintiffs argue that the

designation exceeds the Department's statutory authority over foreign nationals' interests in

property and violates the Free Speech Clause.

**A. Technical Background**

1. <u>Cryptocurrency and Blockchain Technology</u>

The government describes "cryptocurrency" as follows: Cryptocurrency is a type of virtual currency that can be traded and exchanged on blockchains, and that can be used for payment or investment purposes. (*See* Admin. Record ("A.R.") Vol. 1, Dkt. 91-1, at 22–23; A.R. Vol. 23, Dkt. 91-3, at 157–58). A "blockchain" is a decentralized ledger, or record of transactions, that relies on an online network of users to maintain the ledger's accuracy. (A.R. Vol. 1, Dkt. 91-1, at 23; A.R. Vol. 2, Dkt. 91-2, at 97). Cryptocurrency can be exchanged "directly person to person, through a cryptocurrency exchange, or through other intermediaries." (A.R. Vol. 1, Dkt. 91-1, at 23; A.R. Vol. 3, Dkt. 91-3, at 158). Cryptocurrency is typically stored within a digital "wallet," which functions like a virtual account integrated into the blockchain and is identified by a "wallet address." (A.R. Vol. 1, Dkt. 91-1, at 23–24; A.R. Vol. 3, Dkt. 91-3, at 158). Wallets can generate or store "keys" that are used to send and receive cryptocurrency. (A.R. Vol. 3, Dkt. 91-3, at 158). Those keys include public keys, which are analogous to bank account numbers, and private keys, which function like a personal identification number or password. (*Id.*).

Cryptocurrency users transmit funds between digital wallet addresses, after which the transactions are recorded into "blocks," or entries on the blockchain's ledger. (A.R. Vol. 1, Dkt. 91-1, at 24; A.R. Vol. 2, Dkt. 91-2, at 108). Blockchains do not record real names or physical addresses, but only the transfers between digital wallets, thus maintaining a degree of anonymity for users. (*Id.*). If the identity of a wallet owner becomes known, however, that owner's transactions can be traced. (A.R. Vol. 2, Dkt. 91-2, at 108).

Cryptocurrency can take the form of virtual coins or tokens, both of which are designed using blockchain technology. (A.R. Vol. 1, Dkt. 91-1, at 23; A.R. Vo1. 2, Dkt. 91-2, at 48–50). Coins—including Bitcoin, traded on the Bitcoin blockchain, and Ether, on the Ethereum

23-50669.1493

blockchain—are the fundamental (or "native") medium of exchange on a blockchain, and imitate traditional fiat currencies. (*See* A.R. Vol. 1, Dkt. 91-1, at 23; A.R. Vo1. 2, Dkt. 91-2, at 50). Tokens, in contrast, are assets created through software developed on top of a blockchain, which have value and therefore can be bought, sold, and traded. (A.R. Vo1. 2, Dkt. 91-2, at 50). In essence, crypto tokens are akin to vouchers or coupons, whereas crypto coins are more like dollars and cents. (*Id.*). Tokens can be created and distributed by the project developer for a particular purpose or intended use, so there exist many different kinds of tokens. (*Id.*). For example, a particular blockchain "protocol"—that is, the set of rules that govern the operation of the blockchain, or some subset of transactions on the blockchain—can provide users with tokens that allow them to store data on the protocol's network, to access certain benefits, or even to manage the protocol itself. (*Id.* at 50–52). Once purchasers obtain tokens, those tokens can be used in accordance with their design limitations. (*Id.* at 50).

One important kind of token is a governance token, which can represent a share of ownership or voting rights in a decentralized autonomous organization ("DAO"). (*Id.*). A DAO is a management structure that allows the holders of governance tokens to vote on organizational decisions. (A.R. Vol. 1, Dkt. 91-1, at 151). Typically, to form a DAO, a core developer group creates a protocol, layered on top of an existing blockchain, that allows for the distribution of governance tokens to users, backers, and other stakeholders. (*Id.*). The protocol often specifies quorum requirements to submit a voting proposal, as well as rules for voting. (*See id.* at 153). Each token typically corresponds to a set amount of voting power within the organization and also corresponds to a variable price on a secondary market, where the token maybe bought and sold. (*Id.*). Although DAOs often describe themselves as highly decentralized and democratized, (*see, e.g.*, A.R. Vol. 3, Dkt. 91-3, at 151), the actual governance authority of DAOs is often highly concentrated, (A.R. Vol. 1, Dkt. 91-1, at 151), and the core developer group often remains closely involved in managing,

3

promoting, and proposing changes to the protocol to be voted upon by the DAO, (*see, e.g., id.* at 53; A.R. Vol. 2, Dkt. 91-2, at 125).

## 2. Ethereum

According to the government, Ethereum is a prominent virtual currency blockchain. (A.R. Vol. 1, Dkt. 91-1, at 27; A.R. Vol. 2, Dkt. 91-2, at 79). A transaction on the Ethereum blockchain generally involves the transfer of Ether ("ETH")—the native cryptocurrency of the Ethereum blockchain, (A.R. Vol. 2, Dkt. 91-2, at 65)—from one account to another, (*id.* at 80). An Ethereum account is a wallet with an ETH balance that can be used to execute transactions on the Ethereum blockchain. (A.R. Vol. 1, Dkt. 91-1, at 142). There are two kinds of Ethereum accounts: (1) "externally owned" accounts, which are effectively wallets that may be controlled by anyone with the corresponding private keys, and (2) "smart contracts," or "pools" which are software programs deployed directly onto the Ethereum network, and which may be run by Ethereum users who satisfy the program's conditions. (*Id.* at 143). Smart contracts allow users to route digital asset deposits and withdrawals by generating a randomized key upon deposit, which the depositing user can later use to withdraw the funds. (Blockchain Ass'n.'s Amici Br., Dkt. 49, at 12–13).

Externally owned accounts allow users to initiate transactions for ETH or token transfers. (*Id.*). When a transaction is initiated from an externally owned account, that request is broadcast to the entire Ethereum network. (A.R. Vol. 2, Dkt. 91-2, at 80). A person known as a "validator" will then execute the transaction by altering the balances of the sending and receiving accounts according to the request. (*Id.*). This transaction requires a fee, known as "gas," paid in ETH in an amount determined by the amount of computation required to complete the transaction request. (*Id.* at 65, 80). Upon completion of a transaction, the validator is rewarded by the network with a portion of the gas, for doing the work of verifying and executing the transaction and recording the transaction in the next block on the blockchain. (*Id.* at 65).

4

Unlike an externally owned account, a smart contract is computer code that is stored directly on the Ethereum blockchain, and which automatically executes all or parts of an agreement, pursuant to its specifications. (A.R. Vol. 3, Dkt. 91-3, at 228). The deployment of a smart contract to the blockchain has a cost, which is exacted in the form of gas. (*Id.*). Once deployed, authorized users (or other smart contracts) can execute the code. (*Id.*). The fee for executing a smart contract is determined by the complexity of the smart contract. (*Id.*).

### 3. Cryptocurrency mixers

According to the government, cryptocurrency mixing services, known as "mixers" or "tumblers," are designed to obscure the source or owner of particular cryptocurrency units, thereby allowing users to remain anonymous. (*Id.* at 211). A mixer customer typically directs mixer software to send a certain number of cryptocurrency units to a specific address that is controlled by the mixer, for a fee. (*Id.*). The mixer then takes the sender's cryptocurrency units and pools them together with the cryptocurrency of other users (*i.e.*, "mixes" the cryptocurrency) before delivering the specified number of units to the requested destination. (*Id.*). This renders it difficult to determine the link between a sender and recipient wallet account. (*Id.*).

Mixers are sometimes operated via smart contracts. (*See* A.R. Vol. 2, Dkt. 91-2, at 38). To initiate a transaction, a user sends the cryptocurrency to the mixer and, in return, receives a cryptographic "note," or password, proving that they are the depositor. (*Id.*). The deposited cryptocurrency is then mixed with cryptocurrency units of other users. (*Id.*). At a time of the user's choosing, the user sends the note back to the mixer and withdraws the designated amount to a specified recipient address. (*Id.*). The withdrawal transaction is typically initiated by the withdrawal wallet address alone, to ensure that no connection can be drawn between sender and recipient. (*See id.* at 123). However, because every transaction requires that the account initiating the transaction pay "gas," the withdrawal account must be prefunded with Ether to pay that fee. (*Id.*). Because pre-

23-50669.1496

funding the withdrawal account would allow the source of the pre-existing balance to be traced, transactions are often executed with the aid of service providers called "relayers," who both provide a fee to the mixer and collect a fee from the depositor, in exchange for initiating the withdrawal transaction. (*Id.*). Relayers provide an extra layer of anonymity by eliminating the requirement to pre-fund the recipient account. (*See id.*).

4. Tornado Cash

Plaintiffs describe Tornado Cash as a "decentralized, open-source software project made of the smart contracts on the Ethereum blockchain." (Pls.' Mot., Dkt. 41, at 10 (citing A.R. Vol. 2, Dkt. 91-2, at 8)). According to Plaintiffs, unlike mixing services, Tornado Cash is an autonomous software, and its users rely on smart contracts that are immutable, autonomous, and self-executing. (*Id.* (citing A.R. Vol. 2, Dkt. 91-2, at 8–11).

In contrast, the government describes Tornado Cash as "an organization that runs a cryptocurrency mixing service." (Pls.' Mot., Dkt. 80, at 20 (citing A.R. Vol. 1, Dkt. 91-1, at 34). According to the government, Tornado Cash's organizational structure consists of: (1) several developers who launched the mixing service and created the Tornado Cash DAO, and (2) the DAO, which votes on implementing new features. (*Id.*). The government claims that the DAO is made up of users who hold Tornado Cash's governance token, "TORN," which is also a virtual asset that may be bought and sold. (*Id.* (citing A.R. Vol. 1, Dkt. 91-, at 44–51)).

The parties also differ in their characterization of the smart contracts. It is undisputed that Tornado Cash uses smart contracts to provide a layer of privacy for its users by allowing them to deposit crypto assets in one wallet and then withdraw assets from a different wallet. Plaintiffs claim that as of 2020, the smart contracts are immutable, autonomous software applications with no custodial operator that automatically check the inputs necessary for a valid transaction, allowing withdrawals without human intervention. (Defs.' Mot., Dkt. 41, at 10–11 (citing A.R. Vol. 2, Dkt.

91-2, at 10–14)). However, the government states that these smart contracts are created by Tornado Cash developers and then approved and deployed by the DAO, to provide customers with virtual currency mixing services on multiple blockchains. (A.R. Vol. 1, Dkt. 91-1, at 52). According to the government, although certain smart contracts are designed to be immutable, Tornado Cash periodically develops new smart contracts to update its service, and the older smart contracts become inoperative. (*See id.* at 62 (referencing upgrades to the "pools," which OFAC considers to be a reference to smart contracts); A.R. Vol. 2, Dkt. 91-2, at 28 (showing outdated smart contracts)).

The parties also dispute Tornado Cash's use of relayers. Relayers withdraw funds from the Tornado Cash pool on a user's behalf, to further obscure the source of funds. (A.R. Vol. 1, Dkt. 91-1, at 57). The government argues that Tornado Cash collects fees through relayers, third parties who have agreed to provide an extra layer of anonymity enhancement to avoid the need for users to pre-fund a recipient account. (*Id.* at 56–60 & n.113, 951). Plaintiffs claim that relayers are an optional, privacy-enhancing service, but according to the government, eighty-four percent of Tornado Cash transactions use relayers. (*Id.*, Dkt. 91-1, at 58; *id.* at 58 n.11).

## B. Legal Background

### 1. The International Emergency Economic Powers Act

The International Emergency Economic Powers Act ("IEEPA") authorizes the President to declare national emergencies "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Once a national emergency is declared, IEEPA authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest[,] by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

7

*Id.* § 1702(a)(1)(B). Presidents have historically used this authority to impose economic sanctions on many countries, individuals, and entities, and those who provide support for malicious cyber-enabled activities. *See, e.g.*, Exec. Order No. 12,978, 60 Fed. Reg. 54,579 (Oct. 21, 1995) (blocking assets of persons who "play a significant role in international narcotics trafficking centered in Colombia"); Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005) (blocking assets of persons who have engaged in transactions that have materially contributed to the proliferation of weapons of mass destruction and their supporters).

Pursuant to IEEPA, the President issued Executive Order ("E.O.") 13694 on April 1, 2015. Exec. Order No. 13,694, 80 Fed. Reg. 18,077 (Apr. 2, 2015). The order explained the President's determination that "the increasing prevalence and severity of malicious cyber-enabled activities originating from . . . outside the United States constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.* The President declared a national emergency to counter the articulated threat, blocking the property and interests in property of certain persons determined to be engaging in malicious cyber-enabled activities. *Id.*

On January 3, 2017, the President issued E.O. 13757, which amended E.O. 13694 to further address "the increasing use of [significant malicious cyber-enabled activities] to undermine democratic processes or institutions." Exec. Order No. 13,757, 82 Fed. Reg. 1 (Jan. 3, 2017). The order provides for blocking the property and interests in property of "any person"— i.e., any "individual or entity," 31 C.F.R. § 578.313—that the Secretary of the Treasury determines is "responsible for or complicit in" or has "engaged in, directly or indirectly, cyber-enabled activities originating from, or directed by persons located . . . outside the United States," where such activities (1) "are reasonably likely to result in, or have materially contributed to, a significant threat to the national security" or U.S. "foreign policy[] or economic health," and (2) "have the purpose or effect of . . . causing a significant misappropriation of funds or economic resources, trade secrets, personal

8

identifiers, or financial information for commercial or competitive advantage or private financial gain." E.O. 13,757, § 1. The order also provides for blocking the property and interests in property of "any person" that the Secretary determines to have "materially assisted, sponsored, or provided financial, material, or technological support for" any such cyber-enabled activity. *Id.*

E.O. 13694, as amended by E.O. 13757, further authorizes the Secretary "to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order." E.O. 13,694, § 8. Subsequently, the Secretary delegated to the Director of OFAC the authority to block persons under E.O. 13694, as amended. *See* 31 C.F.R. § 578.802. Pursuant to that delegation, OFAC promulgated regulations to implement E.O. 13694, as amended. *See* 31 C.F.R. pt. 578. OFAC's regulations provide bases and procedures for any blocked person to challenge their designation and establishes procedures for OFAC's consideration of and response to any such challenge. *Id.* § 501.807. These regulations also allow for OFAC to issue general and specific licenses that would authorize transactions otherwise prohibited by the sanctions. *See id.* § 578.404.

