No. 23-50669

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

JOSEPH VAN LOON; TYLER ALMEIDA; ALEXANDER FISHER;
PRESTON VAN LOON; KEVIN VITALE; NATE WELCH,

*Plaintiffs-Appellants,*

*v.*

DEPARTMENT OF THE TREASURY; OFFICE OF FOREIGN ASSETS CONTROL;
JANET YELLEN, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE TREASURY;
ANDREA M. GACKI, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE
OFFICE OF FOREIGN ASSETS CONTROL,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, No. 1:23-CV-00312 RP
(Hon. Robert L. Pitman)

## BRIEF OF LAW PROFESSORS
## CARLA L. REYES, J.W. VERRET, AND DEL WRIGHT
## AS *AMICI CURIAE* IN SUPPORT OF
## PLAINTIFFS-APPELLANTS AND REVERSAL

Aaron M. Streett
Matthew M. Hilderbrand
**BAKER BOTTS LLP**
910 Louisiana Street
Houston, Texas 77002-4995
Tel: 713.229.1234
Fax: 713.229.1522
aaron.streett@bakerbotts.com

*Counsel for Amici Curiae*

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned hereby supplements the certificate of interested persons in the parties' briefs by naming the following persons who have an interest in the outcome of this litigation.

***Amici Curiae*:**

Carla L. Reyes

J.W. Verret

Del Wright

**Counsel for *Amici Curiae*:**

Aaron M. Streett

Matthew M. Hilderbrand

BAKER BOTTS LLP

*/s/ Aaron M. Streett*
Aaron M. Streett
*Counsel of Record for Amici Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES ........................ i

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF *AMICI* ....................................................................... 1

SUMMARY OF ARGUMENT ............................................................... 3

ARGUMENT ..................................................................................... 5

I.     Tornado Cash Is Not A Person ...................................................... 5

      A.     Primer On Mixers .................................................................. 5

      B.     Tornado Cash Is A Decentralized Mixer ............................ 10

      C.     Tornado Cash Is Not An Entity ........................................... 13

      D.     Why It Matters ................................................................. 16

II.    Tornado Cash Does Not Have Property ....................................... 17

      A.     Smart Contracts Are Computer Programs ............................ 18

      B.     Smart Contracts Are Not Contracts ..................................... 19

      C.     Why It Matters ................................................................. 20

III.   Tornado Cash Is A Privacy Tool ................................................. 22

      A.     The Appeal of Crypto ........................................................ 22

      B.     The Need for Privacy Protections ...................................... 23

      C.     Why It Matters ................................................................. 26

CONCLUSION ................................................................................. 26

CERTIFICATE OF SERVICE ............................................................. 28

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ...................... 29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Americans for Prosperity Foundation v. Bonta*,
   141 S. Ct. 2373 (2021) .................................................................... 24

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) (en banc) ........................................... 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................ 20

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) .......................................................................... 20

*United States v. Apel*,
   571 U.S. 359 (2014) .......................................................................... 17

*United States v. Gratkowski*,
   964 F.3d 307 (5th Cir. 2020) .............................................................. 8

*Van Loon v. Dep't of Treasury*,
   --- F. Supp. 3d ---, 2023 WL 5313091 (W.D. Tex. Aug. 17, 2023) ....... 17, 20, 21

## STATUTES & RULES

22 U.S.C. § 9214(c)(1) ............................................................... 16, 20

22 U.S.C. § 9214(f) ............................................................................ 17

50 U.S.C. § 1702(a)(1)(B) ......................................................... 16, 20

50 U.S.C. § 1705 ............................................................................... 17

Fed. R. App. P. 29(a)(2) ...................................................................... 1

Fed. R. App. P. 29(a)(4)(E) ................................................................. 1

## REGULATIONS

31 C.F.R. § 510.305 .......................................................................... 16

31 C.F.R. § 510.323 ..............................................................20, 21

31 C.F.R. § 578.313 ..................................................................16

Proposal of Special Measure Regarding Convertible Virtual Currency
  Mixing, as a Class of Transactions of Primary Money Laundering
  Concern, 88 Fed. Reg. 72,701 (proposed Oct. 23, 2023) ...................................26

**OTHER AUTHORITIES**

Noelle Acheson, *Crypto Long & Short: No, Bitcoin Was Not a Response to
  the Financial Crisis*, CoinDesk (Jan. 24, 2021) ...................................22

Arkham Research Team, *Understanding Tornado Cash*, Arkham
  Intelligence (Sept. 23, 2023)...............................................................12

Vitalik Buterin (@VitalikButerin), Twitter (Aug. 9, 2022, 3:49 AM)....................24

Vitalik Buterin et al., *Blockchain Privacy and Regulatory Compliance:
  Towards a Practical Equilibrium* (Sept. 6, 2023) ...............................25

Vitalik Buterin, *Ethereum: A Next-Generation Smart Contract and
  Decentralized Application Platform* (2014) ........................................18

Chainanalysis Team, *Crypto Mixers and AML Compliance*, Chainanalysis
  (Aug. 23, 2022)...................................................................................9

Chainanalysis Team, *Trolls Have Sent an Estimated $52,000 in Small
  Tornado Cash Payments Following OFAC Designation*, Chainanalysis
  (Aug. 11, 2022) ...................................................................................25

Marisa T. Coppel, *How OFAC's Tornado Cash Sanctions Violate U.S.
  Citizens' Constitutional Rights*, CoinDesk (Apr. 18, 2023)...............................13

Department of Justice, *Ohio Resident Pleads Guilty to Operating Darknet-
  Based Bitcoin 'Mixer' that Laundered Over $300 Million* (Aug. 18,
  2021) ...................................................................................................9

Matt Egan, *Bank deposit delays: Some customers still haven't been paid*,
  CNN (Nov. 6, 2023) ...........................................................................23

Electronic Frontier Foundation, *Financial Censorship* ...........................................24

Elliptic, *Has a Sanctioned Bitcoin Mixer Been Resurrected to Aid North Korea's Lazarus Group?* (Feb. 13, 2023) ............................................9

Thomas Emmer (@GOPMajorityWhip), Twitter (Aug. 23, 2022 9:30 AM) .........13

Ethereum, *Gas Fees* ....................................................................................7

Ethereum, *What is Ether (ETH)?* .................................................................7

Annika Feign, *What is Blockchain Technology?*, CoinDesk (Nov. 22, 2022) ..........7

Financial Crimes Enforcement Network, *First Bitcoin "Mixer" Penalized by FinCEN for Violating Anti-Money Laundering Laws* (Oct. 19, 2020)................9

Vicky Ge Huang & Caitlin Ostroff, *Bitcoin Booms in Wake of Bank Crisis*, Wall St. J. (Mar. 21, 2023) .........................................................................22

Zachary A. Goldfarb & Karen Tumulty, *IRS admits targeting conservatives for tax scrutiny in 2012 election*, Wash. Post (May 10, 2013)...........................23