2. Executive Order Providing for Sanctions with Respect to North Korea

Pursuant to IEEPA, the President issued E.O. 13722 on March 15, 2016. Exec. Order No. 13722, 81 Fed. Reg. 14,943 (March 18, 2016). The President explained that "the Government of North Korea's continuing pursuit of its nuclear and missile programs . . . increasingly imperils the United States and its allies." *Id.* The President therefore blocked the property and interests in property of the Government of North Korea and the Workers' Party of Korea. *Id.* § 1(a). In addition, the President blocked persons determined "to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of" the Government of North Korea. *Id.* § 2(a)(vii). E.O. 13694 authorizes the Secretary of the Treasury "to take such actions, including the promulgation of rules and regulations, and to employ all powers

granted to the President by IEEPA [and the United Nations Participation Act of 1945] as may be necessary to carry out the purposes of this order." E.O. 13694, § 8. The Secretary later delegated to the Director of OFAC the authority to block persons under E.O. 13722, and OFAC promulgated implementing regulations in response. *See* 31 C.F.R. pt. 510.

### C. OFAC's Designation of Tornado Cash

On August 8, 2022, OFAC designated Tornado Cash pursuant to E.O. 13694, as amended. *See* Press Release, U.S. Dep't of the Treasury, U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash, https://perma.cc/AY3X-Z8JG. The accompanying press release asserted that Tornado Cash "indiscriminately facilitates anonymous transactions by obfuscating their origin, destination, and counterparties, with no attempt to determine their origin." *Id.* OFAC noted that illicit actors often use mixing services like Tornado Cash to launder funds. *Id.* The press release claims that Tornado Cash has laundered hundreds of millions of dollars' worth of virtual currency since its creation in 2019, including hundreds of millions of dollars for the Lazarus Group, a North Korean state-sponsored hacking group. *Id.*

On November 8, 2022, OFAC rescinded its original designation and simultaneously re-designated Tornado Cash pursuant to E.O. 13694, as amended, and E.O. 13722, to include an additional basis for the designation regarding its North Korea (formally known as "Democratic People's Republic of Korea," or "DPRK") activities, and to consider additional information. (*See* A.R. Vol. 1, Dkt. 91-1, at 14–101); *see also* Press Release, U.S. Dep't of the Treasury, Treasury Designates DPRK Weapons Representatives: Tornado Cash Redesignated with Additional DPRK Authorities, New OFAC Guidance, https://perma.cc/TGD5-8MXH. In support of this designation, OFAC determined that Tornado Cash materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, an activity described in section 1(a)(ii) of E.O. 13694, as amended. (A.R. Vol. 1, Dkt. 91-1, at 68–74). OFAC

determined that the online theft of more than $600 million in cryptocurrency constituted a cyber-enabled activity covered by section 1(a)(ii) of E.O. 13694. (*Id.* at 68–72). OFAC determined that the DPRK's malicious cyber-enabled activities threaten the United States and the broader international community and pose a significant threat to the international financial system. (*Id.* at 71). OFAC also observed that the DPRK has increasingly relied on cybercrime to generate revenue for its weapons of mass destruction and ballistic missile programs. (*Id.*). Next, OFAC established that, because the Lazarus Group used the Tornado Cash software to launder illicit proceeds, Tornado Cash provided support to an activity described in section 1(a)(ii) of E.O. 13694, as amended. (*Id.* at 72–74). Specifically, OFAC explained that the main ETH address used by the Lazarus Group to conduct the heist sent 2,001 ETH to another ETH address, which in turn sent 2,000 ETH in batches of 100 ETH to Tornado Cash. (*Id.* at 61–62).

OFAC also designated Tornado Cash for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, the Government of North Korea, pursuant to section 2(a)(vii) of E.O. 13722. (*Id.* at 74–77). OFAC first determined that the Lazarus Group constituted an agency, instrumentality, or controlled entity of the Government of North Korea based on its relationship with the Reconnaissance General Bureau, North Korea's primary intelligence bureau. (*Id.* at 74). Furthermore, as discussed above, Tornado Cash is alleged to have facilitated the laundering of the $600 million proceeds stolen by the Lazarus Group. (*Id.* at 76). OFAC also asserted that Tornado Cash facilitated the laundering of $100 million in proceeds stemming from a separate virtual currency theft allegedly perpetrated by the Lazarus Group.. (*Id.* at 76–77).

### D. Procedural History

Plaintiffs filed their original complaint on September 8, 2022. (Dkt. 1). They amended their complaint on November 22, 2022. (Dkt. 21). They bring claims under the Administrative Procedure

Act ("APA"), the First Amendment's Free Speech Clause, and the Fifth Amendment's Due Process Clause. (*Id.* at 23–26).

The parties filed competing motions for summary judgment. (Pls.' Mot., Dkt. 41; Defs. Mot., Dkt. 80). In their motion, Plaintiffs argue that OFAC's designation of Tornado Cash exceeds the Department's statutory authority over foreign nationals' interests in property and violates the Free Speech Clause. Specifically, Plaintiffs argue that: (1) Tornado Cash is neither a foreign "national" or "person" under IEEPA nor a "person" under the North Korea Act; (2) the smart-contracts components of the designation are not "property" that can be regulated under either of the acts; and (3) Tornado Cash cannot have a property interest in those components. (Pls.' Mot., Dkt. 41, at 17–27). Plaintiffs further argue that the Department's actions violate their rights of free speech. (*Id.* at 27–29). The government, on the other hand, argues that Tornado Cash is an entity that may be designated and that it has a property interest in the smart contracts. (Defs.' Mot., Dkt. 18–35). The government also argues that the designation does not restrict Plaintiffs' protected speech, and that, in any case, any such restriction would be lawful under the applicable constitutional standard. (*Id.* at 36–40).

## II. LEGAL STANDARD

"Summary judgment is [the] appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, even though the Court does not employ the standard of review set forth in the rule governing summary judgment motions." *Larson v. Geren*, No. SA-08-CA-722-FB, 2010 WL 11542078, at *4 (W.D. Tex. Apr. 14, 2010) (internal quotation marks omitted), *aff'd*, 432 F. App'x 356 (5th Cir. 2011). When judicial review is sought under 5 U.S.C. § 706, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

The APA directs that a "court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. In APA cases, "[e]vidence cannot be submitted in the reviewing court and the parties are bound by the evidence in the administrative record." *Redmond v. United States*, 507 F.2d 1007, 1011 (5th Cir. 1975). As relevant here, an agency action may not be set aside unless it is "arbitrary" and "capricious," "not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706; *see also Holy Land Found. for Relief & Dev. v. Ashcroft* ("*Holy Land II*"), 333 F.3d 156, 162 (D.C. Cir. 2003) (applying these standards to an OFAC designation). In such cases, "a reviewing court is bound by the findings of the administrative agency if those findings are supported by substantial evidence on the administrative record as a whole." *Redmond*, 507 F.2d at 1011. "The agency's decision does not have to be ideal so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Wright v. United States*, 164 F.3d 267, 268–69 (5th Cir. 1999) (per curiam).

## III. DISCUSSION

### A. APA Claims

#### 1. <u>Tornado Cash is an Entity that May Be Designated</u>

Under IEEPA, the President may direct the Department to take action "with respect to or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B). Similarly, under the North Korea Act, the Department may take action with respect to the "property and interest in property" of "any person" who knowingly engages in certain enumerated conduct. 22 U.S.C. § 9214(c). Pursuant to these statutes, the President issued two executive orders that authorize the designation of "any person" determined to meet the criteria set forth by the terms of those orders. *See* E.O. 13,722, § 2(a)(vii); E.O. 13,757, § 1(a)(ii), (iii)(B).

13

Plaintiffs argue that OFAC's designation of Tornado Cash exceeds these statutory powers because Tornado Cash is not a foreign "national" or "person." In matters of national security, "'an agency's application of its own regulations, receives an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation.'" *Paradissiotis v. Rubin*, 171 F.3d 983, 987 (5th Cir. 1999) (citing *Consarc Corp. v. United States Treasury Dept., Office of Foreign Assets Control,* 71 F.3d 909, 914 (D.C.Cir.1995)). The Department has defined "person" to mean an "individual or entity." 31 C.F.R. §§ 510.322, 578.313. In turn, its definition of "entity" encompasses "a partnership, association, trust, joint venture, corporation, subgroup, or other organization."[1] 31 C.F.R. §§ 510.305, 578.305. Plaintiffs contend that Tornado Cash does not fit within this definition because, to the extent that Tornado Cash has any organizational structure, its structure does not even satisfy the definition of unincorporated association. (Pls.' Mot., Dkt. 41, at 19).

The Court finds that Tornado Cash is an entity that may be properly designated as a person under IEEPA. Where regulatory terms are "neither unusual, scientific, nor words of art," the Court applies their ordinary meaning. *Whirlwind Mfg. Co. v. United States*, 344 F.2d 153, 156 (5th Cir. 1965); *see Shah v. Azar*, 920 F.3d 987, 994 n.22 (5th Cir. 2019) ("[W]e should assume that the ordinary meaning of the regulation's language expresses its purpose and enforce it according to its terms." (internal quotation marks omitted)). The term "association" is neither unusual nor a term of art, and its ordinary meaning is "[a] body of persons who have combined to execute common purpose or

---

[1] Amici curiae the Blockchain Association and DeFi Education Fund ask the Court to substitute this definition with Merriam-Webster's definition of "entity," which requires a "separate and distinct existence" from its members. (Amici Br., Dkt. 49, at 18). As OFAC has defined "entity" in its regulation, the Court declines to adopt the Amici's definition. *See, e.g.*, *Streber v. Hunter*, 221 F.3d 701, 722 (5th Cir. 2000) (rejecting dictionary definition for "a term of art defined by the tax code").

14

advance a common cause." *Association*, 2, Oxford English Dictionary Online (3d ed. 2022), https://www.oed.com/view/Entry/11981.

The record shows that Tornado Cash is an association within this ordinary definition. The entity is composed of its founders, its developers, and its DAO. (A.R. Vol. 1, Dkt. 91-1). The founders and developers "'mostly do[] research and publish[] the code to GitHub.'" (*Id.* at 40 (citing Tornado Cash co-founder Roman Semenov)). The DAO, on the other hand, is responsible for governing the platform, which includes "'[a]ll deployments, protocol changes, and important decisions.'" (*Id.*; *see also id.* at 40–41 (describing Tornado Cash's governance as "controlled, and governed by its DAO.")). Utilizing this structure, Tornado Cash has been able to place job advertisements, maintain a fund to compensate key contributors, and adopt a compensation structure for relayers, among other things. (*See id.* at 41–43). Substantial evidence supports the argument that founders, developers, and DAO constitute "[a] body of persons who have combined to execute [the] common purpose" of developing, promoting, and governing Tornado Cash.

Plaintiffs disagree with this definition on three main grounds. First, Plaintiffs argue that Tornado Cash is not an entity but an autonomous software. However, as the Court notes above, OFAC identified both the software known as Tornado Cash and an entity formed by certain individuals. The record sufficiently supports OFAC's determination that the founders, the developers, and the Tornado Cash DAO have acted jointly to promote and govern Tornado Cash and to profit from these activities.

Second, Plaintiffs argue that there is no evidence that the individual members of the DAO "have manifested any agreement to a common purpose." (Pls.' Mot., Dkt. 41, at 19–20). Specifically, Plaintiffs note that the Tornado Cash DAO is composed of anyone who owns a TORN token, regardless of how it was acquired or whether the owners ever intended to vote or otherwise actively participate in the governance structure. (*Id.*). This argument fails because the DAO is an entity unto

itself that, through its voting members, has demonstrated an agreement to a common purpose. As the government notes, the structure is not unlike that of stockholders of a corporation who may not intend to vote in a shareholder meeting, without this affecting the structure of the entity. (Defs.' Mot., Dkt. 80, at 32). Furthermore, an express agreement is not necessary. Plaintiffs import the "manifesting agreement" requirement from other, unrelated areas of law. (*See id.* at 19 (citing cases applying RICO, evaluating contract liability, and Fifth Amendment protections, respectively)). Based on the plain meaning of "association," OFAC need only show: (1) that Tornado Cash consists of a body of individuals, and (2) that this body furthers a common purpose. OFAC has done so.

Finally, Plaintiffs argue that Tornado Cash cannot be an association because the designation explicitly "excluded" "Tornado Cash's individual founders, developers, members of the DAO, or users, or other persons involved in supporting Tornado Cash," but this overstates the purpose of the designation. (Defs.' Mot., Dkt. 20–21). OFAC may designate entities without concurrently designating their individual owners or officers (and vice versa), as it has routinely done so in the past. (*See* Pls.' Mot., Dkt. 80, at 35 n.10 (collecting examples)). Doing so does not undermine the designation.

In summary, the Cout finds that Tornado Cash is an association within the ordinary meaning of the term and is therefore an entity that may be designated per OFAC regulations.

### 2. Tornado Cash Has a Property Interest in the Smart Contracts

Next, Plaintiffs argue that, even if Tornado Cash is a properly designated entity, it does not have a property interest in the smart contacts that have been blocked. Plaintiffs ask the Court to adopt the ordinary meaning of "interest in property": a "legal or equitable claim to or right in property." (Pls.' Mot., Dkt. 41, at 24); *Interest*, BLACK'S LAW DICTIONARY (11th ed. online 2019). However, ordinary meanings should not replace terms of art that have been defined by regulation. *See, e.g.*, *Streber v. Hunter*, 221 F.3d 701, 722 (5th Cir. 2000) (rejecting dictionary definition for "a term

23-50669.1507

of art defined by the tax code"). Here, OFAC has already defined the terms "property" and "interest in property" within its implementing regulations, giving them a broad reach that has been upheld by other courts, as the Court will discuss below. 31 C.F.R. §§ 510.323, 578.314.