Coryanne Hicks, *Understanding Crypto Wallets*, Forbes (Aug. 30, 2023)..............8

*Matt.* 6:3 (King James Version)..................................................................23

Milk Road, *7 Figure Wallet Tracking* (May 19, 2023) ...........................................24

Matthias Nadler & Fabian Schär, *Tornado Cash and Blockchain Privacy: A Primer for Economists and Policymakers*, Fed. Res. Bank of St. Louis Rev. (Feb. 9, 2023) ...........................................................................5, 9, 18, 19

Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (Oct. 31, 2008) ........................................................................................6, 22

Office of Foreign Assets Control, *Burma-related Designations; North Korea Designations; Cyber-related Designation, Cyber-related Designation Removal; Publication of Cyber-related Frequently Asked Questions* (Nov. 8, 2022) .....................................................................................13

Office of Foreign Assets Control, *Frequently Asked Questions* (Nov. 8, 2022) .....................................................................13, 14, 15, 21

Office of Foreign Assets Control, *Specially Designated Nationals List Update* (Aug. 8, 2022) ............................................................................13

Office of Foreign Assets Control, *U.S. Treasury Issues First-Ever Sanctions on a Virtual Currency Mixer, Targets DPRK Cyber Threats* (May 6, 2022) ....................................................................................................9

Open Source Initiative, *Open Source Definition (Annotated)* (July 24, 2006) .......11

Alexey Pertsev et al., *Tornado Cash Privacy Solution Version 1.4* (Dec. 17, 2019) ...................................................................................................10

Carla L. Reyes & Del Wright, *Blockchain Law & Policy: Materials, Cases, and Problems* (West Academic, under contract) ...................................1

Carla L. Reyes, *A Unified Theory of Code-Connected Contracts*, 46 J. Corp. L. 981 (2021) ...................................................................................6, 18

Carla L. Reyes, *Autonomous Business Reality*, 21 Nev. L.J. 437 (2021).................1

Carla L. Reyes, *Autonomous Corporate Personhood*, 96 Wash. L. Rev. 1453 (2021) .........................................................................................................1

Carla L. Reyes, *Conceptualizing Cryptolaw*, 96 Neb. L. Rev. 601 (2017)...........1, 6

Carla L. Reyes, *Creating Cryptolaw for the Uniform Commercial Code*, 78 Wash. & Lee L. Rev. 1521 (2021)........................................................1

Carla L. Reyes, *Emerging Technology's Language Wars: Cryptocurrency*, 64 Wm. & Mary L. Rev. 1193 (2023) ..................................................1

Carla L. Reyes, *Emerging Technology's Language Wars: Smart Contracts*, 85 Wis. L. Rev. Forward 588 (2022)............................................*passim*

Carla L. Reyes, *If Rockefeller Were a Coder*, 87 Geo. Wash. L. Rev. 373 (2019)......................................................................................................16

Carla L. Reyes et al., *Distributed Governance*, 59 Wm. & Mary L. Rev. Online 1 (2017) ...................................................................................1

Sam Reynolds, *Tornado Cash Co-Founder Says the Mixer Protocol Is Unstoppable*, CoinDesk (Jan. 25, 2022).........................................5, 11

Robert Stevens, *What Are Crypto Whales and Why Are They Important?*, CoinDesk (Mar. 15, 2023) .................................................................24

Nick Szabo, *The Idea of Smart Contracts* (1997)..................................................18

Ian Talley & Dustin Volz, *U.S. Sanctions Crypto Platform Tornado Cash, Says It Laundered Billions*, Wall St. J. (Aug. 8, 2022) ......................................13

Eli Tan, *Hacker Steals Bill Murray's Crypto After $185K NFT Charity Auction*, CoinDesk (Sept. 2, 2022) ....................................................25

Jeremy Tanner, *Didn't receive a bank deposit Friday? This may be why*, The Hill (Nov. 3, 2023).............................................................23

Teleforum, *Is the Office of Foreign Assets Control's Sanctioning of Tornado Cash a Threat to the Future of Financial Privacy?* (Oct. 26, 2022)....................2

Tornado Cash, *Tornado.Cash Governance Proposal*, Medium (Dec. 17, 2020) ...................................................................14, 16

Tornado Cash, *Tornado.cash Is Finally Trustless!*, Medium (May 20, 2020)..11, 19

Peter Van Valkenburgh, *What is Bitcoin mining, and why is it necessary?*, Coin Center (Dec. 15, 2014) ...................................................7

J.W. Verret, *I am Spartacus (I am Tornado Cash)*, Substack (Aug. 16, 2022) ........2

J.W. Verret, *Treasury officials would have done more for national security by leaving Tornado Cash alone*, Cointelegraph (last visited Nov. 20, 2023) ................................................................2

Paul Vigna, *Who Is Bitcoin Creator Satoshi Nakamoto? What We Know— and Don't Know*, Wall St. J. (Dec. 7, 2021).........................................24

Alex Wade et al., *How does Tornado Cash work?*, Coin Center (Aug. 25, 2022) .................................................................*passim*

Angela Walch, *The Path of the Blockchain Lexicon (and the Law)*, 36 Rev. Banking & Fin. L. 713 (2017) ...........................................10

Gary Weinstein, *AI and Blockchain Analytics: The Urgent Need for Crypto Privacy Tools*, Forbes (Apr. 7, 2023) ...............................................8

Del Wright, Jr., *A Short & Happy Guide to Bitcoin, Blockchain and Crypto* (2020)................................................................2

Del Wright, Jr., *Broken Infrastructure*, 90 UMKC L. Rev. 861 (2022)....................2

Del Wright, Jr., *Crypto & Blockchain Law - In a Nutshell* (forthcoming)................2

Del Wright, Jr., *Quadratic Voting and Blockchain Governance*, 88 UMKC
　　L. Rev. 475 (2019) ................................................................................3

# INTEREST OF *AMICI*

*Amici* are law professors at the forefront of legal scholarship relating to the regulation of cryptocurrency and other decentralized technologies.[1]

Carla L. Reyes is an Associate Professor of Law at Southern Methodist University Dedman School of Law. She is a faculty affiliate with the Initiative for CryptoCurrencies & Contracts and with the University College London Centre for Blockchain Research. She serves as the Research Director for the Uniform Law Commission's Technology Committee and as an Associate Research Director of the Permanent Editorial Board of the Uniform Commercial Code. She has written books and articles on legal issues arising from blockchains and artificial intelligence.[2] Of special relevance, she has studied how legal professionals misunderstand terms used by the blockchain community.[3]

---

[1] All parties consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici* or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). *Amici* appear in their personal capacity, and the views expressed herein should not be attributed to their respective universities or to their other academic or professional affiliations.