Plaintiffs urge the Court to reject broad definition, claiming that OFAC is not entitled to deference when defining unambiguous statutory terms. But "interest in property" is hardly an unambiguous term. For example, the Supreme Court has already interpreted the word "interest" to encompass interests that are not legally enforceable. *Regan v. Wald*, 468 U.S. 222, 224, 225–26, 233–34 (1984). Therefore, the Court will reject Plaintiffs' definition and evaluate whether Tornado Cash has a property interest in the smart contracts based on OFAC's regulatory definitions.

*a. The Smart Contracts are Property Within the Meaning of the Statute*

Plaintiffs contend that the smart contracts are not property because they are incapable of being owned, and that, even if they were, Tornado Cash does not have a "legal or equitable claim or right in property" to them. But OFAC's regulations define "property" and "interest in property" as follows:

> The terms property and property interest include money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes, guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens or other rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any other evidences of title, ownership, or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder, powers of attorney, goods, wares, merchandise, chattels, stocks on hand, ships, goods on ships, real estate mortgages, deeds of trust, vendors' sales agreements, land contracts, leaseholds, ground rents, real estate and any other interest therein, options, negotiable instruments, trade acceptances, royalties, book accounts, accounts payable, judgments, patents, trademarks or copyrights, insurance policies, safe deposit boxes and their contents, annuities, pooling agreements, services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent.

31 C.F.R. §§ 510.323, 578.314.

23-50669.1508

The Court finds that OFAC's determination that the smart contracts constitute property, or an interest in property, is not plainly inconsistent with the regulatory definition of those terms. Plaintiffs argue that the smart contracts cannot be considered property because they are immutable and therefore cannot be owned. However, OFAC's definition of property encompasses "contracts of any nature whatsoever," and—as other courts have recognized—smart contracts are merely a code-enabled species of unilateral contracts. *See, e.g.*, *Rensel v. Centra Tech, Inc.*, No. 17024500-CIV, 2018 WL 4410110, AT *10 (S.D. Fla. June 14, 2018) ("Smart contracts are self-executing contracts with the terms of the agreement between buyer and seller being directly written into lines of code"). *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 330 (S.D.N.Y. 2021) ("A smart contract allows the parties to define the terms of their contract and submit the crypto-assets contemplated in the contract to a secure destination," and may also "function[] as an automated, secure digital escrow account."); *Williams v. Block one*, No. 20-CV-2809, 2022 WL 5294189, at *2 n.19 (S.D.N.Y. Aug. 15, 2022) (citing plaintiff's explanation that smart contracts "are programs that verify and enforce the negotiation or performance of binary contracts"); *Snyder v. STX Techs.*, Ltd., No. 19-6132, 2020 WL 5106721, at *2 (W.D. Wash. Aug. 31, 2020) (breach of contract action for violation of a smart contract term). Even if not every smart contract can be considered a contract, the record shows that Tornado Cash promoted and advertised the contracts and its abilities and published the code with the intention of people using it—hallmarks of a unilateral offer to provide services. (*See, e.g.*, A.R. Vol. 1, Dkt. 91-1, at 62–63 (discussing blog post's advertising Tornado Cash's features and services)).

In fact, Plaintiffs acknowledge that smart contracts are "like a vending machine" because "the smart contract automatically carries out a particular, predetermined task without additional human intervention." (*Id.* at 10). This reinforces the Court's point. Vending machines are examples of unilateral contracts. And like vending machines, a smart contract is a tool that carries out a

particular, predetermined task. The fact that smart contracts do so without additional human intervention, like a vending machine, or that they are immutable, does not affect its status as type of contract and, thus, a type of property within the meaning of the regulation.

### b. Tornado Cash Has a Property Interest in the Smart Contracts

Plaintiffs further argue that Tornado Cash does not have a property interest in the smart contracts. Plaintiffs urge the Court to instead adopt the "ordinary meaning" of "interest," which would restrict the definition to a "legal or equitable claim or right in property." *Interest*, BLACK'S LAW DICTIONARY (11th ed. online 2019). But OFAC's definition of "interest" is expansive. 31 C.F.R. §§ 510.323, 578.314. The regulations define the word "interest" as "an interest of any nature whatsoever, direct or indirect." *Id.* The phrase "any interest" should be construed broadly, and it includes even interests that are not legally enforceable. *Regan*, 468 U.S. at 224, 225–26, 233–34 (recognizing that the phrase "any interest" should be construed broadly); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 67 (D.D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003) ("IEEPA does not limit the President's blocking authority to the existence of a legally enforceable interest."). The beneficial interest Tornado Cash derives from the smart contracts falls within this definition.

Tornado Cash has a beneficial interest in the deployed smart contracts because they provide Tornado Cash with a means to control and use crypto assets. The smart contracts generate fees in the form of TORN tokens for the DAO when users execute a relayer-facilitated transaction. Plaintiffs disagree on several grounds. First, they insist that the use of a relayer is entirely optional, but the record shows that almost eighty-four percent of Tornado Cash transactions use these relayer services. (A.R. Vol. 1, Dkt. 91-1, at 58; *id.* at 58 n.11).

Next, Plaintiffs argue that Tornado Cash may have an interest in the TORN tokens but not in the smart contracts themselves, because Tornado Cash does not have a "right or expectancy" in

19

the smart contracts. (Defs.' Reply, Dkt. 17). Plaintiffs' claim that a possibility of future indirect profits is too remote because it depends on a "cascading economic causation" theory that could, theoretically, increase the value of TORN. (*Id.* at 17–18). However, the benefits to Tornado Cash are not hypothetical or remote. Tornado Cash receives a regular stream of revenue from the smart contracts in the form of TORN tokens transferred to the DAO for relayer-enabled transactions, which, as the Court noted above, encompass the vast majority of the transactions. (A.R. Vo. 1, Dkt. 91-1, at 33, 40, 57, 63). The D.C. Circuit has construed the IEEPA to encompass this kind of economic potential. In *Holy Land Foundation for Relief & Development v. Ashcroft*, the D.C. Circuit concluded that Hamas had a beneficial interest in Holy Land's property because the purported charity acted as a fundraiser for the terrorist organization—that is, because Hamas would profit in the future from the fundraising proceeds. 333 F.3d 156, 162–63 (D.C. Cir. 2003); *see also id.* (("The language ['any interest' in IEEPA] therefore imposes no limit on the scope of the interest, and OFAC has defined this statutory term, pursuant to explicit authorization from Congress, 50 U.S.C. § 1704, to mean, 'an interest of any nature whatsoever, direct or indirect.'"). *Holy Land* confirms that, within the expansive regulatory meaning, Tornado Cash has a beneficial interest based on its expectation that the smart contracts it deployed will continue to generate this revenue.

Defendants also cite *Centrifugal Casting Mach. Co., Inc. v. American Bank & Trust Co.* for the proposition that interest must be a "legal or equitable claim to or right in property." 966 F.2d 1348, 1353 (10th Cir. 1992) (concluding that Iraq did not have a property interest in the proceeds of a contract). However, the Court's analysis is not inconsistent with *Centrifugal Casting*. In that case, the government argued that Iraq had a property interest in the money plaintiff received under a letter of credit "because it was allegedly a contract payment made by Iraq" and plaintiff had allegedly breached the contract. *Id.* However, as the Tenth Circuit noted, Iraq was an account party to the letter of credit, and it had not even made an actual breach of contract claim against plaintiff. *Id.* The

20

23-50669.1511

government was essentially claiming breach on their behalf, but such an interest was not only too remote but antithetical to the nature of a letter of credit, in light of Iraq's status as an account party. *Id.* Here, in contrast, the stream of revenue Tornado Cash received, which was directly claimed by the Tornado Cash DAO, is a much more direct interest. Furthermore, while Iraq could have only claimed an interest by ignoring the basic structure of the financing device, Tornado Cash designed the compensation structure to generate this revenue for the DAO.

Plaintiffs' other proffered analogies are similarly unpersuasive. For example, Plaintiffs argue that the Tornado Cash DAO is like a power company, which may "profit from hot summer weather that causes increased use of air conditioning," but which could not claim to have a property interest in the weather. (Pls.' Mot., Dkt. 41, at 25–26). This analogy is misleading. Such a company may not have a property interest in the weather, but it would undoubtedly own interests in the physical infrastructure and equipment, and even more abstract rights, such as transmission rights, that allow it to produce and transmit energy. Likewise, Tornado Cash may not own the crypto-economy, but, within the meaning of the statute, it has a property interest in smart contracts, which are simultaneously contracts and tools that allow it to provide privacy to its users.

Finally, Plaintiffs argue that OFAC's definition is too expansive because "[i]f abstract and ownerless software code can be designated, it is hard to see why other intangible concepts could not be forbidden as well." (Pls.' Mot., Dkt. 41, at 23). This argument is circular, as it relies on the assumption that the smart contracts are indeed "abstract and ownerless," which the record does not support. Furthermore, unlike abstract ideas, deployed smart contracts convey an ongoing benefit for Tornado Cash, in the form of fees transmitted to the DAO. Tornado Cash has a property interest in this ongoing benefit.

In summary, the Court finds that OFAC's designation of Tornado Cash does not exceed its statutory powers and is not plainly inconsistent with its regulations. Tornado Cash is an entity that

may be designated by OFAC and it has a property interest in the smart contracts it has deployed. Accordingly, the Court will grant summary judgment for the government on this issue.

### B. First Amendment Claims

Plaintiffs also raise a First Amendment claim and argue that Tornado Cash's designation fails constitutional scrutiny because it is overbroad and not narrowly tailored. The Court will grant summary judgment to the government and dismiss these claims. Plaintiffs have not shown that the government's action in any way implicates the First Amendment.

Plaintiffs argue that the government is prohibiting some of them from engaging in socially valuable speech because they, if not for the designation, they would use the Tornado Cash software to make donations to important political and social causes. (Pls.' Mot., Dkt. 41, at 28–29). Indeed, the First Amendment protects the right of individuals to donate money to social causes of their choosing. *See, e.g.*, *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) ("The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute."); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). However, it does not protect the right to do so through any particular bank or service of their choosing, and Plaintiffs do not cite any case to the contrary.

In fact, Plaintiffs' evidence does not sufficiently support their arguments. Plaintiffs claim that "[w]ithout the privacy afforded by Tornado Cash, users such as [Plaintiff] Almeida are hindered in expressing their views" of the Ukranian conflict. (Pls.' Mot., Dkt. 41, at 29 (*citing See Citizens United v. Federal Election Commission*, 558 U.S. 310, 351 (2010)). But Mr. Almeida's affidavit does not describe such a hindrance, nor does it state that he has stopped donating to his preferred causes, that he would be unable to donate through other services, or that his speech has otherwise been chilled. Furthermore, Plaintiffs do not explain how the designation prevents them from using other services that may allow them privacy for their transactions.

23-50669.1513

Instead, Plaintiffs insist that the government may not interfere with their "liberty of expression . . . on the plea that it may be exercised in some other place," simply because Plaintiffs "have alternate forums' available to them." (Pls.' Reply, Dkt. 88, at 17–18 (citing *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939); *Chicago Area Military Project v. City of Chicago*, 508 F.2d 921, 926 (7th Cir. 1975); *see also Hobbs v. Hawkins*, 968 F.2d 471, 481 (5th Cir. 1992)) (cleaned up). While true, this principle applies primarily to public spaces. *Schneider*, 308 U.S. at 148, 151. Tornado Cash, however, is not a public place or public forum; the cases Plaintiffs cite are inapposite.

Plaintiffs also claim that the designation chilled "the right to publish . . . source code," which other circuits have held is protected speech. (Pls.' Mot., Dkt. 41, at 29 (citing A.R. Vo. 2, Dkt. 91-2, at 130); *see also id.* (citing *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 447 (2d Cir. 2001); *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000). Similarly, amicus curiae Electronic Frontier Foundation argues that OFAC's designation has had a chilling effect on certain code developers. (Amicus Br., Dkt. 82, at 13–14). However, OFAC's designation blocks only transactions in property in which Tornado Cash holds an interest, such as the smart contracts. It does not restrict interaction with the open-source code unless these interactions amount to a transaction. Plaintiffs claim that using the code is impossible, since its sole function is to perform transactions. (Pls.' Reply, Dkt. 87, at 22). Plaintiffs' characterization is misleading. Developers may, for example, lawfully analyze the code and use it to teach cryptocurrency concepts. They simply cannot execute it and use it to conduct cryptocurrency transactions. Finally, to the extent that the designation could serve to create a chilling effect, Plaintiffs have not claimed, let alone sufficiently demonstrated, that any Plaintiff in this suit has felt inhibited to use the open-source code. Accordingly, the Court will grant summary judgment for Defendants on this claim.

23-50669.1514

## C. Takings Claims

Plaintiffs Almeida, Van Loon, and Welch also allege that they are unable to access Ether that belongs to them because it is trapped in a Tornado Cash smart-contract pool. Accordingly, they raise Fifth Amendment Takings claims, claiming that they did not receive any process prior to the deprivation. (Compl., Dkt. 21, at 26). However, Plaintiffs did not move for summary judgment on this ground. (Pls.' Mot. Summ. J., Dkt. 41, at 8, 30). The government moved for summary judgment on all counts. (Defs.' Mot. Summ. J., Dkt. 80, at 25–26, 52).