[2] *See*, *e.g.*, Carla L. Reyes & Del Wright, *Blockchain Law & Policy: Materials, Cases, and Problems* (West Academic, under contract); Carla L. Reyes, *Creating Cryptolaw for the Uniform Commercial Code*, 78 Wash. & Lee L. Rev. 1521 (2021); Carla L. Reyes, *Autonomous Business Reality*, 21 Nev. L.J. 437 (2021); Carla L. Reyes, *Autonomous Corporate Personhood*, 96 Wash. L. Rev. 1453 (2021); Carla L. Reyes, *Conceptualizing Cryptolaw*, 96 Neb. L. Rev. 601 (2017); Carla L. Reyes, Nizan Geslevich Packin & Benjamin P. Edwards, *Distributed Governance*, 59 Wm. & Mary L. Rev. Online 1 (2017).

[3] *See*, *e.g.*, Carla L. Reyes, *Emerging Technology's Language Wars: Cryptocurrency*, 64 Wm. & Mary L. Rev. 1193 (2023); Carla L. Reyes, *Emerging Technology's Language Wars: Smart Contracts*, 85 Wis. L. Rev. Forward 588 (2022).

J.W. Verret—the "BlockProf," as he is known on X[4]—is a forensic accountant and securities lawyer, as well as an Associate Professor at the Antonin Scalia Law School at George Mason University.  He served as Senior Counsel and Chief Economist at the U.S. House of Representatives Financial Services Committee, where he oversaw federal anti-money-laundering developments and the Treasury Department's evolving attempts to regulate digital assets.  He serves on the board of the Zcash Foundation, which funds research into cryptocurrency privacy, and he is the Founder of the Crypto Freedom Lab.  Prof. Verret has published and dialogued on the Tornado Cash sanctions, which have attracted international attention.[5]  He owns cryptocurrencies and understands firsthand the need for privacy tools like Tornado Cash.

Del Wright is a Professor of Law at the University of Missouri – Kansas City School of Law.  His research focuses on cryptoassets and the regulation of blockchain technologies, and he frequently teaches and publishes on these subjects.[6]

---

[4] BlockProf (@JWVerret), Twitter, https://twitter.com/JWVerret.

[5] *See, e.g.*, *Is the Office of Foreign Assets Control's Sanctioning of Tornado Cash a Threat to the Future of Financial Privacy?*, Teleforum (Oct. 26, 2022), https://fedsoc.org/events/ofac-s-sanctioning-of-tornado-cash-a-threat-to-the-future-of-financial-privacy; J.W. Verret, *Treasury officials would have done more for national security by leaving Tornado Cash alone*, Cointelegraph (last visited Nov. 20, 2023), https://cointelegraph.com/news/the-treasury-department-would-do-more-for-national-security-by-leaving-tornado-cash-alone/amp; J.W. Verret, *I am Spartacus (I am Tornado Cash)*, Substack (Aug. 16, 2022), https://jwverret.substack.com/p/blockprof-be6.

[6] Del Wright, Jr., *Crypto & Blockchain Law – In a Nutshell* (forthcoming); Del Wright, Jr., *A Short & Happy Guide to Bitcoin, Blockchain and Crypto* (2020); Del Wright, Jr., *Broken Infrastructure*,

As a former federal prosecutor with the Department of Justice, he is keenly aware of the need to balance strong support for law enforcement with the constitutional and statutory limits on agency power.

OFAC's designation of an open-source, non-custodial mixer raises novel legal issues for which a technological understanding is necessary. Blockchain-related terminology involves technical terms of art that often mean something else in another context—like "smart contracts," which refer to a specific technical artifact that usually has nothing to do with creating legally enforceable contracts. *Amici* urge the Court to consider what these words mean to the community that actually uses them, and not to rely solely on the agencies who would regulate it.

## SUMMARY OF ARGUMENT

What if your bank statements, credit-card bills, credit reports, and paychecks were posted online? Major blockchain protocols like Bitcoin and Ethereum are fully public, containing records of every single transaction performed via the blockchain. Users of cryptocurrency can maintain some privacy by using pseudonymous "wallets," but a wallet can be linked to a real-world person, in which case that person's entire financial history is traceable.

---

90 UMKC L. Rev. 861 (2022); Del Wright, Jr., *Quadratic Voting and Blockchain Governance*, 88 UMKC L. Rev. 475 (2019).

"Mixers" restore user privacy in cryptocurrency transactions by pooling deposited funds together and redistributing them. Mixing services are often performed by third-parties who take custody of funds, mix them, and return them.

Tornado Cash is a mixer that operates without any centralized person or entity. It is a set of self-executing scripts deployed on the Ethereum blockchain. Users of Tornado Cash value its non-custodial, decentralized, and immutable characteristics.

Treasury's Office of Foreign Assets Control (OFAC) sanctioned Tornado Cash, invoking its authority to sanction "foreign nationals" or "persons" by freezing their "property." The district court upheld the agency's sanction, but this Court should reverse.

*First*, Tornado Cash is a software program, not a person. OFAC might as well have tried to sanction an open-source online calculator. "Tornado Cash," as understood by the relevant community, refers to the online tool and not to the amorphous group of loosely affiliated strangers that OFAC described as "Tornado Cash."

*Second*, OFAC has not established why Tornado Cash's immutable smart contracts are "property." Smart contracts are open-source software applications that are incapable of being owned, possessed, or controlled. The term "smart *contract*" is a confusing misnomer, especially to lawyers, and the district court succumbed to common misconceptions about what they are.

***Third***, Tornado Cash is basic cybersecurity hygiene in a world of radical transparency. Mixers restore a baseline level of privacy for blockchain users that *all* of us expect in our personal finances—again, if your bank statements were posted online, nobody would blame you for trying to reclaim some privacy.

## ARGUMENT

## I. Tornado Cash Is Not A Person

Tornado Cash is an online, open-source, decentralized, non-custodial mixing protocol that runs primarily on the Ethereum blockchain.[7] Its developers burned the admin key, making Tornado Cash an "unstoppable," self-executing set of scripts.[8] To fully grasp the significance of these details, we must start by summarizing some key technical concepts.

### A. Primer On Mixers

The impetus behind modern blockchain technology was the desire to facilitate electronic payments without having to trust third parties (like banks) to transfer the funds. This is because third-party intermediaries impose transaction costs and present the risk of a central point of failure (like the bank's servers and financial

---

[7] Matthias Nadler & Fabian Schär, *Tornado Cash and Blockchain Privacy: A Primer for Economists and Policymakers*, Fed. Res. Bank of St. Louis Rev. (Feb. 9, 2023), https://ssrn.com/abstract=4352337.