"The Fifth Circuit has found when a plaintiff fails to pursue a claim or defense beyond the party's initial complaint, the claim is deemed abandoned." *Weaver v. Basic Energy Servs., L.P.*, No. MO-13-CV-022, 2014 WL 12513180, at *2 (W.D. Tex. Jan. 8, 2014), *aff'd*, 578 F. App'x 449 (5th Cir. 2014); *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned retaliatory abandonment claim when she failed to defend claim in response to motion to dismiss). The parties agreed to resolve the claims through the administrative record and cross-motions to dismiss. (Joint Mot. Entry Sched. Order, Dkt. 23). However, Plaintiffs did not pursue their Fifth Amendment claim, even after the government raised the issue of waiver in its cross motion. (Defs.' Mot. Summ. J., Dkt. 80, at 25–26). Because Plaintiffs failed to pursue their Fifth Amendment claim, they have waived it. Accordingly, the Court will grant the government's motion for summary judgment as to this claim.

## IV. CONCLUSION

For these reasons, the Court **ORDERS** as follows. **IT IS ORDERED** that Plaintiffs Joseph Van Loon, Tyler Almeida, Alexander Fisher, Preston Van Loon, Kevin Vitale, and Nate Welch's Motion for Partial Summary Judgment, (Dkt. 41), is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants Department of Treasury, Office of Foreign Assets Control, Janet Yellen, and Andrea M. Gacki's Motion for Summary Judgment, (Dkt. 80), is

**GRANTED**. The government is entitled to summary judgment as to all of Plaintiffs' claims against it.

      **IT IS FURTHER ORDERED** that Plaintiffs' Motion for Oral Argument, (Dkt. 89), is **DENIED**.

      The Court will enter Final Judgment in a separate order.

      **SIGNED** on August 17, 2023.

 

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

23-50669.1516

# TAB 4



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

OFFICE OF FOREIGN ASSETS CONTROL

Case ID CYBER2-28475

<u>DESIGNATION AND BLOCKING MEMORANDUM</u>

The Office of Foreign Assets Control, pursuant to Executive Order 13694 of April 1, 2015, "Blocking the Property of Certain Persons Engaging in Significant Malicious Cyber-Enabled Activities," as amended by Executive Order 13757 of December 28, 2016, "Taking Additional Steps to Address the National Emergency With Respect to Significant Malicious Cyber-Enabled Activities" (E.O. 13694, as amended), Executive Order 13722 of March 15, 2016, "Blocking Property of the Government of North Korea and the Workers' Party of Korea, and Prohibiting Certain Transactions with Respect to North Korea" (E.O. 13722), section 203 of the International Emergency Economic Powers Act (50 U.S.C. § 1702) (IEEPA), the National Emergencies Act (50 U.S.C. § 1601 et seq.), section 301 of title 3, United States Code, section 578.802 of the Cyber-Related Sanctions Regulations, 31 C.F.R. part 578, and section 510.802 of the North Korea Sanctions Regulations, 31 C.F.R. part 510, determines, after consultation with the Attorney General and the Secretary of State, that there is reason to believe the entity identified below and in the attached evidentiary memorandum meets one or more criteria for designation set forth in E.O. 13694, as amended, and E.O. 13722, and, therefore, is designated as a Specially Designated National or Blocked Person.

Entity

**TORNADO CASH** is an entity—that is, a "partnership, association, trust, joint venture, corporation, group, subgroup, or other organization"—that may be designated pursuant to IEEPA. **TORNADO CASH** is an entity with an organizational structure that consists of: (1) its founders – Alexey Pertsev, Roman Semenov, and Roman Storm – and other associated developers, who together launched the Tornado Cash mixing service, developed new Tornado Cash mixing service features, created the Tornado Cash Decentralized Autonomous Organization (DAO), and actively promote the platform's popularity in an attempt to increase its user base; and (2) the Tornado Cash DAO, which is responsible for voting on and implementing those new features created by the developers. **TORNADO CASH** is identified with the following identifiers listed below:

1.    TORNADO CASH; Website tornado.cash; Digital Currency Address - ETH 0x12D66f87A04A9E220743712cE6d9bB1B5616B8Fc; alt. Digital Currency Address - ETH 0x47CE0C6eD5B0Ce3d3A51fdb1C52DC66a7c3c2936; alt. Digital Currency Address - ETH 0x910Cbd523D972eb0a6f4cAe4618aD62622b39DbF; alt. Digital Currency Address - ETH 0xA160cdAB225685dA1d56aa342Ad8841c3b53f291; alt. Digital Currency Address - ETH 0xD4B88Df4D29F5CedD6857912842cff3b20C8Cfa3; alt. Digital Currency Address - ETH 0xFD8610d20aA15b7B2E3Be39B396a1bC3516c7144; alt. Digital

23-50669.902

# U.S. DEPARTMENT OF THE TREASURY

## Treasury Designates DPRK Weapons Representatives

November 8, 2022

*Tornado Cash Redesignated with Additional DPRK Authorities, New OFAC Guidance*

WASHINGTON – Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) is designating two individuals for engaging in transportation and procurement activities on behalf of the Democratic People's Republic of Korea (DPRK). These individuals have acted on behalf of Air Koryo, an entity previously designated by OFAC for operating in the transportation industry in the DPRK economy. OFAC also delisted and simultaneously redesignated Tornado Cash under Executive Order (E.O.) 13722 and E.O. 13694, as amended. The redesignation takes into account additional information and also includes an additional basis for the designation of Tornado Cash regarding its support for DPRK activities. Tornado Cash, an entity that provides virtual currency mixing services, obfuscated the movement of over $455 million stolen in March 2022 by the OFAC-designated, DPRK-controlled Lazarus Group in the largest known virtual currency heist to date. OFAC also issued a new Frequently Asked Question (FAQ) to provide additional compliance guidance regarding the nature of the Tornado Cash entity, and updated three existing FAQs with additional guidance.

This action is part of the United States' ongoing efforts to limit the DPRK's ability to advance its unlawful weapons of mass destruction (WMD) and ballistic missile programs that threaten regional stability and follows numerous recent DPRK ballistic missile launches, which are in clear violation of multiple United Nations (UN) Security Council resolutions. Continued provocation by the DPRK exemplifies the threat its unlawful weapons and missile programs pose to its neighbors, the region, international peace and security, and the global non-proliferation regime.

"Today's sanctions action targets two key nodes of the DPRK's weapons programs: its increasing reliance on illicit activities, including cybercrime, to generate revenue, and its ability to procure and transport goods in support of weapons of mass destruction and ballistic missile programs," said Under Secretary of the Treasury for Terrorism and Financial Intelligence Brian E. Nelson.

# INDIVIDUALS FACILITATING THE DPRK'S BALLISTIC MISSILE AND WEAPONS PROGRAMS

Air Koryo is the DPRK's national flag carrier and reportedly continues to own and operate all civilian aircraft registered in the DPRK. Air Koryo previously transported parts used in Scud-B missile systems, which fall under a UN prohibition on exporting arms and related materiel to the DPRK. According to a UN report, Air Koryo is controlled by and integrated into the DPRK military and the airline's assets are actively utilized for military purposes.

**Ri Sok**, an Air Koryo representative in Dandong, China, was involved in the transportation of electronic parts from China to the DPRK on behalf of the DPRK's Ministry of Rocket Industry (MORI). OFAC designated MORI on April 1, 2022 for being owned or controlled by the Munitions Industry Department (MID), an entity designated on August 30, 2010 pursuant to E.O. 13382 for its involvement with or provision of support for the DPRK's WMD and ballistic missile programs. The MID, which oversees the DPRK's ballistic missile development and nuclear weapons program, was designated by the UN on March 2, 2016.

**Yan Zhiyong** is a logistics manager with Air Koryo and facilitates the transportation of goods to the DPRK. Specifically, Yan Zhiyong transported goods from China to the DPRK on behalf of the Reconnaissance General Bureau (RGB), the DPRK's principal intelligence agency. The RGB, which is also involved in the DPRK's arms trade, was designated on January 2, 2015 pursuant to E.O. 13687 for being a controlled entity of the Government of the DPRK. The RGB was designated by the UN on March 2, 2016. Yan Zhiyong was the primary point of contact and intermediary for shipments destined for the DPRK and has used a Beijing-based company to transport goods into the DPRK.

Ri Sok and Yan Zhiyong are designated pursuant to E.O. 13722 for acting or purporting to act for or on behalf of, directly or indirectly, Air Koryo, a person whose property and interests in property are blocked pursuant to E.O. 13722 and who has ties to the DPRK's military activities.

# REDESIGNATING TORNADO CASH

In addition to the Air Koryo representatives, OFAC simultaneously delisted and redesignated **Tornado Cash** under E.O. 13722 and E.O. 13694, as amended, for its role in enabling malicious cyber activities, which ultimately support the DPRK's WMD program. Effective immediately, the August 8, 2022 designation of Tornado Cash is no longer operative, and it is wholly replaced by today's action.

CYBER2-29777 - 00010

23-50669.911

Tornado Cash is an entity that provides virtual currency mixing services through smart contracts that primarily operate on the Ethereum blockchain. The Tornado Cash smart contracts are a form of computer code that Tornado Cash uses to implement its governance structure, provide mixing services, offer financial incentives for users, increase its user base, and facilitate the financial gain of its users and developers. These smart contracts have been used by actors to obfuscate the source of funds derived from cyber heists, including funds stolen by Lazarus Group in March 2022.  Malicious cyber actors subsequently used the Tornado Cash smart contracts to launder more than $96 million of funds derived from the June 24, 2022 Harmony Bridge Heist, and at least $7.8 million from the August 2, 2022 Nomad Heist.

Lazarus Group used the Tornado Cash smart contracts to obfuscate the source of funds derived from the March 2022 cyber heist. Lazarus Group was designated on September 13, 2019 pursuant to E.O. 13722 for being an agency, instrumentality, or controlled entity of the RGB, which has been identified as part of the Government of the DPRK. Today, OFAC is sanctioning Tornado Cash pursuant to E.O. 13722 for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, the Government of the DPRK, a person whose property and interests in property are blocked pursuant to E.O. 13722.

OFAC is also redesignating Tornado Cash pursuant to E.O. 13694, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a cyber-enabled activity originating from, or directed by persons located, in whole or in substantial part, outside the United States that is reasonably likely to result in, or has materially contributed to, a significant threat to the national security, foreign policy, or economic health or financial stability of the United States and that has the purpose or effect of causing a significant misappropriation of funds or economic resources, trade secrets, personal identifiers, or financial information for commercial or competitive advantage or private financial gain. Specifically, the smart contracts through which Tornado Cash operates were used to obfuscate the source and destination of funds derived from Lazarus Group's March 2022 cyber heist.

## SANCTIONS IMPLICATIONS

As a result of today's action, all property and interests in property of the individuals and entity designated today that are in the United States or in the possession or control of U.S. persons must be blocked and reported to OFAC. OFAC's regulations generally prohibit all dealings by

U.S. persons or within the United States (including transactions transiting the United States) that involve any property or interests in property of blocked or designated persons.

In addition, persons that engage in certain transactions with the individuals or entities designated today may themselves be exposed to designation. Furthermore, any foreign financial institution that knowingly facilitates a significant transaction or provides significant financial services for any of the individuals or entities designated today could be subject to U.S. correspondent or payable-through account sanctions.

The power and integrity of OFAC sanctions derive not only from its ability to designate and add persons to the Specially Designated Nationals and Blocked Persons (SDN) List but also from its willingness to remove persons from the SDN List consistent with the law. The ultimate goal of sanctions is not to punish but to bring about a positive change in behavior. For information concerning the process for seeking removal from an OFAC list, including the SDN List, please refer to OFAC's Frequently Asked Question 897. For detailed information on the process to submit a request for removal from an OFAC sanctions list, please refer to OFAC's website.

For additional information and guidance regarding sanctions implications specific to Tornado Cash, please reference OFAC's FAQs 1076–1079 and FAQ 1095.

For information on complying with virtual currency-related sanctions, please see OFAC's Sanctions Compliance Guidance for the Virtual Currency Industry here    and OFAC's FAQs on virtual currency here.

For more information on the individuals and entity designated today, click here.

CYBER2-29777 - 00012

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

OFFICE OF FOREIGN ASSETS CONTROL

CYBER2–28475

## EVIDENTIARY MEMORANDUM

MEMORANDUM FOR:    Andrea M. Gacki
                   Director
                   Office of Foreign Assets Control

THROUGH:           Ripley Quinby
                   Deputy Associate Director
                   Office of Global Targeting

                   ▉▉▉▉▉▉▉▉▉▉▉▉
                   Assistant Director
                   Russia, Europe, and Cyber Division

FROM:              ▉▉▉▉▉▉▉▉▉▉▉▉
                   Acting Section Chief
                   Cyber and Virtual Assets Section

                   ▉▉▉▉▉▉▉▉▉▉▉▉
                   Sanctions Investigator
                   Cyber and Virtual Assets Section

                   ▉▉▉▉▉▉▉▉▉▉▉▉
                   Sanctions Investigator
                   Russia and Europe Section

SUBJECT:           (U//FOUO) **TORNADO CASH**:  Designation Pursuant to
                   Executive Order 13694 of April 1, 2015, as amended by
                   Executive Order 13757 of December 28, 2016; and Executive
                   Order 13722 of March 15, 2016

I.   (U) **INTRODUCTION** ..................................................................................................2
II.  (U) **EXECUTIVE SUMMARY** .......................................................................................4
III. (U) **IDENTIFYING INFORMATION** ...........................................................................6
IV.  (U) **BACKGROUND** ........................................................................................................9
     A) (U) *Virtual Currencies* .............................................................................................9
        1) (U) **Key Concepts** ..............................................................................................9
           (a) (U) *Blockchains and Tokens* ........................................................................9
           (b) (U) *Smart Contracts* .....................................................................................11
           (c) (U) *Governance* ............................................................................................12