[8] Sam Reynolds, *Tornado Cash Co-Founder Says the Mixer Protocol Is Unstoppable*, CoinDesk (Jan. 25, 2022), https://www.coindesk.com/tech/2022/01/25/tornado-cash-co-founder-says-the-mixer-protocol-is-unstoppable. *Amici* acknowledge that the admin keys for some Tornado Cash functions were not removed, but the admin keys for the program's primary functions—the ones relevant to the mixing protocols and OFAC's sanctions—were burned.

health).  One must also *trust* the third party to deal honestly with the funds.  Pioneers in the blockchain movement thus looked for alternatives to this trust-based model of electronic commerce.[9]

Blockchain protocols arose as one solution to the third-party problem. Blockchain protocols are sometimes analogized to ledgers.[10]  Ledgers, of course, record financial transactions.  Blockchain protocols record transactions, too.[11]  But unlike the private ledgers maintained by financial institutions, no single entity has control over a blockchain protocol.  Instead, blockchain protocols are maintained by the continuing consensus of a community of users, relying on a peer-to-peer network and a shared network protocol instead of a central server.[12]  Each user has equal access to the ledger, and anybody can participate in the network.

Validators power blockchains.  Sometimes called "miners," these are users whose computers support the blockchain by recording and validating transactions,

---

[9] Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* at 1 (Oct. 31, 2008), https://bitcoin.org/bitcoin.pdf.  Satoshi Nakamoto is the pseudonymous creator of Bitcoin.

[10] Some use the phrase "decentralized ledgers" in this context.  *Amici* acknowledge that there is some debate about the appropriate terminology surrounding "blockchain" versus "decentralized ledger technology."  *See* Reyes, *Conceptualizing Cryptolaw*, *supra* note 2, at 389-90.  For the sake of precision, and to avoid any misconceptions about how blockchain protocols work, *amici* prefer to use the term blockchain protocol.

[11] Technically, a blockchain protocol tracks transitions in "state," which refers to the content of program data stored in memory at any given point in the program's execution.  *See* Carla L. Reyes, *A Unified Theory of Code-Connected Contracts*, 46 J. Corp. L. 981, 992 (2021).

[12] Reyes, *Conceptualizing Cryptolaw*, *supra* note 2, at 389-90.

thus securing the ledger.[13]  To oversimplify both the process and the differences among different blockchains, validators do this by verifying the time stamps and digital signatures of transactions, checking them against the public blockchain, and then, upon reaching a consensus with other validators, adding the new information to the shared ledger as a new "block" on the blockchain.[14]  In exchange for their service, validators are paid by the blockchain in the ledger's native cryptocurrency.[15]  On the Ethereum blockchain, that cryptocurrency is called ether (ETH).[16]  Parties seeking to transact on Ethereum are responsible for paying a network processing fee—known as "gas"—which is passed on to compensate validators, creating an incentive for them to maintain the blockchain.[17]

Transparency is a key feature of blockchain technology.  Radical transparency allows validators to verify transactions and thus ensure the accuracy and integrity of the shared record of transactions.  Because that record is fully auditable by the community, the blockchain is nearly impossible to tamper with or destroy, as any alterations could be detected simply by examining the blocks in the chain.[18]

---

[13] Peter Van Valkenburgh, *What is Bitcoin mining, and why is it necessary?*, Coin Center (Dec. 15, 2014), https://www.coincenter.org/education/advanced-topics/mining.

[14] *Id.*

[15] *Id.*

[16] *What is Ether (ETH)?*, Ethereum, https://ethereum.org/en/eth (last visited Nov. 20, 2023).

[17] *Gas Fees*, Ethereum, https://ethereum.org/en/gas (last visited Nov. 20, 2023).

[18] Annika Feign, *What is Blockchain Technology?*, CoinDesk (Nov. 22, 2022), https://www.coindesk.com/learn/what-is-blockchain-technology.

But radical transparency also has drawbacks. Because blockchains are public and provide a permanent recorded history of all transactions, it is possible to know someone's entire financial history on the blockchain. Although a user interacts with the public blockchain using a pseudonymous public key address that is associated with a private key held in a "wallet,"[19] an outside observer can link wallets—and thus public key addresses—to real-world identities. Often, it is not difficult to do this, especially with the assistance of software programs that analyze public blockchain data.[20]

Mixers are a solution to the transparency problem. Also known as tumblers, mixers vary in structure and in how they function, but generally they restore privacy by obscuring the transaction history of mixed cryptocurrencies. The details vary, but mixers do this by pooling deposited funds, shuffling them up, and then further transferring the funds to a new wallet unassociated with the depositing wallet.[21]

---

[19] "Wallet" is another term of art, referring to the software that allows users to manage the private keys to their cryptocurrency associated with their public-facing address, letting users transact in the units of data we refer to as cryptocurrency. Coryanne Hicks, *Understanding Crypto Wallets*, Forbes (Aug. 30, 2023), https://www.forbes.com/advisor/investing/cryptocurrency/crypto-wallets. On Ethereum, a wallet address is a string of 42 alpha-numeric characters.

[20] *See, e.g.*, *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020); Gary Weinstein, *AI and Blockchain Analytics: The Urgent Need for Crypto Privacy Tools*, Forbes (Apr. 7, 2023), https://www.forbes.com/sites/digital-assets/2023/04/07/ai-and-blockchain-analytics-the-urgent-need-for-crypto-privacy-tools/?sh=4d1b133b52c8.

[21] Alex Wade, Michael Lewellen & Peter Van Valkenburgh, *How does Tornado Cash work?*, Coin Center (Aug. 25, 2022), https://www.coincenter.org/education/advanced-topics/how-does-tornado-cash-work.

Mixing services have existed at least as long as cryptocurrencies, but historically they were centralized and custodial. This means that a third party performed the mixing service (centralized) and did so by taking control of the digital asset to perform the mixing function (custodial).[22] For example, Helix, the first cryptocurrency mixer sanctioned by the Treasury Department's Financial Crimes Enforcement Network (FinCEN), was operated by a man from Ohio.[23] The first cryptocurrency mixer that OFAC designated, Blender.io, was also a custodial mixer.[24] Blender.io ceased operations in April 2022,[25] and European authorities seized the servers running the mixer.[26] There are major drawbacks to using centralized mixers: they can be shut down, and the third-party custodian might steal deposited funds.[27]

---

[22] Nadler & Schär, *supra* note 7, at 3.

[23] Department of Justice, *Ohio Resident Pleads Guilty to Operating Darknet-Based Bitcoin 'Mixer' that Laundered Over $300 Million* (Aug. 18, 2021), https://www.justice.gov/opa/pr/ohio-resident-pleads-guilty-operating-darknet-based-bitcoin-mixer-laundered-over-300-million; *see* Financial Crimes Enforcement Network, *First Bitcoin "Mixer" Penalized by FinCEN for Violating Anti-Money Laundering Laws* (Oct. 19, 2020), https://www.fincen.gov/news/news-releases/first-bitcoin-mixer-penalized-fincen-violating-anti-money-laundering-laws.

[24] Wade et al., *supra* note 21; *see* Office of Foreign Assets Control, *U.S. Treasury Issues First-Ever Sanctions on a Virtual Currency Mixer, Targets DPRK Cyber Threats* (May 6, 2022), https://home.treasury.gov/news/press-releases/jy0768.