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

(d) (U) *Illicit Finance Risks* ...............................................................11
2) (U) **Ethereum and Similar Blockchains** ..................................11
   (a) (U) *How Ethereum Works* ...........................................................16
   (b) (U) *ERC-20 Tokens* ......................................................................16
3) (U) **Cryptocurrency Mixing Services** .......................................16
   (a) (U) *Illicit Uses* ................................................................................17
B) (U) *TORNADO CASH* ..........................................................................20
1) (U) **Founders and Developers** .......................................................21
2) (U) **Decentralized Autonomous Organization (DAO)** ..............25
3) (U) **Smart Contracts Associated with TORNADO CASH** ..........31
4) (U) **Trusted Setup Ceremony** ......................................................40
C) (U) *The Tornado Cash Mixing Service* ............................................40
1) (U) **How It Works** ..........................................................................41
2) (U) **How the Tornado Cash Smart Contracts Enable Mixing** .....41
3) (U) **Anonymity Mining** .................................................................44
4) (U) **The Relayer Network** ............................................................44
   (a) (U) *How Relayers Work* ..............................................................45
D) (U) *TORNADO CASH's Property and Interests in Property* ...........48
1) (U) **TORNADO CASH's Interest in the Tornado Cash Smart Contracts** ............48
2) (U) **TORNADO CASH's Interest in the TORN Smart Contract** .........50
3) (U) **TORNADO CASH's Interest in Pool and Relayer Smart Contracts** ...........51
E) (U) *Foreign Person Property Interest Nexus* ...................................52
1) (U) **Interest of North Korea** ..........................................................52
2) (U) **Foreign Person Founders and Developers** .........................54
3) (U) **Foreign Person TORN Token Holders** ...............................54
V. (U) **BASES FOR DETERMINATIONS** ................................................55
A) (U) *Designation Pursuant to E.O. 13694, as Amended* ..................55
1) (U) *Sky Mavis-Ronin Bridge Heist* (Cyber-Enabled Activity) .........56
2) (U) **TORNADO CASH** ................................................................59
B) (U) *Designation Pursuant to E.O. 13722* .........................................61
VI. (U) **ADDITIONAL INFORMATION** ...................................................64

## I. (U) **INTRODUCTION**

(U) On April 1, 2015, the President issued Executive Order (E.O.) 13694, "Blocking the Property of Certain Persons Engaging in Significant Malicious Cyber-Enabled Activities." [Exhibit 99]

(U) On December 28, 2016, the President issued E.O. 13757, "Taking Additional Steps to Address the National Emergency With Respect to Significant Malicious Cyber-Enabled Activities." [Exhibit 45]

(U) E.O. 13694, as amended by E.O. 13757 ("E.O. 13694, as amended"), blocks the property and interests in property of any person determined by the Secretary of the Treasury, in consultation with the Attorney General and the Secretary of State, to meet one or more of the criteria of the Order. [Exhibit 99] [Exhibit 45]

2

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

### B.    (U) *TORNADO CASH*

(U) As will be detailed below, **TORNADO CASH** is an entity[36, 37] that provides cryptocurrency mixing services.  OFAC assesses that **TORNADO CASH** is an entity — that is, a "partnership, association, trust, joint venture, corporation, group, subgroup, or other organization" — that may be designated pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1708 (IEEPA).  *See* section 6(b), E.O. 13694, as amended; section 9(b), E.O. 13722. **TORNADO CASH**'s organizational structure consists of: (1) its founders —— Alexey Pertsev, Roman Semenov, and Roman Storm — and other associated developers, who together launched the Tornado Cash mixing service, developed new Tornado Cash mixing service features, created the **TORNADO CASH** Decentralized Autonomous Organization (DAO), and actively promote the platform's popularity in an attempt to increase is user base; and (2) the DAO, which is responsible for voting on and implementing new features created by the developers.  In order to participate in the **TORNADO CASH** DAO, members must obtain "TORN," a virtual token issued by **TORNADO CASH** that gives the holder the right to vote on governance measures and influence the ongoing development and maintenance of the service operated by **TORNADO CASH**.  Although TORN plays an important governance function, it is also a virtual currency that may be bought and sold on secondary markets, the value of which increases as **TORNADO CASH** increases its user base and popularity.  **TORNADO CASH** uses computer code known as "smart contracts" to implement its governance structure, provide mixing services, offer financial incentives for users, increase its user base, and facilitate the financial gain of its users and developers.

(U//FOUO) **TORNADO CASH** collects fees through its "relayers," which provide a widely used, anonymity-enhancing service for users.  In order for a relayer to be listed on the Tornado Cash relayer registry, the relayer must "stake" (i.e., deposit) TORN, the **TORNADO CASH** DAO's governance token.  **TORNADO CASH** collects a fee from relayers for each transaction processed by the relayer, and distributes those fees to members of the **TORNADO CASH** DAO.  The relayers, in turn, collect a fee from users of **TORNADO CASH**.

(U//FOUO) Specifically, an Ethereum transaction processed by **TORNADO CASH** through a relayer involves several fees:

1. The Ethereum "gas" fee, which is the fee paid in Ethereum by the initiator of any transaction on the Ethereum network to the validators who process the transactions.
2. The fee paid by the Tornado Cash user to the relayer, which is deducted from the funds deposited by the user to the Tornado Cash smart contract.  In the case of an Ethereum transaction, this fee would be paid in Ethereum.
3. The fee paid by the relayer to **TORNADO CASH**, which is paid in TORN and deducted from the TORN that the relayer staked to be listed as an available relayer by **TORNADO CASH**.  These TORN fees are distributed to members of the DAO who have staked their TORN to vote on **TORNADO CASH** governance proposals. This voting process is

---

[36] (U) E.O. 13694, as amended, defines an entity as a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization. [Exhibit 99, p. 2]

[37] (U) E.O. 13722 defines an entity as a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization. [Exhibit 100, p. 5]

20

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

further described in *Section IV.B.2*, (***TORNADO CASH***: **Decentralized Autonomous Organization (DAO)**)).

(U//FOUO) Relayers are more fully described in *Section IV.C.4* (***The Tornado Cash Mixing Service***: **The Relayer Network**).

1.  (U) ***TORNADO CASH***: **Founders and Developers**

(U

[Exhibit 3, p. 1]

(U) According to a January 25, 2022 CoinDesk article, in an interview with CoinDesk, Tornado Cash co-founder Roman Semenov said, "The Tornado Cash team mostly does research and publishes the code to GitHub.[38, 39]  All the deployments, protocol changes, and important decisions are made by the community via Tornado Governance Decentralized Autonomous Organization and deployment ceremonies," which are events when new code is pushed live. [Exhibit 6, pp. 3–4]

(U) According to the employment opportunity page on **TORNADO CASH**'s website, **TORNADO CASH** had an open job advertisement that states that it is "looking for a Solidity[40] Engineer, to join our ranks and strengthen our skill set."  The advertisement states that hires will:

*   Design and write smart contracts on Ethereum to implement new features;
*   Collaborate and share experiences with an enthusiastic and driven team;
*   Contribute integrating state-of-the-art features for the next version of the protocol;
*   Work in a fast-paced and challenging environment;
*   Be able to work autonomously, great communication remotely, and continually get self-connected; and

---

[38] (U) According to its website, ███████████████████ GitHub offers free and paid products for storing and collaborating on code.  Some products apply only to personal accounts, while other plans apply only to organization and enterprise accounts.  [Exhibit 80, p. 1]

[39] According to the website of the General Services Administration, accessed on October 24, 2022, GitHub is a web-based interface that uses Git, the open-source version control software that lets multiple people make separate changes to web pages at the same time.  GitHub allows multiple developers to work on a single project at the same time, reduces the risk of duplicative or conflicting work, and can help decrease production time.  With GitHub, developers can build code, track changes, and innovate solutions to problems that might arise during the site development process simultaneously.  Non-developers can also use it to create, edit, and update website content. [Exhibit 219, pp. 1–2]

[40] (U) According to an article on Ethereum's website, last updated on February 15, 2022, Solidity is a programming language for implementing smart contracts.  [Exhibit 118, p. 1]

21

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

UNCLASSIFIED//~~FOR OFFICIAL USE ONLY~~
~~PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT~~

- If interested, gain significant knowledge on zk-SNARKs[41] and improve your skills on this topic." [Exhibit 119, p. 1]

(U) According to an August 15, 2022 Cointelegraph article, in 2021, **TORNADO CASH** created a fund to provide incentives to key contributors to the project.[42] [Exhibit 18, pp. 1–2]

(U) According to the GitHub page of the archived code base of the software used by **TORNADO CASH**, the source code contains 34 different repositories.[43] [Exhibit 48, p. 1]

(U) According to the commit log for the "Tornado Core" repository, the most recent commit[44] was by user "Alexey Pertsev" on March 24, 2022. Another commit was by user "Roman Semenov" on October 31, 2021. Still another commit was by user "poma"[45] on October 29, 2021. [Exhibit 74, p. 1] OFAC assesses that the usernames "Alexey Pertsev" and "Roman Semenov" are associated with **TORNADO CASH** developers Alexey Pertsev and Roman Semenov. Additional information regarding these individuals is discussed in *Section IV.E.2.*

(U//~~FOUO~~) Based on the above information regarding the "Tornado Core" commit log, OFAC concludes that the software used and developed by **TORNADO CASH** has undergone active development by a core group of developers over a period of multiple years.

### 2. (U) *TORNADO CASH*: Decentralized Autonomous Organization (DAO)

---

[41] (U) According to the "What are zk-SNARKs?" page of the Zcash website, ███████████████ 'zk-SNARK" stands for "Zero-Knowledge Succinct Non-Interactive Argument of Knowledge," and refers to a proof of construction where one can prove possession of certain information, e.g. a secret key, without revealing that information, and without any interaction between the prover and verifier. [Exhibit 133, p. 1]

[42] (U) According to the August 15, 2022 Cointelegraph article, accessed on August 25, 2022, "the fund was held in a community-managed multi-signature wallet with five peer-elected members validating transactions who were selected because of their contributions to the project. Following the United States' sanctioning of USD Coin (USDC) and Ethereum addresses associated with the crypto mixer Tornado Cash, the signatories of the projects' multi-signature community fund have disbanded." "However, given that interacting with Tornado Cash now comes with more risks — including penalties for U.S. citizens ranging from fines of up to $10 million or prison time of up to 30 years — the community members in charge of the fund have vacated their posts and handed control to the project's DAO. On August 12, the signatories started to relinquish their ability to manage the fund. On August 12, [2022], the signatories started to relinquish their ability to manage the fund. And on August 14, 2022 all five members of the multi-signature wallet completely removed their access, leaving only the governance wallet as the fund's sole owner." [Exhibit 18, p. 2]

[43] (U) According to the website of GitHub, ███████████████████ a repository is usually used to organize a single project. Repositories can contain folders and files, images, videos, spreadsheets, and data sets, anything your project needs. Often, repositories include a README file, a file with information about your project. [Exhibit 229, p. 2]

[44] (U) According to the website of GitHub, you can save small groups of meaningful changes as *commits*. Similar to saving a file that has been edited, a *commit* records changes to one or more files in your branch. [Exhibit 80, p. 1]

[45] (U//~~FOUO~~) A GitHub user profile page for "poma" ████████████ links to the **TORNADO CASH** website and lists the user's real name as "Roman Semenov." [Exhibit 208, p. 1] Based on this information, OFAC assesses that the username "poma" was also controlled by **TORNADO CASH** founder Roman Semenov.

UNCLASSIFIED//~~FOR OFFICIAL USE ONLY~~
~~PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT~~

CYBER2-29777 - 00034

23-50669.935

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

(U) **TORNADO CASH** is controlled by a DAO, which is comprised of members who have obtained TORN[46] tokens.  TORN tokens provide members of the DAO with ownership stake in a fashion similar to stockholders; the more TORN tokens a member has, the more voting power they have.  Developers of **TORNADO CASH** research and develop new features to **TORNADO CASH** and post them on websites such as GitHub for members of the DAO to propose to the collective members of the DAO for implementation.  If a vote to implement passes, the DAO implements the new features in a process called Trusted Setup Ceremony.  The DAO is the central controlling mechanism of **TORNADO CASH**.

   a. (U) *The TORN Token*

(U) **TORNADO CASH** governance is accomplished through the DAO, which is made up of individuals who have been issued TORN tokens.  According to a September 6, 2021 blog post on the website of Medium,[47] authored by **TORNADO CASH**, which has since been deleted by the author, and which was accessed by OFAC through the Wayback Machine's August 8, 2022 archive, the blog post describes the **TORNADO CASH** decision making processes, which combines both on-chain[48] and off-chain[49] governance:

> "Governance is at the heart of every decentralized protocol and Tornado Cash does not deviate from this rule.  By principle, for a decentralized protocol to function correctly, the decision-making process needs to be put between the hands of its users.  Those users form a community that has the right & duty to shape the next versions of the tool they use.  Usually, this community has the means to express itself through governance tokens.  In other words, if the protocol was the community's battlefield, governance would be its weapon & tokens its ammunition.  For the DAO to run smoothly, governance rules need to be clearly specified and cover all potential areas.  We just need to take a look at political voting systems around the world to assert that decision making rules have a tremendous impact on the final made decision.  On-chain governance offers the community (i.e., TORN holders) the means to implement the desired changes to their protocol.  If the community agrees on adding or changing a given feature, the update will only be implemented if the on-chain governance rules are complied with.  All those changes must go through proposals.  Those proposals can be suggested to Tornado Cash users & TORN holders directly on https://app.tornado.cash/governance [the Tornado Cash Website], by any eligible community [i.e., DAO] member." [Exhibit 70, pp. 2–4]

---

[46] (U) According to an August 13, 2022 Bitcoin.com article, TORN is the Tornado Cash governance token with a fixed supply, and which may be used to propose changes to Tornado Cash and its governance, and vote on such changes.  There are approximately 1,511,065 TORN tokens, with 30 percent reserved for the developers and contributors.  [Exhibit 34, p. 1]

[47] (U) According to the "About" page of its website, accessed on April 22, 2022, Medium is an open platform where over 100 million readers come to find insightful and dynamic thinking, where expert and undiscovered voices alike dive into the heart of any topic.  [Exhibit 41, p. 1]

[48] (U) According to an October 2018 NIST report, "on-chain" refers to data that is stored or a process that is implemented and executed within a blockchain system.  [Exhibit 189, p. 82]

[49] (U) According to an October 2018 NIST report, "off-chain" refers to data that is stored or a process that is implemented and executed outside of any blockchain system.  [Exhibit 189, p. 82]

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT
CYBER2-29777 - 00035

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

USDT pool, 1,000 USDT pool, 0.1 WBTC, 1 WBTC, 10 WBTC, TORN Token, Governance Proxy, Reward Verifier, Withdraw Verifier, Tree Update Verifier, Reward Swap, TornadoCash Proxy, TornadoTrees, Miner, and Poseidon Hasher. [Exhibit 175, pp. 5–12]

(U//FOUO) Based on the above description of the **TORNADO CASH** bug bounty program, OFAC assesses that **TORNADO CASH** offered TORN that it controlled to help identify and remediate security vulnerabilities in the Tornado Cash smart contracts. The substantial value of the rewards offered by the bug bounty program demonstrates that **TORNADO CASH** believed that bugs in these smart contracts had the potential to cause damage to **TORNADO CASH**.