[25] *Has a Sanctioned Bitcoin Mixer Been Resurrected to Aid North Korea's Lazarus Group?*, Elliptic, (Feb. 13, 2023), https://hub.elliptic.co/analysis/has-a-sanctioned-bitcoin-mixer-been-resurrected-to-aid-north-korea-s-lazarus-group.

[26] Chainalysis Team, *Crypto Mixers and AML Compliance*, Chainalysis (Aug. 23, 2022), https://www.chainalysis.com/blog/crypto-mixers.

[27] Nadler & Schär, *supra* note 7, at 3.

Tornado Cash is fundamentally different.

## B.    Tornado Cash Is A Decentralized Mixer

Tornado Cash is decentralized, non-custodial, and not offered as a service by anybody, meaning there is no third party doing the mixing, and nobody takes control of the funds. Tornado Cash also operates according to "immutable" smart contracts for which the admin key was destroyed, which means the code cannot be altered.[28]

Ethereum users interact with the Tornado Cash protocol by depositing funds into the application and then withdrawing them at a later time to a different account.[29] The depositing wallet is given a private key—like a receipt—which authorizes any account bearing that key to withdraw the funds later on.[30] Tornado Cash accepts deposits in increments (1s, 10s, 100s,) and mixes like denominations together (1s with 1s, 10s with 10s).[31] The more deposits in the pool, the harder it is for an outside observer to link deposit to withdrawal.[32]

---

[28] The term "immutable" is a term of art, referring only to the fact that it is highly improbable that the blockchain record can be tampered with. *See, e.g.*, Angela Walch, *The Path of the Blockchain Lexicon (and the Law)*, 36 Rev. Banking & Fin. L. 713, 735-45 (2017). *Amici* continue to use this term of art even though it does not quite mean what lay persons think of when hearing it.

[29] Wade et al., *supra* note 21; *see also* Alexey Pertsev, Roman Semenov & Roman Storm, *Tornado Cash Privacy Solution Version 1.4* at 1 (Dec. 17, 2019), https://berkeley-defi.github.io/assets/material/Tornado%20Cash%20Whitepaper.pdf.

[30] Pertsev et al., *supra* note 29, at 3.

[31] Wade et al., *supra* note 21.

[32] *Id.*

The program was deployed not to a central server but instead to the Ethereum blockchain. Its functions are self-executing according to strict and unchangeable scripts.[33] Once funds are deposited into the pools, the funds will not release unless a user presents with the depositor's unique key code.[34] Because Tornado Cash's operations are entirely pre-determined, at no point can an intermediary access or control the deposited funds.

Tornado Cash's code is open-source, and the instance of the code deployed to the Ethereum blockchain is immutable. The source code itself, which was developed by a community of developers, is freely available online, meaning anyone can view, inspect, and use it.[35] The specific instance of the code deployed to Ethereum, however, is unchangeable. The developer team publicly and irrevocably sealed the Ethereum-deployed Tornado Cash code by destroying the key.[36] According to one of the developers, immutability was the goal: "it wouldn't make much sense if some third party [like developers] would have control over [Tornado Cash]."[37]

---

[33] *Id.* The term "self-executing" is another term of art that is often misunderstood to mean that these smart contracts are intelligent, acting of their own accord. In reality, smart contracts are passive and must be "called" (triggered) before the code will execute. *See* Reyes, *Smart Contracts*, *supra* note 3, at 94.

[34] Wade et al., *supra* note 21.

[35] *Id.*; *see also The Open Source Definition (Annotated)*, Open Source Initiative (July 24, 2006), https://opensource.org/definition-annotated. Tornado Cash's source code can be found online.

[36] Wade et al., *supra* note 21; Tornado Cash, *Tornado.cash Is Finally Trustless!*, Medium (May 20, 2020), https://tornado-cash.medium.com/tornado-cash-is-finally-trustless-a6e119c1d1c2.

[37] Reynolds, *supra* note 8.

Finally, users have the option of engaging a relayer for additional privacy. Recall that anyone trying to execute a transaction on Ethereum must pay for gas. Thus, any wallet account attempting to withdraw funds from Tornado Cash must be preloaded with funds. Sending funds to the withdrawal account, however, could create a link between the deposit account and the withdrawal account. To reduce this risk, users can select a third-party "relayer" from Tornado Cash's Relay Registry.[38] The relayer is a person who pays gas to the blockchain and triggers withdrawal of the deposited funds to the user's wallet, earning a fee in the process.[39] The Tornado Cash protocol ensures that withdrawn funds reach the intended recipient and are never in the relayer's custody, meaning the relayer cannot steal the funds.[40]

These features are what make Tornado Cash attractive. Because it is non-custodial, decentralized, and immutable, no third party ever controls deposited funds, and the program cannot be altered, manipulated, or destroyed. Tornado Cash became the most popular mixer on Ethereum, resulting in a large anonymity set, further adding to its success.[41]

---

[38] Wade et al., *supra* note 21.

[39] *Id.*

[40] *Id.*

[41] Arkham Research Team, *Understanding Tornado Cash*, Arkham Intelligence (Sept. 23, 2023), https://www.arkhamintelligence.com/research/understanding-tornado-cash.

## C. Tornado Cash Is Not An Entity

OFAC first sanctioned Tornado Cash in August 2022.[42]  OFAC's designation of autonomous software, instead of a person, shocked the cryptocurrency community, with even members of Congress demanding that the agency explain itself.[43]  A few months later, in November, OFAC redesignated Tornado Cash and simultaneously published Frequently Asked Questions entries, which attempted to explain its theory of Tornado Cash's personhood.

FAQ entry 1095 declared that "the entity known as Tornado Cash" is in fact an *organization* consisting of (1) "its founders and other associated developers" and (2) "the Tornado Cash DAO."[44]  In the very same FAQ, however, the agency said it

---

[42] Office of Foreign Assets Control, *Specially Designated Nationals List Update* (Aug. 8, 2022), https://ofac.treasury.gov/recent-actions/20220808 (original designation); Office of Foreign Assets Control, *Burma-related Designations; North Korea Designations; Cyber-related Designation, Cyber-related Designation Removal; Publication of Cyber-related Frequently Asked Questions* (Nov. 8, 2022), https://ofac.treasury.gov/recent-actions/20221108 (re-designation).

[43] Representative Thomas Emmer (@GOPMajorityWhip), Twitter (Aug. 23, 2022 9:30 AM), https://twitter.com/GOPMajorityWhip/status/1562084891247902721; Marisa T. Coppel, *How OFAC's Tornado Cash Sanctions Violate U.S. Citizens' Constitutional Rights*, CoinDesk (Apr. 18, 2023) ("OFAC's decision to sanction Tornado Cash is unprecedented, marking the first time that software has been targeted for sanctions."), https://www.coindesk.com/consensus-magazine/2023/04/18/how-ofacs-tornado-cash-sanctions-violate-us-citizens-constitutional-rights; Ian Talley & Dustin Volz, *U.S. Sanctions Crypto Platform Tornado Cash, Says It Laundered Billions*, Wall St. J. (Aug. 8, 2022), https://www.wsj.com/articles/u-s-sanctions-virtual-currency-mixer-tornado-cash-11659971832.