### 4. (U) *TORNADO CASH*: Trusted Setup Ceremony

(U//FOUO) As detailed below, **TORNADO CASH** has facilitated community involvement in deployment of smart contracts through a Trusted Setup Ceremony; OFAC assesses that these ceremonies increase the profile and privacy bona fides of **TORNADO CASH**, thus increasing its appeal to users. The involvement of large numbers of participants in such a ceremony distinguishes a smart contract that has undergone the ceremony from one that has not. Trusted Setup Ceremonies also demonstrate **TORNADO CASH**'s role in serving as a coordinating mechanism for an online community of users and supporters who might otherwise be unable to organize joint action to implement a smart contract-based mixing service.

(U) According to a May 2020 blog post on the Medium website, authored by "Tornado Cash," **TORNADO CASH** was "happy to announce that the Tornado Cash Trusted Setup Ceremony has been launched." Tornado Cash "ask[ed the] crypto community to help make Tornado Cash fully trustless by contributing to the ceremony." Tornado Cash explained: "We plan to end the ceremony on May 10, 2020. If there is high demand, we will keep it open for a couple more days. [Exhibit 39, pp. 1–3]

(U) According to the website of Vitalik Buterin, one of the founders of Ethereum, a trusted setup ceremony is a procedure that is done once to generate a piece of data that must then be used every time some cryptographic protocol is run. Generating this data requires some secret information; the "trust" comes from the fact that some person or some group of people has to generate these secrets, use them to generate the data, and then publish the data and forget the secrets. But once the data is generated, and the secrets are forgotten, no further participation from the creators of the ceremony is required. [Exhibit 55, p. 1]

(U//FOUO) According to the website of **TORNADO CASH**, accessed via the Wayback Machine's August 5, 2022 archive, the Tornado Cash Trusted Setup Ceremony had a searchable database of participants. OFAC queried this database ███████ for Tornado Cash founders Storm, Semenov, and Pertsev and identified that each was named in the database, indicating that they were participants in the Trusted Setup Ceremony. [Exhibit 71, pp. 1–3] Based on this information, OFAC assesses that the founders of **TORNADO CASH** contributed to the Trusted Setup Ceremony.

### C. (U) *The Tornado Cash Mixing Service*

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

CYBER2-29777 - 00050
23-50669.951

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

(U) According to **TORNADO CASH**'s website, accessed through the Wayback Machine's February 18, 2022 archive, "relayers are used to withdraw to an account with no ETH balance. The relayer sends a withdrawal transaction and takes a part of the deposit as compensation (though the protocol itself does not collect any fees). The relayer cannot change any withdrawal data including recipient address. The Tornado Cash initial developers do not control or play any role in relaying transactions; the relay network is independent and run by the community." [Exhibit 64, p. 7]

(U//FOUO) Although relayers independently set their fees, and the relayer fees are paid directly to the relayers, **TORNADO CASH** separately collects a per-transaction fee in TORN from relayers. This mechanism is explained in further detail in the remainder of this section and in the next section.

(U//FOUO) According to an August 25, 2022 Coin Center article, the relayer registry is the smart contract 0x58E8dCC13BE9780fC42E8723D8EaD4CF46943dF2 ("0x58E8d"). According to Coin Center, the relayer registry can be updated pending a Tornado Cash community vote. [Exhibit 62, p. 24] Because the smart contract can be updated by the Tornado Cash community,[117] OFAC assesses that **TORNADO CASH** has the ability to thereby manage the relayer registry.

(U//FOUO) According to Etherscan, smart contract 0x58E8d has a total of 722 transactions. The most recent transaction to smart contract 0x58E8d occurred on September 20, 2022 and executed the function "stake to relayer." [Exhibit 96, p. 1] Based on the substantial number of transactions, OFAC assesses that Tornado Cash relayers regularly stake to the relayer smart contract or otherwise interact with the relayer smart contract.

(U) According to the website of **TORNADO CASH**, which was archived by the Internet Archive on June 9, 2022, following the execution of Tornado Cash tenth governance proposal, anyone can become a relayer for Tornado Cash users. The only condition to be included on the Tornado Cash UI is to lock a min[imum] of 300 TORN.[118] To remain listed, it is needed to keep enough TORN locked (~ 40 TORN in April 2022) to be able to pay back the transaction fee to the staking contract. Since the implementation of the Relayer Registry proposal, the protocol collects a fee directly from the relayer's staked balance through the "Staking Reward" contract for each withdrawal. This fee percentage may vary from one pool to another and is also subject to change through on-chain governance. Currently[119] it is fixed at 0.3 percent. Some pools remain without fees, either because the instance is too small to assign a fee (0.1 ETH, 100

---

[117] (U) OFAC assesses the term "community" as used in this and other exhibits includes, but is not limited to, holders of TORN and developers of Tornado Cash.

[118] (U) According to a note in the exhibit, this minimum stake can be changed by a governance vote at any time. [Exhibit 139, p. 1]

[119] (U//FOUO) OFAC assesses that this information was current as of the date it was archived, June 9, 2022.

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

CYBER2-29777 - 00059

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

DAI/USDT, 1000 DAI/USDT), or because there is not enough liquidity on Uni[swap] v3[120] (all cDAI instances). [Exhibit 139, p. 1]

    D.    (U) *TORNADO CASH's Property and Interests in Property*[121, 122]

        1.  (U) **TORNADO CASH's Interest in the TORNADO CASH Smart Contracts**

(U//FOUO) According to the website of Ethereum, creating a smart contract has a cost because you are using network storage. [Exhibit 58, p. 2] Because creating a contract on the Ethereum blockchain has a cost, OFAC assesses that any given contract has a nonzero monetary value. Because creating a smart contract requires initiating a transaction and paying a fee, OFAC assesses that users create smart contracts because they regard the functionality of the smart contract as having value. Accordingly, OFAC assesses that **TORNADO CASH** regarded smart contracts created on its behalf as having value; that **TORNADO CASH** has derived value from smart contracts created on its behalf; and that therefore **TORNADO CASH** has an interest in such smart contracts.

(U//FOUO) Based on information presented in this memorandum, OFAC assesses that **TORNADO CASH** has an interest in the smart contracts created on its behalf because use, popularity, and success of the smart contracts increases the economic value of **TORNADO CASH** and of the TORN tokens, including those held by **TORNADO CASH** itself as well as those issued by the DAO to individual DAO members. The DAO issued TORN tokens to early

---

[120] (U//FOUO) According to Uniswap's website, Uniswap v1 was launched in November 2018 as a proof of concept for automated market makers (AMMs), a type of exchange where anyone can pool assets into shared market making strategies. In May 2020, Uniswap v2 introduced new features and optimizations. As of March 23, 2021, Uniswap v3 was introduced. [Exhibit 141, p. 1] OFAC assesses v3 refers to version three of Uniswap.

[121] (U) The relevant OFAC regulations define "interest," when used with respect to property (e.g., "an interest in property"), as "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. §§ 510.313, 578.309. "Property" and "property interest" are defined as follows:

> The terms *property* and *property interest* include money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes, guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens or other rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any other evidences of title, ownership, or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder, powers of attorney, goods, wares, merchandise, chattels, stocks on hand, ships, goods on ships, real estate mortgages, deeds of trust, vendors' sales agreements, land contracts, leaseholds, ground rents, real estate and any other interest therein, options, negotiable instruments, trade acceptances, royalties, book accounts, accounts payable, judgments, patents, trademarks or copyrights, insurance policies, safe deposit boxes and their contents, annuities, pooling agreements, services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent.

31 C.F.R. §§ 510.323, 578.314.

[122] (U) Similar to the physical address of a real estate property that is owned by a blocked person, the digital currency addresses of Tornado Cash smart contracts may refer to interests in property of **TORNADO CASH** and also serve as identifiers associated with **TORNADO CASH**.

48

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

CASH has an interest in user transactions that are withdrawn through relayers, and in the TORN tokens used in that process.

### 3. (U) TORNADO CASH's Interest in Pool and Relayer Smart Contracts

(U//FOUO) According to the August 25, 2022 post on the website of Coin Center, "a key principle of Tornado Cash pools is that a user's privacy is derived in large part from the simultaneous usage of the pool by many other users. If the pool had only a single user, it would not matter that the link between the user's deposit and withdrawal addresses was severed: simple inference would make it obvious where the withdrawn tokens came from. Instead, pools are used by many users simultaneously. Think of it like a bank's safe deposit box room. Anyone can go and store valuables in a locked box in that room, and, assuming the locks are good, only the person with the key can ever get those valuables back. Security aside, however, this may or may not be privacy enhancing. If only one person is ever seen going into and out of the room, then we know any valuables in that room are theirs. If, on the other hand, many people frequently go into and out of the room, then we have no way of knowing who controls which valuables in which boxes." [Exhibit 62, pp. 6–7] Because the efficacy of TORNADO CASH as a mixer depends on a critical mass of users depositing funds to its pool smart contracts, OFAC assesses that TORNADO CASH's efforts to entice more and more users to deposit funds into its smart contracts is evidence of TORNADO CASH's interest in in the funds that users have deposited into its smart contracts.

(U//FOUO) According to data from Dune, out of a total of 145,448 withdrawal transactions from Tornado Cash, 121,702 used relayers and 23,746 were withdrawn to wallets. [Exhibit 8, p. 1] Because relayers were used in the substantial majority of withdrawal transactions from TORNADO CASH, OFAC assesses that tokens held in the TORNADO CASH smart contract pools have the potential to generate fees for TORNADO CASH because of the fees required to use relayers. OFAC therefore assesses that TORNADO CASH has an interest in such funds.

(U//FOUO) According to data from Dune, in the week of August 29, 2022, relayer fees for Tornado Cash paid to Governance in U.S. dollars were $76,135. [Exhibit 77, p. 1] Based on this information, OFAC assesses that TORNADO CASH was receiving fees generated through use of its pool and relayer smart contracts. These facts further evidence that TORNADO CASH has an interest in the pool and relayer smart contracts.

(U//FOUO) According to the "Staking" section of TORNADO CASH's website, with the introduction of a decentralized relayer register, a staking reward has been implemented for all holders with locked TORN in the governance contract. TORN holders can still lock their tokens into the governance contract as they used to for governance purposes. The significant difference is that they are now able to receive a portion of the fees collected by the protocol from relayers. In a nutshell, for each withdrawal through the relayer method, the chosen relayer has to pay a fee to the protocol from the staked balance (that should still be maintained above the 300 TORN threshold). Currently, this fee has been fixed at 0.3 percent by the governance and can be changed at any time through an on-chain [proposal of change and corresponding vote].

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

[Exhibit 5, p. 1]  Based on the fact that the Tornado Cash Governance Contract[125] receives a fee from each withdrawal through the relayer method, OFAC assesses that **TORNADO CASH** has an interest in such withdrawals.

(U//FOUO) As described previously in *Section IV.C.6* (*The Tornado Cash Mixing Service*: **The Relayer Network**), becoming a relayer listed on the **TORNADO CASH** UI requires staking TORN to the Tornado Cash Governance Contract.  **TORNADO CASH** collects a fee from this staked TORN each time the relayer is used to facilitate a withdrawal from the **TORNADO CASH** pool smart contracts.  In return, the relayer receives a portion of the withdrawal (for example, a relayer receives ETH for withdrawals from ETH pools).  As **TORNADO CASH** deducts fees from the relayer's staked TORN, the relayer must acquire and stake more TORN in order to continue acting as a relayer.  Consequently, higher volume usage of the Tornado Cash mixing service, resulting in greater numbers of withdrawals via relayers, creates additional demand for TORN tokens.  Therefore, based on **TORNADO CASH**'s interest in and holdings of TORN tokens, OFAC assesses that **TORNADO CASH** has an interest in its mixing service as deployed via the pool, relayer, and other smart contracts.

E.    (U) *Foreign Person Property Interest Nexus*[126]

1.    (U) **Interest of North Korea**

(U) According to a February 9, 2021 Reuters[127] article, a preliminary United Nations (UN) inquiry into the theft of $281 million worth of assets from a cryptocurrency exchange in September 2020 "strongly suggests" links to North Korea—with industry analysts pointing to Seychelles-based KuCoin as the victim of one of the largest reported digital currency heists.  A confidential report by independent sanctions monitors to UN Security Council members said blockchain transactions related to the hack also appeared to be tied to a second hack last October when $23 million was stolen.  "Preliminary analysis, based on the attack vectors and subsequent efforts to launder the illicit proceeds, strongly suggests links to the DPRK," the monitors wrote.  They accuse Pyongyang of using stolen funds to support its nuclear and ballistic missile

---

[125] (U) As detailed above, the Tornado Cash governance contract plays an essential role in the operation and governance of **TORNADO CASH** and of the service provided by **TORNADO CASH**.

[126] (U) Section 203 of the International Emergency Economic Powers Act ("IEEPA"), authorizes the President to:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, *any property in which any foreign country or a national thereof has any interest* by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B) (emphasis added).  Thus, OFAC may block or prohibit even domestic transactions where a foreign country or national thereof has an interest in the underlying property.