[44] Office of Foreign Assets Control, *Frequently Asked Questions* (Nov. 8, 2022) (hereinafter "*FAQ No. 1095*"), https://ofac.treasury.gov/faqs/1095.

had *not* designated "Tornado Cash's individual founders, developers, members of the DAO, or users, or other persons involved in supporting Tornado Cash."[45]

But there is no "entity *known* as Tornado Cash." OFAC made it up. Tornado Cash was, and still is, known as a decentralized mixing tool—a set of computer software programs deployed to the Ethereum protocol as persistent scripts that operate without any third party. Hence the crypto community's surprise at OFAC's designation in August 2022. As far as *amici* are aware, it was only with OFAC's designation in Fall 2022 that the name "Tornado Cash" would come to refer to two very different things: one, the mixing tool everyone knew it to be, and two, OFAC's purported "entity" consisting of the software project's founders, developers, and DAO.

*Amici* acknowledge that Tornado Cash's developers, using the pseudonymous username "Tornado Cash," posted articles about the software's development on the social journalism platform known as Medium from 2019 until 2022.[46] But these developers publishing about the software's progress are not the "Tornado Cash" entity OFAC designated—indeed the TORN token (and thus the DAO) was not even proposed until the end of 2020.[47]

---

[45] *Id.*

[46] *See* Tornado Cash, Medium, https://tornado-cash.medium.com.

[47] Tornado Cash, *Tornado.Cash Governance Proposal*, Medium (Dec. 17, 2020), https://tornado-cash.medium.com/tornado-cash-governance-proposal-a55c5c7d0703.

OFAC is speaking out of both sides of its mouth. On one hand, OFAC has not designated the founders, developers, or DAO—something OFAC could likely do straightforwardly under its powers to designate "persons." Yet on the other hand, it claims that those very groups of persons collectively comprise an unincorporated organization it calls "Tornado Cash," empowering it to improperly designate a mixing tool. This contrived redefinition of Tornado Cash makes the agency's real target clear: the protocol, not the people. The agency is playing word games to expand its statutory authority.

Indeed, the agency's formulation of the supposed Tornado Cash entity betrays itself. If "Tornado Cash" refers to a group of persons, as OFAC states, then it makes no sense to say that the group is composed of "*its founders and developers*."[48] Groups of people do not have "developers." Software programs do. The agency's own designation thus confirms it has designated Tornado Cash the program and not Tornado Cash the purported organization.

Finally, *amici* spot another problem with the agency's theory of Tornado Cash and its personhood. OFAC defined the Tornado Cash organization as including its DAO. But "DAO" stands for "decentralized autonomous organization," which is simply a network of interacting smart contracts—*software programs*—which allow

---

[48] *FAQ No. 1095*, *supra* note 44 (emphasis added).

users to undertake some activity.[49]  Sometimes, a DAO is structured so that people

who hold tokens in a decentralized platform, like Tornado Cash, can vote on

upgrades to the platform.[50]  But the DAO itself is just another program like the

Tornado Cash protocol.[51]  OFAC cannot solve its personhood problem by pointing

to yet another open-source and decentralized computer program.

### D.    Why It Matters

As relevant here, Treasury has authority to sanction only a "foreign country

or national" under the International Emergency Powers Act (IEEPA),[52] or a "person"

under the North Korea Sanctions & Policy Enhancement Act (North Korea Act).[53]

Treasury has, by regulation, expanded the definition of "person" to mean "an

individual or entity,"[54] which it further defined to mean "a partnership, association,

trust, joint venture, corporation, group, subgroup, or other organization."[55]

---

[49] *See* Carla L. Reyes, *If Rockefeller Were a Coder*, 87 Geo. Wash. L. Rev. 373, 387 (2019).

[50] *See id.* at 387-89.

[51] *See* Wade et al., *supra* note 21 (listing Ethereum addresses sanctioned by OFAC, including the governance smart contracts); *see* Tornado Cash, *supra* note 47 (proposing Tornado Cash governance smart contract structure).

[52] 50 U.S.C. § 1702(a)(1)(B).

[53] 22 U.S.C. § 9214(c)(1).

[54] 31 C.F.R. § 578.313.

[55] 31 C.F.R. § 510.305.

OFAC's designation of Tornado Cash is unlawful because Tornado Cash is software, not a "foreign national," "person," "association," "joint venture," "group," or even "other organization" within the plain meaning of those terms.

The district court was wrong to blindly defer to the agency in its application of the statutory term "person" to Tornado Cash.[56] This is because OFAC, in essence, created a new criminal law. Because of the designation, Americans cannot transact with Tornado Cash—an open-source software program that enhances privacy without the existence of a third-party person or entity providing mixing services— without risking hefty criminal penalties.[57] Americans now face criminal liability for the very reasonable act of seeking financial privacy. Deference is not appropriate when an agency's action imposes criminal penalties.[58]

## II. Tornado Cash Does Not Have Property

Tornado Cash is an open-source software program deployed on a blockchain. As a non-person, it cannot own property. But even if the court were to accept, *arguendo*, the existence of a Tornado Cash legal entity composed of the protocol's

---

[56] *Van Loon v. Dep't of Treasury*, --- F. Supp. 3d ---, 2023 WL 5313091, at *7 (W.D. Tex. Aug. 17, 2023).

[57] 50 U.S.C. § 1705; 22 U.S.C. § 9214(f).

[58] *United States v. Apel*, 571 U.S. 359, 369 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference." (citing *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment))); *Cargill v. Garland*, 57 F.4th 447, 467 (5th Cir. 2023) (en banc) ("We must not apply *Chevron* [deference] where, as here, the Government seeks to define the scope of activities that subject the public to criminal penalties."), *cert. granted*, No. 22-976 (U.S. Nov. 3, 2023).

founders, developers, and the DAO, the agency's theory suffers from another problem: that entity does not have property interests in the immutable smart contracts designated in the OFAC order. In holding that the supposed Tornado Cash association possesses property interests in the immutable smart contracts associated with the Tornado Cash protocol, the district court seems to have misunderstood the nature of smart contracts.

## A. Smart Contracts Are Computer Programs

Again, we start with the basics. Ethereum was designed to allow for more complex transactions than Bitcoin and thus promote a robust digital economy.[59] To do this, Ethereum relies on programs called "smart contracts."[60]

Originally proposed in the 1990s,[61] a smart contract is a computer program that takes certain actions upon receiving a prompt.[62] "In other words, smart contracts are computer code that says, 'if data is received that X has occurred, Y will execute.'"[63]

---

[59] Vitalik Buterin, *Ethereum: A Next-Generation Smart Contract and Decentralized Application Platform* (2014).