[127] (U) According to the homepage of its website, accessed on April 29, 2022, Reuters, the news and media division of Thomson Reuters, is the world largest multimedia news provider, reaching billions of people worldwide every day.  Reuters provides business, financial, national, and international news to professionals via desktop terminals, the world's media organizations, industry events, and directly to consumers.  [Exhibit 147, p. 16]

52

UNCLASSIFIED//FOR OFFICIAL USE ONLY
PRIVILEGED / PRE-DECISIONAL AND DELIBERATIVE DRAFT

# TAB 5

In addition to sending and receiving tokens, user accounts can interact with smart contracts, which are applications that extend the functionality of Ethereum. When developers program smart contracts, they decide what operations the smart contract will support and what rules those operations must follow. These rules and operations are written using code that is broadcast to Ethereum's network, just like the token transactions described above. Once a smart contract's code is added to Ethereum's records, it receives a unique address and can be interacted with by any user to automatically carry out the rules and operations it supports.

In essence, smart contracts are open-source applications that anyone can deploy to Ethereum. Just like the rest of Ethereum, smart contracts can be viewed and used by anyone, anywhere, and without relying on an intermediary.

Both people and smart contracts can have Ethereum addresses; the key difference is that when a person has an address they have the private key that controls any tokens sent to that address. That person will ultimately decide if and when any transactions are made with those tokens. When a smart contract has an address, the rules and operations written in the smart contract code control the tokens. They could be simple rules (*e.g.* automatically send the tokens back), or more complicated rules. There could be rules that include human operations and human decisions (*e.g.* send the tokens back if 3 out of 5 of these human-controlled addresses send a signed message saying they agree). The rules could also, however, be fully and permanently outside of any human being's control. In that case, so too are any tokens sent to that address until and unless the contract sends them back to some human according to the rules.

CYBER2-29777 - 00547

23-50669.1080

# Ethereum Smart Contract Example: Timelocked Escrow



The User deposits 1 ETH token to be held in escrow for 7 days by the Smart Contract. After 7 days, the user can reclaim the tokens.

By default, smart contracts are immutable, which means they cannot be removed or updated by anyone once deployed. It is possible for the smart contract's developers to include (in the contract code) the ability to update functionality as a supported operation (*e.g.* this *human-controlled* address can rewrite the contract in the future). However, such an operation must be included in the smart contract's code prior to the smart contract's deployment (*i.e.* publication to the Ethereum network). Without the inclusion of updatability prior to deployment, a smart contract cannot be modified by anyone. It is also possible to revoke the ability to update functionality by transferring the permissions for this ability to a placeholder Ethereum address for which there is no corresponding private key. This placeholder is known as "the zero address." Once the ability to update a contract has been revoked, it cannot be reclaimed and the contract can no longer be changed.

CYBER2-29777 - 00548

23-50669.1081

Unlike traditional finance, Ethereum's records are completely transparent: anyone can download and view the balances and transaction history of its user accounts. Although user addresses are pseudonymous, if a real-world identity is linked to a user address, it becomes possible to trace that user's complete financial history. Ethereum's transparency is important for auditability (*e.g.* verifying that updates to records are valid). However, this transparency also makes it difficult for users to protect their personal information. By default, a record of a casual transaction today (*e.g.* paying for Wi-Fi at the airport) leads directly to records of earlier transactions, which may include any intimate, revealing, or sensitive transactions made by the same user long ago.

Among the many different applications smart contracts may support, they may also provide an avenue for users to regain the privacy they expect when interacting with financial systems. Central to that privacy is the use of smart contracts to break the public chain of records that would otherwise link your transaction today to every transaction you've ever made in the past. Enter Tornado Cash.

## 3. Tornado Cash: A smart contract application

Tornado Cash is an open source software project that provides privacy protection for Ethereum's users. Like many such projects, the name does not refer to a legal entity, but to several open source software libraries that have been developed over many years by a diverse group of contributors. These contributors have published and made Tornado Cash available for general use as a collection of smart contracts on the Ethereum blockchain.

CYBER2-29777 - 00549

23-50669.1082

As we will explain, some of these smart contracts have been sanctioned by OFAC. The core of Tornado Cash's privacy tools, however, make up a subset of the addresses sanctioned by OFAC: the Tornado Cash "pools." Each Tornado Cash pool is a smart contract deployed to Ethereum. Like other smart contracts, the pool contracts extend the functionality of Ethereum with specific operations that can be executed by any user of Ethereum according to the rules defined in the Tornado Cash contracts' code.

This section will describe how these pools work. In particular, it will describe the key innovation that enables these pools to function autonomously: an application of privacy-preserving mathematics known as "zero-knowledge cryptography."

Subsequent sections will describe the specific addresses sanctioned by OFAC, and what they do. An appendix at the end will list all of the sanctioned contracts and their salient features.

## Tornado Cash Core Contracts: Pools

Tornado Cash pools are smart contracts that enable users to transact privately on Ethereum. When prompted by a user, pools will automatically carry out one of two supported operations: "deposit" or "withdraw." Together, these operations allow a user to deposit tokens from one address and later withdraw those same tokens to a different address. Crucially, even though these deposit and withdrawal events occur publicly on Ethereum's transparent ledger, any public link between the deposit and withdrawal addresses is severed. The user is able to withdraw and use their funds without fear of exposing their entire financial history to third parties.

CYBER2-29777 - 00550

23-50669.1083

In support of the deposit and withdrawal operations, these smart contracts encode strict rules that further define its functionality. These rules are automatically applied to the deposit and withdrawal operations to maintain a very important property shared by all Tornado Cash pools: **users can only withdraw the specific tokens they originally deposited.**

This property is enforced automatically for all the pool's operations, and ensures that Tornado Cash pools are entirely *non-custodial*. That is, a user who deposits and later withdraws tokens maintains total ownership and control over their tokens, even as they pass through the pool. At no point is the user required to relinquish control of their tokens to anyone.

A key principle of Tornado Cash pools is that a user's privacy is derived in large part from the simultaneous usage of the pool by many other users. If the pool had only a single user, it wouldn't matter that the link between the user's deposit and withdrawal addresses was severed: simple inference would make it obvious where the withdrawn tokens came from. Instead, pools are used by many users simultaneously. Think of it like a bank's safe deposit box room. Anyone can go and store valuables in a locked box in that room, and, assuming the locks are good, only the person with the key can ever get those valuables back. Security aside, however, this may or may not be privacy enhancing. If only one person is ever seen going into and out of the room, then we know any valuables in that room are theirs. If, on the other hand, many people frequently go into and out of the room, then we have no way of knowing who controls which valuables in which boxes. By guaranteeing the property that users can only withdraw tokens they originally deposited, many users can simultaneously use these pools with the assurance that no-one else will receive their tokens.

Traditionally, these assurances would be provided by a *custodial* service: a bank in the safe deposit box example, or a group of people running a "mixing service" in common cryptocurrency arrangements. Mixing services like Blender.io directly accept tokens from their clients, aggregate and mix them, and then return the funds to their clients (often taking some fee in the process). During the intermediate aggregation and mixing stage, the funds in question are completely in the control of the operators of the mixing service and are commingled. At the final stage of the mixing process, a user would receive funds sourced directly from the myriad other users that also used the service.

In contrast, Tornado Cash pools have no custodial operator, and users only ever withdraw the tokens they originally deposited (rather than a mixture of tokens from the other users of the service). This is made possible because of important properties of the deposit and withdrawal operations, which are automatically carried out through the use of a privacy-preserving branch of mathematics called "zero-knowledge cryptography." This zero-knowledge cryptography is included in Tornado Cash's smart contract code, and forms the foundation on which the deposit and withdrawal operations function.

## Zero-Knowledge Proofs

To recall an earlier point, Ethereum is transparent: anyone can view the transaction history and balance of any user account. Likewise, anyone can view the interaction history, balance, and code of a smart contract application. If a user prompts a smart contract to perform an operation, this interaction becomes a fact that is forever recorded in Ethereum's public records and can be recalled and inspected by anyone. So how is it that a user can deposit into a Tornado Cash pool and later withdraw to a different

3. That the submitted "lock" has not been submitted previously (*i.e.* the deposit in question has not already been withdrawn).

Assuming the proof is verified, the pool smart contract automatically:

1. Sends the user their tokens.

2. Records the encoded "lock" in a public list of other users' encoded locks, ensuring the same tokens cannot be withdrawn again.

Crucially, the above operations are carried out while the following is never revealed: which specific encoded note the proof corresponds to (*i.e.* who, among all of Tornado Cash's depositors, is now withdrawing).

## Can Tornado Cash be removed or updated? If so, by whom?

As stated previously, for most readers, *Tornado Cash* is synonymous with a core subset of the Tornado Cash smart contracts: the Tornado Cash pools. The vast majority of these contracts are immutable. That is, they have no ability to be updated or removed by anyone. A complete list of sanctioned, immutable Tornado Cash pools can be found in Appendix A.

Note that many of these pools had, at one point, an "operator" role. The operator role was originally held by 0xDD4c...3384, aka *Gitcoin Grants: Tornado.cash*, another sanctioned address. This role afforded its holder two permissions:

- updateVerifier: Used to update the "verifier" used by the smart contract. In essence, this permission could be used

to modify how the contract processed zero-knowledge proofs.

- changeOperator: Used to transfer the "operator" permission to another address, or revoke the "operator" permission entirely by transferring it to the zero address.

In May 2020, the updateVerifier permission was used in conjunction with the changeOperator permission as a final update to these Tornado Cash pools. This updated all pools' zero-knowledge proof processors to their final version, which incorporated the contributions of over 1,100 community participants. Additionally, this update revoked the "operator" permission by using changeOperator to transfer the permission to the zero address. In effect, the update performed in May 2020 cemented the community's preferences, and ensured no further changes could be made. Details on this process can be found here.

A handful of SDN-listed pools still have an "operator" permission. Of these, two belong to very old, now-unused versions of Tornado Cash. The remaining pools either have newer, immutable versions, or were used so little that they were likely overlooked during the May 2020 final update. Most of these remaining eight pools have never been used, and the ones that were used were only used once or twice within the past three years. A complete list of sanctioned, outdated Tornado Cash pools that retain the operator permission can be found in Appendix C.

## Tornado Cash Auxiliary Contracts & Controls

## Governance and TORN Token

The pool smart contracts represent the core of the Tornado Cash application, which remains immutable and uncontrolled by any party. However, OFAC's sanctions also

CYBER2-29777 - 00557

23-50669.1090

include auxiliary smart contracts that provide coordination mechanisms for the continued maintenance and use of Tornado Cash by its community. Several of these contracts are unused today, belonging to older versions of Tornado Cash. A complete list of OFAC-sanctioned smart contracts that relate to Tornado Cash's community maintenance can be found in Appendix B.

The SDN List includes two primary contracts still in use today:

- *Tornado Cash (Router)*: References a registry of up-to-date Tornado Cash pools, consistent with the current version of Tornado Cash. Users may *optionally* choose to interact with Tornado Cash pools via the Router contract, which ensures their deposit and withdrawal operations are processed using up-to-date code.

- *Tornado Cash (Relayer Registry)*: References a registry of operators providing relay-assisted withdrawal services to users of Tornado Cash. Users may *optionally* elect to process their withdrawals via a relayer, which may afford additional privacy.

Unlike the pool smart contracts, the Router and Relayer Registry support some updatable functionality. However, the permission to update these contracts is held not by a human, but by another smart contract. This smart contract, also known as *Tornado Cash: Governance*, defines the rules and operations that determine how the Router and Relayer Registry may be updated.

In short, *Tornado Cash: Governance* provides that updates to these smart contracts are processed at the behest of the community, which holds public votes to determine what updates should occur, and when. Any holder of TORN tokens may participate in these votes. TORN is an ERC20-

CYBER2-29777 - 00558

23-50669.1091

token built on Ethereum that is expressly used by the community to vote on governance proposals. Any user of Ethereum may purchase TORN tokens and participate in this process.

Note that while this process allows the wider Ethereum community to participate in the development and maintenance of Tornado Cash, *no part of this process allows for the update or removal of Tornado Cash pool smart contracts*. Additionally, participating in the *Tornado Cash: Governance* process is *entirely optional*: users can use Tornado Cash pools without any involvement, oversight, or interaction with the *Tornado Cash: Governance* process.

Although *Tornado Cash: Governance* and the TORN token contract are parts of the Tornado Cash software ecosystem, neither was added to OFAC's SDN List.

### Relayers

As previously mentioned, "relayers" are independent operators that provide an *optional* service for Tornado Cash users.

By default, when users prompt the Tornado Cash pool contracts for withdrawal, the withdrawal account needs to already have Ether in order to pay the Ethereum network to process the smart contract's operations. However, sending Ether to the withdrawal account prior to withdrawal might create a link between the user's deposit and withdrawal accounts.

Relayers allow users to process withdrawals without needing to pre-fund their withdrawal accounts, which helps users maintain privacy when withdrawing.

CYBER2-29777 - 00559

23-50669.1092

## Tornado Cash Relayer-assisted Withdrawal



Users select a relayer from a public *Relayer Registry*, another sanctioned Tornado Cash smart contract. The user then uses their withdrawal account to sign a transaction authorizing the relayer-assisted withdrawal. The user sends this transaction to their selected relayer, who processes the withdrawal on their behalf, earning a fee in the process. Note that even though they process withdrawals on behalf of users, relayers never have custody over users' tokens; the smart contract ensures that withdrawn tokens are only ever sent to the user's withdrawal account.

OFAC has not specifically added any relayer addresses to the SDN List, but it has added the smart contract that contains a registry of relayers to the list.

## Compliance Tool

Tornado Cash was built to enable Ethereum's users to reclaim their privacy. Rather than exposing their complete financial history, Tornado Cash gives users control over their personal information: both what is shared and with whom it is shared. However, maintaining privacy and preserving control over one's personal information does not need to come at the expense of non-compliance with legal obligations.

operation in the future.

- Some OFAC-identified addresses retain a level of human control. However, these addresses are not core to the operation of the privacy tools found at the immutable addresses and they can not exercise control over any user tokens.