[60] *Id.*

[61] Nick Szabo, *The Idea of Smart Contracts* (1997), https://nakamotoinstitute.org/the-idea-of-smart-contracts.

[62] Reyes, *Smart Contracts*, *supra* note 3, at 93; Nadler & Schär, *supra* note 7, at 3.

[63] Reyes, *A Unified Theory*, *supra* note 11, at 987 (citation omitted).

Once a smart contract is deployed on Ethereum, it gets a unique address, which allows Ethereum users to interact with the program, including by sending cryptocurrency or tokens to the smart contract's address.[64]  Funds sent to smart contracts like Tornado Cash's are locked at that address and cannot be used in any other way until the smart contract is prompted to release them.[65]

The Ethereum-deployed smart contracts comprising Tornado Cash's mixing protocol are "immutable," meaning they cannot be altered.  This is because, in May 2020, Tornado Cash's developers deployed the smart contracts on Ethereum and destroyed the ability to update the code.[66]

## B.    Smart Contracts Are Not Contracts

The term "smart contract" is an unfortunate misnomer for lawyers, as it is loaded with assumed meaning for those with law degrees.  One of the *amici* found empirical evidence confirming that the legal community "impose[s] the meaning of the word contract as a term of art in law onto the technical development and uses for smart contracts, a technical term of art with a different meaning" to the blockchain community. [67]  Smart contracts, however, are merely self-executing "if-then" computer programs.

---

[64] Wade et al., *supra* note 21.

[65] Nadler & Schär, *supra* note 7, at 3.

[66] Wade et al., *supra* note 21; Tornado Cash, *supra* note 36.

[67] Reyes, *Smart Contracts*, *supra* note 3, at 113.

## C.    Why It Matters

Relevant here, Treasury has authority to block only transactions involving "property in which any foreign country or a national thereof has any interest" under IEEPA,[68] and transactions in "property and interests in property" of a person designated under the North Korea Act.[69]  The district court's affirmance on grounds that immutable smart contracts are "property" cannot stand.[70]

In concluding that Tornado Cash's immutable smart contracts are property, the district court fell into the trap of reflexively assessing "smart contracts" against common legal terminology, rather than accounting for their technical reality.  The court noted that Treasury regulations define "property and property interest" as including "contracts of any nature whatsoever"[71] and reasoned as follows: "smart contracts" are "merely a code-enabled species of unilateral contracts," a "type of contract and, thus, a type of property within the meaning of the regulation."[72]  But as explained, "smart contract" in this context means an if-then computer software

---

[68] 50 U.S.C. § 1702(a)(1)(B).

[69] 22 U.S.C. § 9214(c)(1).

[70] While *amici* cannot rule out the possibility that there may be other theories as to whether persons can have property interests in immutable smart contracts, OFAC's designation can be upheld only on the theory it gave when enacting the sanction.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

[71] 31 C.F.R. § 510.323.

[72] *Van Loon v. Dep't of Treasury*, --- F. Supp. 3d ---, 2023 WL 5313091, at *9-10 (W.D. Tex. Aug. 17, 2023).

program deployed to a blockchain protocol where it sits and waits to be used; it does not refer to a "contract" in the legal sense. Smart contracts are not "contracts of any nature whatsoever" under the regulation and therefore cannot be a property or an interest in property under that theory.[73]

The district court separately erred in theorizing that the purported Tornado Cash entity has a "beneficial interest" in the smart contracts because its DAO can receive indirect compensation from relayer-assisted transactions.[74] This theory suffers from an obvious logical flaw: OFAC has not equated the purported Tornado Cash entity with the DAO, which is not a designated entity.[75] Even assuming the indirect benefit that some TORN token holders might receive from relayer-supported transactions is an interest in property, it is illogical to attribute the property of the

---

[73] *See* 31 C.F.R. § 510.323. Even if the district court had grounded its rationale in the "services of any nature" prong of the agency's definition, *see id.*, the result would be no different. On a plain reading of "services," the term refers to work done by one person on behalf of another. Thus, even if Tornado Cash is an organization composed of the software program's founders, developers, and the DAO, none of those persons, either as individuals or acting in concert as an organization, perform any services on behalf of other people. At no point do they participate in the deposit, mixing, or even withdrawal of funds on behalf of users of the Tornado Cash software. Tornado Cash is a tool, not a service.

[74] *Van Loon*, 2023 WL 5313091, at *10 ("Tornado Cash receives a regular stream of revenue from the smart contracts in the form of TORN tokens transferred to the DAO. . . ."). *Amici* view this characterization as technically inaccurate. If TORN tokens were ever transferred from relayers to other TORN token holders, such transactions occurred through smart contracts separate from those that the relayers used to withdraw funds from the mixer.

[75] *FAQ No. 1095*, *supra* note 44 (identifying the Tornado Cash "entity" as an organization consisting of the DAO *plus* the program's founders and its developers, while not designating any of the putative organization's component parts).

DAO (not designated) to Tornado Cash (designated) because, on the agency's own theory, those two putative entities (both smart contracts) are not identical.

In sum, the immutable contracts are not "property" or an "interest in property" of any foreign national or designated person. OFAC therefore lacks authority to block Americans from using the smart contracts.

## III. Tornado Cash Is A Privacy Tool

### A. The Appeal of Crypto

Although some consider cryptocurrencies to be a speculative investment, they are a widely accepted medium of exchange. To this community, cryptocurrency represents an alternative to fiat currency and dependence on third parties. Recall that the impetus behind the development of Bitcoin itself was the desire to reduce reliance on centralized financial institutions.[76] While Bitcoin was in development before the 2008 financial crisis, it is no accident that Bitcoin's rise followed closely on its heels.[77]

It is not difficult to see why decentralization is attractive. Just this year, Americans witnessed the collapse of reputable financial institutions.[78] Indeed, just

---

[76] Nakamoto, *supra* note 9 at 1.

[77] Noelle Acheson, *Crypto Long & Short: No, Bitcoin Was Not a Response to the Financial Crisis*, CoinDesk (Jan. 24, 2021), https://www.coindesk.com/markets/2021/01/24/crypto-long-short-no-bitcoin-was-not-a-response-to-the-financial-crisis.

[78] Vicky Ge Huang & Caitlin Ostroff, *Bitcoin Booms in Wake of Bank Crisis*, Wall St. J. (Mar. 21, 2023) (discussing the rise in cryptocurrency prices after the collapse of Silicon Valley Bank and

this month, the Automated Clearing House (ACH)—the very "backbone of the electronic funds transfer system"—glitched, halting many transactions nationwide.[79]

As cryptocurrency becomes more mainstream, the need for privacy on public blockchains is ever more pressing. Reliable and efficient mixers like Tornado Cash are critical privacy solutions.

### B. The Need for Privacy Protections

Nobody doubts that bad actors abuse mixers. But there are also perfectly legitimate reasons to use mixers—just like there are legitimate reasons to pay for something in cash.

Charitable giving, for instance. There are many good, even religious, reasons to give anonymously.[80] There are also more practical reasons to give privately, such as when making gifts to unpopular causes.[81] For instance, centralized financial institutions can bar transactions with groups they disfavor, exerting pressure to shut

---

Signature Bank in early 2023), https://www.wsj.com/articles/bitcoin-booms-on-back-of-bank-crisis-6c388bd9.

[79] Jeremy Tanner, *Didn't receive a bank deposit Friday? This may be why*, The Hill (Nov. 3, 2023), https://thehill.com/homenews/nexstar_media_wire/4292443-didnt-receive-a-bank-deposit-friday-this-may-be-why; Matt Egan, *Bank deposit delays: Some customers still haven't been paid*, CNN (Nov. 6, 2023), https://www.cnn.com/2023/11/06/business/bank-deposits-paycheck/index.html.

[80] *Matt.* 6:3 (King James Version) ("But when thou doest alms, let not thy left hand know what thy right hand doeth.").

[81] *E.g.*, Zachary A. Goldfarb & Karen Tumulty, *IRS admits targeting conservatives for tax scrutiny in 2012 election*, Wash. Post (May 10, 2013) (federal agency demanded names of donors from certain conservative political groups), https://www.washingtonpost.com/business/economy/irs-admits-targeting-conservatives-for-tax-scrutiny-in-2012-election/2013/05/10/3b6a0ada-b987-11e2-92f3-f291801936b8_story.html.

down speech or activity they disfavor.[82]  The Supreme Court has held, however, that the right to donate anonymously holds First Amendment significance.[83]  Vitalik Buterin, the founder of Ethereum and a Russian national, famously revealed in the wake of OFAC's sanction that he had used Tornado Cash to donate to Ukraine after Russia invaded its neighbor.[84]  Without the ability to anonymize one's assets, it is not hard for hostile governments, political opponents, or cyber criminals to trace the source of politically sensitive donations.  That brings us to another reason for privacy.

Cybersecurity is critical in a cyber economy.  The blockchain community tracks wallets with high balances.  Usually, surveillance is innocuous: observers are curious[85] or perhaps wish to mimic the financial habits of so-called blockchain "whales."[86]  But if the identity of a high-value wallet becomes known, it becomes a

---

[82] *See Financial Censorship*, Electronic Frontier Foundation, https://www.eff.org/issues/financial-censorship (last visited Nov. 20, 2023).

[83] *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021) (holding that a state law requiring charities to disclose identities of major donors violated the First Amendment right to freedom of association).

[84] Vitalik Buterin (@VitalikButerin), Twitter (Aug. 9, 2022, 3:49 AM) https://twitter.com/VitalikButerin/status/1556925602233569280.

[85] *E.g.*, Paul Vigna, *Who Is Bitcoin Creator Satoshi Nakamoto? What We Know—and Don't Know*, Wall St. J. (Dec. 7, 2021) (noting that the wallet associated with Bitcoin's pseudonymous founder has over $55 billion in bitcoin but has remained inert), https://www.wsj.com/articles/who-is-bitcoin-creator-satoshi-nakamoto-what-we-knowand-dont-know-11638020231.

[86] *See* Robert Stevens, *What Are Crypto Whales and Why Are They Important?*, CoinDesk (Mar. 15, 2023), https://www.coindesk.com/learn/what-are-crypto-whales-and-why-are-they-important; *see, e.g.*, Milk Road, *7 Figure Wallet Tracking* (May 19, 2023), https://milkroad.com/daily/7-figure-wallet-tracking.

target for cyber criminals.[87]  And many wallets are publicly known.  For instance, the day after OFAC sanctioned Tornado Cash, anonymous actors targeted the crypto wallets of public figures in the United States, like Shaquille O'Neal, Jimmy Fallon, and Snoop Dogg, by transferring to them roughly $52,000 in low-value amounts of sanctioned ether from Tornado Cash.[88]  Even for the everyday non-celebrity, mixers can help keep them safe from identity theft, especially now that chain-analysis tools are proving increasingly more sophisticated and effective.[89]  Mixers, therefore, are a critical component of blockchain cyber-hygiene.

Most importantly, however, mixers restore a base level of privacy that we all expect in our personal finances—in other words, this is not about *hiding* anything. Returning to the hypothetical at the start of the brief:  What if your bank, credit-card companies, and credit-reporting agencies published all of your financial records online?  Would you not take steps to restore privacy at that point?  Would it be fair to accuse you of *hiding* something?  Of course not!

---

[87] *See*, *e.g.*, Eli Tan, *Hacker Steals Bill Murray's Crypto After $185K NFT Charity Auction*, CoinDesk (Sept. 2, 2022), https://www.coindesk.com/business/2022/09/02/hacker-steals-bill-murrays-crypto-after-185k-nft-charity-auction.

[88] Chainanalysis Team, *Trolls Have Sent an Estimated $52,000 in Small Tornado Cash Payments Following OFAC Designation*, Chainanalysis (Aug. 11, 2022), https://www.chainalysis.com/blog/tornado-cash-ofac-sanction-trolls.

[89] *See* Vitalik Buterin et al., *Blockchain Privacy and Regulatory Compliance: Towards a Practical Equilibrium* at 2 (Sept. 6, 2023), https://ssrn.com/abstract=4563364.

## C.    Why It Matters

In designating Tornado Cash, OFAC paints with too broad a brush.  While it is true that bad actors can use mixers to elude law enforcement, the same is true of cash.  The agency's philosophical starting point—mixing transactions are of *primary* money-laundering concern[90]—orients it toward policies that aggressively punish law-abiding Americans for the sins of a minority of foreign users.

Without access to a non-custodial, decentralized mixer with a large anonymity set like Tornado Cash, Americans' privacy options are limited.  As technology evolves, so too should our regulatory regimes.  But what OFAC did here extends beyond its lawful authority and is a ham-handed solution to a nuanced problem that requires careful balancing of competing interests.  Armed with its newfound power to sanction software, who knows what other computer programs OFAC might go after next?

## CONCLUSION

The Court should reverse the decision below.

---

[90] Proposal of Special Measure Regarding Convertible Virtual Currency Mixing, as a Class of Transactions of Primary Money Laundering Concern, 88 Fed. Reg. 72,701 (proposed Oct. 23, 2023).

Respectfully submitted,

*/s/ Aaron M. Streett*
Aaron M. Streett
Matthew M. Hilderbrand
**BAKER BOTTS LLP**
910 Louisiana Street
Houston, Texas 77002-4995
(713) 229-1234

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

This will certify that a true and correct copy of the above document was served on this the 20th day of November, 2023, via the Court's CM/ECF system on all counsel of record.

/s/ *Aaron M. Streett*
Aaron M. Streett
*Counsel of Record for Amici Curiae*

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,287 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the Microsoft Office Word software in 14-point Times New Roman type style.

*/s/ Aaron M. Streett*
Aaron M. Streett
*Counsel of Record for Amici Curiae*