## Appendix: Categorization of sanctioned addresses

These appendices list all addresses sanctioned by OFAC. They have been categorized according to the function they provide in the context of the Tornado Cash application.

Included with each address listed is the following information:

- *Name:* A name by which the address can be referenced. Note that these names do not come from the Tornado Cash developers, they come from Etherscan: a third party service whose website can be used to display information on the current state of Ethereum. The names listed are intended to be a handy reference, and do not necessarily reflect the views of the community or the Tornado Cash developers.

- *Description:* A short description of what each address refers to.

## A: List of immutable Tornado Cash pools

- 0x12D66f87A04A9E220743712cE6d9bB1B5616B8Fc
  - *Name:* Tornado.Cash: 0.1 ETH

CYBER2-29777 - 00563

23-50669.1096

- *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 0.1 ETH.

  - *Operator:* Revoked (operator set to zero address)

- <u>0x47CE0C6eD5B0Ce3d3A51fdb1C52DC66a7c3c2936</u>

  - *Name:* Tornado.Cash: 1 ETH

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 1 ETH.

  - *Operator:* Revoked (operator set to zero address)

- <u>0x910Cbd523D972eb0a6f4cAe4618aD62622b39DbF</u>

  - *Name:* Tornado.Cash: 10 ETH

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 10 ETH.

  - *Operator:* Revoked (operator set to zero address)

- <u>0xA160cdAB225685dA1d56aa342Ad8841c3b53f291</u>

  - *Name:* Tornado.Cash: 100 ETH

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 100 ETH.

  - *Operator:* Revoked (operator set to zero address)

- <u>0xD4B88Df4D29F5CedD6857912842cff3b20C8Cfa3</u>

  - *Name:* Tornado.Cash: 100 DAI

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 100 DAI.

  - *Operator:* Revoked (operator set to zero address)

- <u>0xFD8610d20aA15b7B2E3Be39B396a1bC3516c7144</u>

  - *Name:* Tornado.Cash: 1000 DAI

- *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 1000 DAI.

  - *Operator:* Revoked (operator set to zero address)

- 0x07687e702b410Fa43f4cB4Af7FA097918ffD2730

  - *Name:* Tornado.Cash: 10000 DAI 2

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 10000 DAI.

  - *Operator:* None (functionality not included)

- 0x23773E65ed146A459791799d01336DB287f25334

  - *Name:* Tornado.Cash: 100000 DAI

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 100000 DAI.

  - *Operator:* None (functionality not included)

- 0x22aaA7720ddd5388A3c0A3333430953C68f1849b

  - *Name:* Tornado.Cash: 5000 cDAI

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 5000 cDAI.

  - *Operator:* Revoked (operator set to zero address)

- 0xBA214C1c1928a32Bffe790263E38B4Af9bFCD659

  - *Name:* Tornado.Cash: 50000 cDAI

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 50000 cDAI.

  - *Operator:* Revoked (operator set to zero address)

- 0x03893a7c7463AE47D46bc7f091665f1893656003

  - *Name:* Tornado.Cash: 50000 cDAI 2

- *Description:* A newer version of the 50000 cDAI Tornado Cash pool, which allows deposits and withdrawals in increments of 50000 cDAI.
  - *Operator:* None (functionality not included)
- <u>0x2717c5e28cf931547B621a5dddb772Ab6A35B701</u>
  - *Name:* Tornado.Cash: 500000 cDAI 2
  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 500000 cDAI.
  - *Operator:* None (functionality not included)
- <u>0xD21be7248e0197Ee08E0c20D4a96DEBdaC3D20Af</u>
  - *Name:* Tornado.Cash: 5000000 cDAI
  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 5000000 cDAI.
  - *Operator:* None (functionality not included)
- <u>0x4736dCf1b7A3d580672CcE6E7c65cd5cc9cFBa9D</u>
  - *Name:* Tornado.Cash: 100 USDC
  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 100 USDC.
  - *Operator:* Revoked (operator set to zero address)
- <u>0xd96f2B1c14Db8458374d9Aca76E26c3D18364307</u>
  - *Name:* Tornado.Cash: 1000 USDC
  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 1000 USDC.
  - *Operator:* Revoked (operator set to zero address)
- <u>0x169AD27A470D064DEDE56a2D3ff727986b15D52B</u>
  - *Name:* Tornado.Cash: 100 USDT

CYBER2-29777 - 00566
23-50669.1099

- *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 100 USDT.

  - *Operator:* Revoked (operator set to zero address)

- <u>0x0836222F2B2B24A3F36f98668Ed8F0B38D1a872f</u>

  - *Name:* Tornado.Cash: 1000 USDT

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 1000 USDT.

  - *Operator:* Revoked (operator set to zero address)

- <u>0x178169B423a011fff22B9e3F3abeA13414dDD0F1</u>

  - *Name:* Tornado.Cash: 0.1 WBTC

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 0.1 WBTC.

  - *Operator:* None (functionality not included)

- <u>0x610B717796ad172B316836AC95a2ffad065CeaB4</u>

  - *Name:* Tornado.Cash: 1 WBTC

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 1 WBTC.

  - *Operator:* None (functionality not included)

- <u>0xbB93e510BbCD0B7beb5A853875f9eC60275CF498</u>

  - *Name:* Tornado.Cash: 10 WBTC

  - *Description:* A Tornado Cash pool that allows deposits and withdrawals in increments of 10 WBTC.

  - *Operator:* None (functionality not included)

## B: List of community-governed contracts

CYBER2-29777 - 00567

23-50669.1100

- 0xd90e2f925DA726b50C4Ed8D0Fb90Ad053324F31b

  - *Name:* Tornado.Cash: Router

  - *Description:* A contract that maintains a list of Tornado Cash pools, which can be used by users to route deposits and withdrawals to the correct Tornado Cash pool.

  - *Still in use:* Yes.

  - *Governance Controls:* No significant controls. The community may choose to withdraw any tokens sent to the Router, as the Router is not an intended recipient of tokens.

- 0x58E8dCC13BE9780fC42E8723D8EaD4CF46943dF2

  - *Name:* Tornado.Cash: Relayer Registry

  - *Description:* This contract allows anyone to register as a Tornado Cash relayer. Relayers provide an *optional* service for users to make gasless withdrawals.

  - *Still in use:* Yes.

  - *Governance Controls:* Updatable pending a community vote.

- 0x527653eA119F3E6a1F5BD18fbF4714081D7B31ce

  - *Name:* Tornado.Cash: Trees

  - *Description:* This contract holds a merkle tree (a kind of list) of all Tornado Cash deposit and withdrawal events.

  - *Still in use:* No, this is associated with an older version of Tornado Cash.

  - *Governance Controls:* Updatable pending a community vote.

- 0xCa0840578f57fE71599D29375e16783424023357

CYBER2-29777 - 00568
23-50669.1101

# TAB 6

Case: 23-5069 12-F Document 24 91 Page: 92 06 Date Filed: 11/13/2023 75

9/1/22, 3:00 PM
Tornado.Cash Governance Proposal. Tornado.Cash has become the largest... | by Tornado Cash | Medium



Get unlimited access          Open in app

Tornado Cash    ( Follow )

Dec 18, 2020 · 9 min read



# Tornado.Cash Governance Proposal

Tornado.Cash has become the largest privacy solution on Ethereum today. Tornado.Cash has been fully autonomous and decentralized, but it's static — it has no way to evolve. This is a proposal to change that. If this proposal is adopted, then the governance of Tornado.Cash will be entrusted to its users, and Tornado.Cash will be allowed to evolve under the stewardship of its community. This way, the users of Ethereum will control their own privacy protocol.

Here is how a proposal for how the Tornado.Cash governance system could work:

## TORN Token

TORN is an ERC20-compatible token with a fixed supply that governs Tornado.Cash. TORN holders can make proposals and vote to change the protocol via governance.

**TORN is not a fundraising device or investment opportunity. It will remain non-transferable until the community decides that unlocking transfers via a governance vote, not earlier than 45 days following deployment, would comply with all applicable laws.**

**Here's how the initial distribution of TORN would break down:**

- **5% (500,000 TORN):** Airdrop to early users of Tornado.Cash ETH pools

- **10% (1,000,000 TORN):** Anonymity mining for Tornado.Cash ETH pools, distributed linearly over 1 year



Get unlimited access        Open in app

- **30% (3,000,000 TORN):** Founding developers and early supporters, will be
  unlocked linearly over 3 years with 1 year cliff

9/1/22, 3:00 PM

Tornado.Cash Governance Proposal. Tornado.Cash has become the largest... | by Tornado Cash | Medium



Get unlimited access          Open in app

## Airdrop

Users who have believed in Tornado.Cash from early on should have a say in governing the protocol. For this reason, early adopters of the protocol will receive an airdrop of TORN.

TORN will be airdropped to <u>all addresses</u> that made deposits into Tornado.Cash ETH pools before block `11400000`. TORN will be airdropped in the form of a non-transferable TORN voucher (vTORN) that can be redeemed 1:1 to TORN within 1 year. TORN that aren't redeemed will be swept into the governance contract after 1 year and become part of the DAO Treasury. Redeemed TORN will be available immediately.

The airdropped amount depends on users' deposit size and age — larger deposits and older deposits will receive more TORN. Multipliers for deposit size are logarithmic:

So a 100 ETH deposit will get twice as many tokens as a 1 ETH deposit. The multiplier allows large and small users of Tornado.Cash to both have a say in governance.

The exact curve for the time multiplier looks like this:

9/1/22, 3:00 PM

Case: 23-50669-12-FR Document 24-91 Page 95 06 Date Filed: 11/13/2023

Tornado.Cash Governance Proposal. Tornado.Cash has become the largest... | by Tornado Cash | Medium



Get unlimited access          Open in app

It is! The Tornado.Cash smart contracts cannot be changed or updated. They are decentralized and immutable.

But for Tornado.Cash to enable mining, it needs more metadata than is currently available: it needs to know the block number for each Tornado.Cash deposit and withdrawal. To that end, a proxy stands in front of the old Tornado.Cash that adds the current block number to each transaction. Thus, for Tornado.Cash users using the proxy, their notes can be used for Anonymity Mining, since the Merkle tree will contain data about when their deposits took place. (The version of Tornado.Cash without a proxy remains fully functional.)

Note: in order to aggregate deposits and withdrawal to the Merkle trees, someone needs to run a script called the `root-updater`. So long as someone out there does this, the system works smoothly and trustlessly. Who handles this role and how it is handled is a decision for the community via governance. For more information on how this works, please check out this repo.

## Governance

In order to participate in Tornado.Cash governance, users first need to lock tokens in the governance contract. If a user votes or creates a proposal, the tokens cannot be unlocked before the proposal execution period ends (8.25 days from proposal creation). The locked tokens can also be delegated to another address.

To create a proposal, a user needs to have at least 1,000 TORN. All proposals must be smart contracts with verified code that are executed from the governance contract (using `delegatecall`). This way, it's easy to audit and test any governance changes.

The voting period for a proposal is 3 days. A proposal will succeed if it receives a simple majority of votes and there are at least `25,000 TORN` total votes (if turnout is too low, the proposal automatically fails).

After a proposal succeeds, it is subject for a timelock of 2 days. After the timelock, any

9/1/22, 3:00 PM

Case 23-50669-12-Document 24 91 Page 96 Date Filed 11/13/2023 75

Tornado.Cash Governance Proposal. Tornado.Cash has become the largest... | by Tornado Cash | Medium



Get unlimited access          Open in app

All of these initial parameters are relatively small, since there won't be many TORN tokens in circulation early on. But as the circulating supply increases, governance may adjust these thresholds.

Governance proposals have the power to change any of Tornado.Cash's internal parameters, including completely upgrading its implementation (via the proxy, of course).

This brings us to...

## Governance Initiation

At the end of the day, this is just a proposal. We don't control Tornado.Cash — its users do, so if the community adopts this proposal, then it will become the way forward for privacy on Ethereum.

We've written the code, and have published it to GitHub and IPFS.

# TAB 7

# Tornado Cash DAO votes to take partial control over treasury funds

theblock.co/post/163274/tornado-cash-dao-votes-to-take-partial-control-over-treasury-funds

Osato Avan-Nomayo

<u>Governance</u> • August 12, 2022, 10:19AM EDT



<u>The Block</u>

**Quick Take**

- The Tornado Cash DAO hastily voted to add its own system of governance to the treasury's multisig.
- The DAO's treasury is now controlled by a four-of-six multisig arrangement — with the DAO as one signer.



The Tornado Cash DAO community has voted in favor of adding the DAO's governance as a signatory to the treasury's multi-signatory (multisig) wallet. The treasury looks after about $21.6 million across three different wallets.

This vote began on Wednesday, based on a proposal on the Tornado Cash DAO governance page, and ended today with 100% approval from all 12 participants. These 12 participants contributed 51,000 TORN tokens to push the vote to completion.

The voting process was hastily put together with the SnapShot initiated together with the proposal. Usually, there is a delay between a proposal being filed and the commencement on-chain. This lag is to create adequate time for the community to discuss the matter at hand. But it would have taken too long for the DAO.

"As it is very important, we need to move on fast on this subject. I will make a snapshot vote today so you guys can vote on it during 3 days," said the Tornado Cash DAO member who filed the proposal.

With the vote passed, the DAO's treasury will now become a four-of-six multisig instead of the previous four-of-five multisig arrangement. The Tornado DAO governance will now be added as a signatory to the treasury wallet. Multisig wallets require a specific minimum number of signatories to approve a transaction. In this case, four out of the six signers must approve any transaction from the treasury.

In practice, this means that if the core developers want to make a transaction involving the treasury, they will need to get signatures from at least four of the six multisig holders. Since one of these holders is now the DAO, they may need to ask the DAO to approve a signature.

# TAB 8

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, a member of the Bar of this Court and counsel for appellants certify that, on November 13, 2023, a copy of the attached Record Excerpts was filed with the Clerk through the Court's electronic filing system.  I further certify that all parties required to be served have been served.

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM