No. 23-50669

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

JOSEPH VAN LOON; TYLER ALMEIDA; ALEXANDER FISHER; PRESTON VAN LOON; KEVIN VITALE; NATE WELCH,

Plaintiffs-Appellants,

v.

DEPARTMENT OF THE TREASURY; OFFICE OF FOREIGN ASSETS CONTROL; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY, IN HER OFFICIAL CAPACITY; ANDREA M. GACKI, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE OFFICE OF FOREIGN ASSETS CONTROL,

Defendants-Appellees.

On Appeal from the United States District Court
for the Western District of Texas

## BRIEF FOR APPELLEES

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

JAIME ESPARZA
  *United States Attorney*

SHARON SWINGLE
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required because defendants-appellees are all governmental parties.  5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

The district court's decision should be affirmed for the reasons stated by the district court. The government stands ready to present oral argument if this Court believes that it would assist the Court's consideration of the issues.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUE ...................................................................... 1

STATEMENT OF THE CASE ....................................................................... 1

    A.    Statutory Background ................................................................ 1

    B.    Factual Background ................................................................... 4

            1.    Cryptocurrency Basics ................................................... 5

            2.    Cryptocurrency Mixing Services .................................... 7

            3.    The Tornado Cash Mixing Service ................................. 9

            4.    Tornado Cash's Use Of Relayers .................................. 13

    C.    The OFAC Designation ......................................................... 15

    D.    Prior Proceedings .................................................................. 17

SUMMARY OF ARGUMENT ..................................................................... 18

STANDARD OF REVIEW ........................................................................... 21

ARGUMENT ................................................................................................ 21

I.    OFAC Reasonably Blocked Transactions Involving Tornado Cash's
Smart Contracts Given Tornado Cash's Support For North Korea And
Malicious Cybercriminals. ................................................................. 21

    A.    Tornado Cash Is an "Entity" Subject to OFAC's Sanctions
Authority................................................................................. 21

    B.    Tornado Cash's Smart Contracts Are "Property" Subject to
Sanctions................................................................................ 24

C.    Foreign Persons Have an Interest in Tornado Cash's Smart Contracts................................................................................ 26

II.   Plaintiffs' Contrary Arguments Lack Merit. ........................................ 27

A.    Substantial Evidence Supports OFAC's Finding That Tornado Cash Is an Entity Whose Members Share a Common Purpose............. 28

B.    Substantial Evidence Supports OFAC's Finding that Tornado Cash's Smart Contracts Are Property........................................ 32

1.    The Smart Contracts Satisfy OFAC's Definition of Property............................................................................ 32

2.    OFAC's Definition of "Property" Is Binding Law. ..................... 35

3.    Plaintiffs' Criticisms of OFAC's Definition Are Insubstantial.......................................................................... 39

4.    This Case Does Not Implicate Any Grave and Doubtful Constitutional Question................................................. 40

C.    Substantial Evidence Supports OFAC's Conclusion that Tornado Cash Has an Interest in Its Smart Contracts............................................ 43

CONCLUSION ............................................................................................ 50

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                              **Page(s)**

*Ali v. Federal Bureau of Prisons*,
    552 U.S. 214 (2008) ........................................................................................ 37

*Allen v. C & H Distribs., LLC*,
    813 F.3d 566 (5th Cir. 2015) ........................................................................ 27

*Arcara v. Cloud Books, Inc.*,
    478 U.S. 697 (1986) ................................................................................ 41, 42

*Boyle v. United States*,
    556 U.S. 938 (2009) ........................................................................................ 31

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
    38 F.4th 1025 (Fed. Cir. 2022) ...................................................................... 36

*Chichakli v. Szubin*,
    546 F.3d 315 (5th Cir. 2008) ........................................................................ 21

*Clark v. Martinez*,
    543 U.S. 371 (2005) ........................................................................................ 40

*Coin Ctr. v. Yellen*,
    No. 3:22cv20375-TKW-ZCB, 2023 WL 7121095 (N.D. Fla. Oct. 30),
    *appeal docketed*, No. 23-13698 (11th Cir. Nov. 7, 2023)................................ 27, 43, 43-44

*Commodity Futures Trading Comm'n v. Ooki DAO*,
    3:22-cv-05416-WHO, 2022 WL 17822445 (N.D. Cal. Dec. 20, 2022) ...................... 30

*Consarc Corp. v. Iraqi Ministry*,
    27 F.3d 695 (D.C. Cir. 1994) ........................................................................ 39

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ................................................................................ 37, 38

*Davis v. United States*,
    495 U.S. 472 (1990) ........................................................................................ 45

v

*De Cuellar v. Brady,*
    881 F.2d 1561 (11th Cir. 1989) ................................................................. 39, 47

*Dolan v. City of Tigard,*
    512 U.S. 374 (1994) ................................................................................ 36

*Ellis v. Liberty Life Assurance Co. of Bos.,*
    394 F.3d 262 (5th Cir. 2004) ..................................................................... 21

*Global Relief Found., Inc. v. O'Neill,*
    315 F.3d 748 (7th Cir. 2002) ..................................................................... 44

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
    333 F.3d 156 (D.C. Cir. 2003) ................................................................... 44

*Jones v. United States,*
    526 U.S. 227 (1999) ................................................................................ 40

*Kaiser Aetna v. United States,*
    444 U.S. 164 (1979) ................................................................................ 36

*Karl Rove & Co. v. Thornburgh,*
    39 F.3d 1273 (5th Cir. 1994) ..................................................................... 30

*Knapp v. U.S. Dep't of Agric.,*
    796 F.3d 445 (5th Cir. 2015) ..................................................................... 21

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    140 S. Ct. 2367 (2020) ............................................................................. 37

*Lomax v. Ortiz-Marquez,*
    140 S. Ct. 1721 (2020) ............................................................................. 37

*Marsh v. Alabama,*
    326 U.S. 501 (1946) ................................................................................ 37

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,*
    416 U.S. 267 (1974) ................................................................................ 45

*Nollan v. California Coastal Comm'n,*
   483 U.S. 825 (1987) .................................................................... 36

*Paradissiotis v. Rubin,*
   171 F.3d 983 (5th Cir. 1999) ...................................................... 39

*Regan v. Wald,*
   468 U.S. 222 n.17 (1984).............................................................. 45

*Southern Cal. Darts Ass'n v. Zaffina,*
   762 F.3d 921 (9th Cir. 2014) ...................................................... 30

*United States v. El-Mezain,*
   664 F.3d 467 (5th Cir. 2011) ...................................................... 37

*United States v. Gonzales,*
   520 U.S. 1 (1997) .......................................................................... 37

*United States v. O'Brien,*
   391 U.S. 367 (1968) ...................................................................... 42

**Statutes:**

Administrative Procedure Act (APA),
   5 U.S.C. § 551 *et seq.*................................................................. 17
      5 U.S.C. § 706 ........................................................................... 32

First War Powers Act, 1941,
   Pub. L. No. 77-354, 55 Stat. 838................................................ 45

International Emergency Economic Powers Act (IEEPA),
   50 U.S.C. § 1701 *et seq.* ............................................................. 1
      50 U.S.C. § 1701(a) ............................................................. 2, 37
      50 U.S.C. § 1702(a)(1)(B) .................... 1, 2, 18, 24, 26, 32, 35, 37, 40
      50 U.S.C. § 1702(c) ................................................................ 16
      50 U.S.C. § 1704....................................................................3, 45

North Korea Sanctions and Policy Enhancement Act of 2016,
   Pub. L. No. 114-122, 130 Stat. 93 (codified as amended at 22 U.S.C. § 9214)........ 28
      22 U.S.C. § 9214(c) ................................................................ 28

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

Ariz. Rev. Stat. Ann. § 44-7061 ............................................................. 34

Tenn. Code. Ann. § 47-10-202(c) ........................................................... 34

**Regulatory Materials:**

31 C.F.R. § 501.807 ................................................................................... 4

31 C.F.R. § 510.305 ....................................................................... 3, 18, 21

31 C.F.R. § 510.313 ....................................................................... 4, 26, 45

31 C.F.R. § 510.322 ............................................................................. 3, 18

31 C.F.R. § 510.323 ........................................... 4, 17, 19, 24, 32, 38, 39

31 C.F.R. § 510.501 ................................................................................... 4

31 C.F.R. § 578.305 ............................................................................. 3, 18

31 C.F.R. § 578.309 ....................................................................... 4, 26, 45

31 C.F.R. § 578.313 ............................................................................. 3, 18

31 C.F.R. § 578.314 ........................................... 4, 17,19, 24, 32, 38, 39

31 C.F.R. § 578.404 ................................................................................... 4

Exec. Order No. 13,466,
    73 Fed. Reg. 36,787 (June 27, 2008)................................................. 2

Exec. Order No. 13,694,
    80 Fed. Reg. 18,077 (Apr. 2, 2015) ...........................................2, 3, 21

Exec. Order No. 13,722,
    81 Fed. Reg. 14,943 (Mar. 18, 2016)......................................3, 21, 24

Exec. Order No. 13,757,
   82 Fed. Reg. 1 (Jan. 3, 2017) ................................................................2, 21, 24

**Rule:**

Fed. R. App. P. 4(a) ......................................................................................... 1

**Other Authorities:**

Black's Law Dictionary (11th ed. 2019):
   *Contract* ...................................................................................................... 25
   *Ownership* ................................................................................................... 36
   *Property* ...................................................................................................... 36
   *Service* ........................................................................................................ 24

15 Fed. Reg. 9040 (Dec. 19, 1950) ................................................................ 45

28 Fed. Reg. 6974 (July 9, 1963) .................................................................. 45

44 Fed. Reg. 75,352 (Dec. 19, 1979) ............................................................ 45

FIOD Belastingdienst, *Arrest of Suspected Developer of Tornado Cash*
   (Aug. 12, 2022), https://perma.cc/P4BM-JASU ...................................... 11

OFAC, U.S. Dep't of the Treasury, *Frequently Asked Questions:*
   *Cyber-Related Sanctions*, https://perma.cc/5KQ5-25GE .............................. 16

Oxford English Dictionary Online (3d ed. 2022) (last visited Mar. 8, 2024):
   *Association*, 2, https://www.oed.com/dictionary/association_n ..........................21-22
   *Group*, 3.a., https://www.oed.com/dictionary/group_n .......................... 22
   *Organization*, 4.a., https://www.oed.com/dictionary/organization_n ...................... 22

Press Release, U.S. Attorney's Office (S.D.N.Y.),
   *Tornado Cash Founders Charged With Money Laundering And Sanctions*
   *Violations* (Aug. 23, 2023), https://perma.cc/VA8W-HCQ5 .................................... 11

Press Release, U.S. Dep't of the Treasury,
   *Treasury Designates DPRK Weapons Representatives: Tornado*
   *Cash Redesignated with Additional DPRK Authorities, New*
   *OFAC Guidance* (Nov. 8, 2022), https://perma.cc/SE5W-WDNK ......................... 15

Press Release, U.S. Dep't of the Treasury,
*U.S. Treasury Sanctions Notorious Virtual Currency Mixer*
*Tornado Cash* (Aug. 8, 2022), https://perma.cc/8W6N-F5J5 ..................................... 15

Restatement (Second) of Contracts (Am. Law Inst. 1981):
§ 4(a) ........................................................................................................... 33
§ 45 ........................................................................................................ 25, 34

1 Williston on Contracts (4th ed.), Westlaw (databased updated May 2023):
§ 1:18 ........................................................................................................... 25
§ 4:20 ........................................................................................................... 33
§ 5:15 ........................................................................................................... 34

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.148. The district court entered summary judgment against plaintiffs on August 17, 2023. ROA.1517-1518. Plaintiffs filed a timely notice of appeal on September 18, 2023. ROA.1519; *see* Fed. R. App. P. 4(a). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

In the event of a national emergency, the Executive Branch may block "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). The Office of Foreign Assets Control (OFAC), a component of the Department of the Treasury, exercised this authority to block the property and interests in property of Tornado Cash. As OFAC explained, Tornado Cash is a corporation-like entity that created, develops, markets, and profits from a service that allows its users to transfer cryptocurrency anonymously. North Korean hackers have used this service to launder hundreds of millions of dollars in stolen cryptocurrency. North Korea uses this stolen money to fund its nuclear and missile programs. The question presented is whether OFAC's blocking order is lawful.

## STATEMENT OF THE CASE

### A.    Statutory Background

Under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.*, the President may exercise a variety of extraordinary economic powers

after he "declares a national emergency with respect to" "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." *Id.* § 1701(a). Among other things, the President may block "any property in which any foreign country or a national thereof has any interest." *Id.* § 1702(a)(1)(B).

This appeal arises from actions taken in response to two national emergencies. The first, declared in 2015, arises from "the increasing prevalence and severity of malicious cyber-enabled activities originating from[] . . . outside the United States." Exec. Order No. 13,694, 80 Fed. Reg. 18,077, 18,077 (Apr. 2, 2015). Additional steps related to that emergency were subsequently taken to address "the increasing use of [significant malicious cyber-enabled] activities to undermine democratic processes or institutions." Exec. Order No. 13,757, 82 Fed. Reg. 1, 1 (Jan. 3, 2017). As amended, Executive Order 13,694 blocks the property and interests in property of "any person" determined by the Secretary of the Treasury to be "responsible for," "complicit in," or "directly or indirectly" "engaged" in certain cyber-enabled activities that threaten the United States' national security, foreign policy, and economy, *id.*, as well as any person determined "to have materially assisted, sponsored, or provided financial, material, or technological support for" such activities, *id.* at 2.

The second emergency, originally declared in 2008, *see* Exec. Order 13,466, 73 Fed. Reg. 36,787 (June 27, 2008), and subsequently amended, arises from "the Government of North Korea's continuing pursuit of its nuclear and missile

programs," Exec. Order No. 13,722, 81 Fed. Reg. 14,943, 14,943 (Mar. 18, 2016).  In

2016, the President issued an executive order taking further steps to deal with that

emergency, blocking the property and interests in property of the Government of

North Korea and the Workers' Party of Korea.  *Id.*  The order also blocks the

property of persons determined by the Secretary of the Treasury "to have materially

assisted, sponsored, or provided financial, material, or technological support for, or

goods or services to or in support of" the Government of North Korea or other

persons that materially supported it.  *Id.* at 14,944.

Each of these executive orders delegates authority to the Secretary of the

Treasury to issue "rules and regulations" and "to employ all powers granted to the

President by IEEPA as may be necessary to carry out" their purposes.  80 Fed. Reg. at

18,079; 81 Fed. Reg. at 14,945; *see* 50 U.S.C. § 1704 (authorizing the President to

"issue such regulations, including regulations prescribing definitions, as may be

necessary for the exercise of the authorities granted" by IEEPA).  The Secretary has

delegated authority to block persons under these orders to the Office of Foreign

Assets Control, a component within the Department of the Treasury.

Pursuant to these authorities, OFAC has issued regulations implementing the

relevant executive orders.  The regulations define "person" as any "individual or

entity."  31 C.F.R. §§ 510.322, 578.313.  An "entity," in turn, is defined as any

"partnership, association, trust, joint venture, corporation, group, subgroup, or other

organization."  *Id.* §§ 510.305, 578.305.  The term "property" includes

3

> money, checks, drafts, bullion, bank deposits, savings accounts, debts,
> indebtedness, obligations, notes, guarantees, debentures, stocks, bonds,
> coupons, any other financial instruments, bankers acceptances,
> mortgages, pledges, liens or other rights in the nature of security,
> warehouse receipts, bills of lading, trust receipts, bills of sale, any other
> evidences of title, ownership, or indebtedness, letters of credit and any
> documents relating to any rights or obligations thereunder, powers of
> attorney, goods, wares, merchandise, chattels, stocks on hand, ships,
> goods on ships, real estate mortgages, deeds of trust, vendors' sales
> agreements, land contracts, leaseholds, ground rents, real estate and any
> other interest therein, options, negotiable instruments, trade acceptances,
> royalties, book accounts, accounts payable, judgments, patents,
> trademarks or copyrights, insurance policies, safe deposit boxes and their
> contents, annuities, pooling agreements, services of any nature
> whatsoever, contracts of any nature whatsoever, and any other property,
> real, personal, or mixed, tangible or intangible, or interest or interests
> therein, present, future, or contingent.

*Id.* §§ 510.323, 578.314.  The term "interest," "when used with respect to property

(*e.g.*, 'an interest in property'), means an interest of any nature whatsoever, direct or

indirect."  *Id.* §§ 510.313, 578.309.

The regulations contain procedures for blocked individuals to challenge their

designations, 31 C.F.R. § 501.807, and for OFAC to grant licenses to engage in certain

transactions involving blocked property, *id.* §§ 510.501, 578.404.

**B.**    **Factual Background**

This case arises from OFAC's decision to designate Tornado Cash under

Executive Orders 13,694 (as amended) and 13,722.  Tornado Cash provides a service

that North Korean hackers have relied upon to launder hundreds of millions of

dollars in stolen cryptocurrency.  North Korea uses this stolen money to fund its

nuclear and missile programs.

### 1.     Cryptocurrency Basics

Cryptocurrencies are digital representations of monetary value recorded on blockchains.  A blockchain is a digital "ledger, or record of transactions, that relies on an online network of users to maintain the ledger's accuracy."  ROA.1493.  Each cryptocurrency is associated with a unique "crypto coin" (also known as a "native" coin) that serves as the fundamental medium of exchange among that blockchain's users.  ROA.923.  Crypto coins serve the same function as traditional fiat currencies (such as the U.S. dollar or the Japanese yen), and can be traded, transferred, and used for payment and investment.  ROA.922.

Crypto coins are usually stored in "wallets" that are the digital equivalent of bank accounts.  ROA.923.  Each wallet is identified by a unique public key that functions like a bank-account number and is commonly referred to as the wallet's "address."  ROA.923-924.  The owner of each wallet holds a private key to the wallet that functions like a password.  ROA.923.  Anyone who holds the private key can access the crypto coins in the wallet.

Cryptocurrency users often transfer funds from one digital wallet to another. *See* ROA.923.  Each time a transaction that involves a given cryptocurrency occurs, some information about the transaction— including the public key of the sending wallet, the public key of the receiving wallet, and the amount of the transaction—is permanently recorded in that cryptocurrency's associated blockchain after a validation process.  *See* ROA.924.

5

Ethereum is a prominent cryptocurrency blockchain whose native crypto coin is called Ether. ROA.928. There are two kinds of Ethereum accounts: externally owned accounts and smart contracts. ROA.928. An externally owned account is a wallet that can be controlled by anyone with the corresponding private key. ROA.928. If a person wants to initiate a transaction from a wallet they control, they broadcast the request to the Ethereum blockchain network and pay a transaction fee. ROA.927-928. This fee, called "gas," is paid in Ether and is based on the amount of computing resources required to complete the transaction request. ROA.933. An individual known as a "validator" then verifies and executes the transaction by editing the ledger to reflect the new balances of the sending and receiving accounts. ROA.927-928. To ensure that these edits are legitimate, only people who "stake" a significant amount of Ether as collateral may become validators. ROA.927-928, 927 n.18.

A smart contract is a computer program uploaded onto a blockchain network. ROA.924. The contract can be programmed to perform a variety of actions once the contract is triggered, from executing crypto transactions to transferring crypto assets to creating new smart contracts. ROA.924, 928. For example, a "simple vendor smart contract could create and assign ownership of a digital asset" once the person triggering the contract sends Ether to a specified recipient wallet, just like a vending machine can be programmed to dispense a product once a certain amount of money is inserted into it. ROA.924. A person who wants to trigger a smart contract on the

Ethereum network must likewise pay gas—that is, a transaction fee—in the form of Ether.  ROA.924.  The more complex the contract, the more gas must be paid. ROA.924.

### 2. Cryptocurrency Mixing Services

Cryptocurrencies such as Ethereum run on public blockchains whose ledgers are "transparent," meaning that the ledgers can be accessed and read by anyone with an internet connection.  ROA.930.  The ledger "do[es] not record real names or physical addresses[] . . . and thus confer[s] a degree of anonymity on users." ROA.924.  But "if the identity of a wallet owner becomes known, their transactions can be traced."  ROA.924.  Indeed, the public nature of blockchain ledgers makes blockchain technology "well-suited to establishing historical claims and chains of strong correlation."  ROA.929-930.  This feature of blockchain technology makes it hard for someone to secretly transfer crypto coins from one wallet to another, since such transactions will be publicly logged on the ledger.

Cryptocurrency mixing services anonymize otherwise public transactions by "obfuscat[ing] the source or owner of particular units of cryptocurrency."  ROA.929. They achieve this by "collect[ing], pool[ing], and . . . shuffl[ing] the cryptocurrencies deposited by many users."  ROA.930 (footnote omitted).  The funds are then withdrawn to new wallets usually controlled by the original depositors.  ROA.930. Mixing services make it possible to transfer cryptocurrency on public blockchains

(such as Ethereum) from one wallet to another in a manner that is much harder to trace.

Unsurprisingly, mixing services "are a go-to tool for cybercriminals" seeking to launder stolen cryptocurrency from dirty wallets to clean ones. ROA.930. In 2022, "crypto addresses tied to illicit activity transferred nearly 10 percent of their funds to mixers" and "account[ed] for 23 percent of funds sent to mixers" that year. ROA.930. North Korean hackers are especially active perpetrators of cybercrime. ROA.930-931. The Lazarus Group—an organization "led" by North Korea's "primary intelligence agency"—has "concentrated its efforts on cryptocurrency crime" and earned "immense[] profit[s]" as a result. ROA.931. Since 2018, "the group has stolen and laundered massive sums of virtual currencies every year, typically in excess of $200 million." ROA.931. Its most successful hacks have netted hundreds of millions of dollars—estimated at over $600 million in one instance and over $250 million in two others. ROA.966.

North Korean hackers have become increasingly reliant on mixing services to launder stolen cryptocurrency. ROA.932. "More than 65 percent" of funds stolen by North Korea were laundered through mixers in 2021, "up from 42 percent in 2020 and 21 percent in 2019." ROA.932. By using these money-laundering tools to "pool and scramble cryptocurrencies from thousands of addresses," North Korean hackers can "obscure the origins of their ill-gotten" gains, making it easier for them to cash out stolen cryptocurrency into traditional fiat currency. ROA.932 (describing North

Korea's typical money-laundering process). North Korea uses this stolen money to support its weapons of mass destruction and ballistic missile programs. ROA.931.

### 3.    The Tornado Cash Mixing Service

Tornado Cash "provides cryptocurrency mixing services" to its users via smart contracts deployed on a variety of blockchain networks, including Ethereum. ROA.933, 952-953. The Lazarus Group used the Tornado Cash service to launder over $600 million worth of Ether that it stole in a single cryptocurrency heist. ROA.969-974, 978. Tornado Cash also facilitated the laundering of another $100 million in cryptocurrency stolen in a different heist for which the Lazarus Group was likely responsible. ROA.976-977, 978. Overall, at least $1 billion worth of cryptocurrencies of criminal origin have passed through the Tornado Cash mixing service. ROA.952.

The Tornado Cash mixing service works by allowing customers to deposit their cryptocurrency into a so-called pool. ROA.955. A pool is a smart contract wallet that automatically carries out certain transactions when prompted by its user. ROA.955. Most pools are designed to work with a preset amount and type of cryptocurrency. ROA.944 & n.77. For example, the "1 ETH Pool Contract" is for deposits and

withdrawals of 1 Ether, the "100 ETH Pool Contract" is for deposits and withdrawals of 100 Ether, and so on.  ROA.944-945, 953.[1]

After making a deposit in a Tornado Cash pool, the depositor receives a digital note entitling its holder to withdraw the same amount of cryptocurrency from the pool at some future date.  ROA.955.  Crucially, deposited cryptocurrency can be withdrawn to a different wallet.  ROA.955.  "[E]ven though these deposit and withdrawal events occur publicly" on the cryptocurrency's public ledger, "any public link between the deposit and withdrawal addresses is severed."  ROA.955.  This gives Tornado Cash's customers "the ability to obfuscate their transactions—regardless of the source of funds, illicit or otherwise."  ROA.952.

These deposit and withdrawal operations do not achieve anonymization by themselves.  The effectiveness of Tornado Cash also depends on "a critical mass of users concurrently depositing and withdrawing transactions to obfuscate links between deposit and withdrawal addresses."  ROA.954.  "A key principle of Tornado Cash pools is that a user's privacy is derived in large part from the simultaneous usage of the pool by many other users."  ROA.955.  If only one user deposited and then withdrew funds from a pool, "simple inference would make it obvious where the

---

[1] Tornado Cash relies on smart contracts for other purposes.  *See* ROA.944-950.  For convenience, and unless otherwise specified, this brief uses the terms "smart contract" and "Tornado Cash's smart contracts" to refer to the smart contracts that constitute Tornado Cash's mixing service, including (but not limited to) the pool contracts described here.

withdrawn tokens came from." ROA.955.  Thus, "the larger the anonymity set, the better it is for the users."  ROA.940.  Tornado Cash emphasized this point on its website and in online posts.  *See* ROA.954 (Tornado Cash website explaining that "maintain[ing] a large number of active deposits" increases anonymity for all users); ROA.954 (post by Tornado Cash explaining that anonymity depends in large part on the "total amount of deposits made").

Tornado Cash was established by a core developer group that designs and updates the service's smart contracts.  ROA.934-935.  The group "actively promotes the platform's popularity in an attempt to increase its user base," ROA.933, posts job advertisements, ROA.934, and encourages investment in Tornado Cash, ROA.942. The group includes founders Alexey Pertsev, Roman Semenov, and Roman Storm. ROA.933.  Pertsev is a Russian national linked to a Russian company that has provided "material and technological support to . . . Russia's primary security agency." ROA.967 (footnote omitted).  Dutch authorities arrested him on money-laundering charges in 2022.  FIOD Belastingdienst, *Arrest of Suspected Developer of Tornado Cash* (Aug. 12, 2022), https://perma.cc/P4BM-JASU.  And in 2023, the United States indicted Semenov (who is also a Russian national) and Storm for conspiracy to commit money laundering and other related charges.  Press Release, U.S. Attorney's Office (S.D.N.Y.), *Tornado Cash Founders Charged With Money Laundering And Sanctions Violations* (Aug. 23, 2023), https://perma.cc/VA8W-HCQ5.

Tornado Cash's operations are controlled by a Decentralized Autonomous Organization (DAO).  ROA.936.  The DAO's most significant responsibility is to approve new smart contracts written by the core developer group.  ROA.935-936.  The DAO is made up of individuals who hold a digital asset that Tornado Cash calls TORN.  ROA.935-936.  TORN is a crypto token created by Tornado Cash.  ROA.923, 963.  A crypto token is a digital asset created to serve a specific purpose.  ROA.923.  Whereas crypto coins are analogous to fiat currency, crypto tokens are analogous to other forms of assets.  ROA.923.  Some crypto tokens resemble deeds that confer ownership rights over physical or virtual objects.  ROA.923.  Others resemble vouchers that their owners may redeem for products or services, such as exclusive perks in a video game.  ROA.923.

TORN is a "governance token[]" that resembles stock issued by a public corporation.  ROA.925.  Each token confers a specified amount of voting power over Tornado Cash's governance decisions.  ROA.925.  TORN thus gives its holders the right to influence the ongoing development and maintenance of the Tornado Cash mixing service.  ROA.936.  This right may be exercised by any TORN holder willing to "stake" their TORN—essentially, registering it so that it may not be sold until subsequently unlocked.  *See* ROA.1070.

Notwithstanding Tornado Cash's assertion that "TORN is not a fundraising device or investment opportunity," ROA.937, the tokens may be bought, sold, and transferred according to their perceived value—just like shares of stock, ROA.925.

"[A]s of October 1, 2022, TORN tokens are available for trade and were trading at $6.37." ROA.968. Moreover, TORN generates value for its holders in at least two ways. First, TORN holders "receive a portion" of Tornado Cash's user fees "based on the amount of TORN they have staked." ROA.963. Second, the success and popularity of Tornado Cash's mixing service "increases the economic value" of each TORN token, in the same way that the success and popularity of a company's services increases the value of that company's stock. ROA.961.

### 4.     Tornado Cash's Use Of Relayers

Mixing services such as Tornado Cash may not completely obscure the relationship between depositing and withdrawing accounts because many blockchain networks levy transaction fees on their users. ROA.958. The source of those fees can sometimes be traced. ROA.958. Ethereum, for example, charges its users "gas" for all transfers conducted on the Ethereum blockchain network. Before a user can withdraw Ether that was deposited into a Tornado Cash pool, the wallet to which the user wants to withdraw the Ether must first contain enough "Ether to pay the Ethereum network to process the smart contract's operations." ROA.958. But a transfer of Ether to the withdrawal wallet will itself be recorded on Ethereum's blockchain ledger. ROA.958. "[S]ending Ether to the withdrawal account prior to withdrawal might create a link between the user's deposit and withdrawal accounts"— the existence of which the Tornado Cash service is designed to obscure. ROA.958.

13

As initially constituted, the Tornado Cash service did not have a built-in mechanism for addressing this "fee payment dilemma." ROA.958 (quotation marks omitted). In February 2022, however, the Tornado Cash DAO voted to institute changes to the service that allow transactions withdrawing funds from Tornado Cash pool to be executed using "relayers" registered with Tornado Cash. ROA.940, 960. Relayers are middlemen who "allow users to process withdrawals without needing to pre-fund their withdrawal accounts." ROA.958. Relayers "manage the entire withdrawal" by paying transaction fees from their own cryptocurrency holdings. ROA.958. Relayers then deduct those fees—as well as fees assessed by Tornado Cash and relayers' own transaction fees—from the amount withdrawn. ROA.958. The remaining cryptocurrency is sent to the account receiving the withdrawal. ROA.958. Because relayers help users "pay fees for . . . withdrawals from a pool while maintaining anonymity," they "form an essential and necessary part of the Tornado Cash ecosystem." ROA.958 (quotation marks omitted). Nearly 84% of Tornado Cash withdrawal transactions involve relayers. ROA.958 & n.113.

When a Tornado Cash customer initiates a relayer-assisted withdrawal of cryptocurrency from a Tornado Cash mixing pool, that transaction triggers a Tornado Cash smart contract that governs relayer transactions. ROA.958. The contract uses an algorithm to select a relayer from a list of registered Tornado Cash relayers and allows the relayer to consummate the withdrawal. ROA.958-959. Anyone can become a relayer for Tornado Cash by acquiring and "staking" a certain amount of

14

TORN with Tornado Cash. ROA.960. Once that occurs, the relayer is added to the list of registered relayers. ROA.958. Each time the relayer processes a transaction, a portion of the relayer's staked TORN is used to pay fees assessed by Tornado Cash, and those fees "are subsequently distributed among" certain "DAO members." ROA.959.

## C.     The OFAC Designation

In November 2022, OFAC designated Tornado Cash pursuant to Executive Orders 13,694 (as amended) (national emergency relating to certain cyber activities that threaten the United States) and 13,722 (national emergency relating to North Korea). ROA.902-906.[2] OFAC identified Tornado Cash as an entity with an organizational structure consisting of the core developer group and the Tornado Cash DAO. ROA.902. As a result of this designation, "all real, personal, and any other property and interests in property" of Tornado Cash that are subject to the jurisdiction of the United States are "blocked." ROA.905. Blocked property "may not be transferred, paid, exported, withdrawn[,] or otherwise dealt in." ROA.905.

---

[2] OFAC originally designated Tornado Cash only under Executive Order 13,694. *See* Press Release, U.S. Dep't of the Treasury, *U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash* (Aug. 8, 2022), https://perma.cc/8W6N-F5J5. The November designation rescinded this initial designation and redesignated Tornado Cash under both Executive Orders 13,694 and 13,722. *See* Press Release, U.S. Dep't of the Treasury, *Treasury Designates DPRK Weapons Representatives: Tornado Cash Redesignated with Additional DPRK Authorities, New OFAC Guidance* (Nov. 8, 2022), https://perma.cc/SE5W-WDNK.

Furthermore, "any transaction or dealing by a U.S. person or within the United States in" blocked property "is prohibited."  ROA.905.[3]

OFAC issued several Frequently Asked Questions (FAQs) informing the public about the scope of this designation and the way OFAC would enforce it.  FAQ 1079 reminded certain users with cryptocurrency in a Tornado Cash mixing pool of their ability to request a specific license to retrieve those funds.  OFAC, U.S. Dep't of the Treasury, *Frequently Asked Questions: Cyber-Related Sanctions*, https://perma.cc/5KQ5-25GE.  FAQ 1078 addressed "dusting" transactions (in which individuals send "unsolicited and nominal amounts of virtual currency . . . from Tornado Cash smart contracts" to other people), explaining that OFAC "will not prioritize enforcement" against people who receive such unsolicited cryptocurrency. *Id.*  And FAQ 1076 clarified that the designation order only prohibits "engaging in any transaction with Tornado Cash or its blocked property."  *Id.*  The designation does not prohibit "interacting with open-source code itself."  *Id.*  For example, "U.S. persons would not be prohibited . . . from copying the open-source code" of a Tornado Cash smart contract "and making it available online for others to view."  *Id.*

---

[3] In addition to the administrative record publicly filed in district court, OFAC provided an *ex parte* classified addendum with additional information justifying its decision.  The district court did not rely on that addendum, but the addendum is available for the Court's review if necessary.  *See* 50 U.S.C. § 1702(c).

### D.    Prior Proceedings

Plaintiffs are five Tornado Cash users.  ROA.149-154.  They sued OFAC in district court, alleging that the OFAC designation order violates the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, because OFAC lacks statutory authority to sanction Tornado Cash.  The district court entered summary judgment against plaintiffs.  The court concluded that OFAC reasonably identified Tornado Cash as an "entity that may be properly designated as a person under IEEPA."  ROA.1505-1507.  The court cited record evidence demonstrating that the entity's constituent parts—the core developer group and the DAO—share a common purpose in "profiting from" the mixing service that Tornado Cash offers.  ROA.1506-1507.  The court further concluded that Tornado Cash's smart contracts constitute "property" under the regulatory definition of that term.  ROA.1507-1510.  That definition encompasses "services of any nature whatsoever" and "contracts of any nature whatsoever."  ROA.1508 (quoting 31 C.F.R. §§ 510.323, 578.314).  The court agreed with OFAC that the smart contracts at the heart of Tornado Cash's mixing service are both services and contracts.  ROA.1509.  Finally, the court concluded that Tornado Cash has an interest in its smart contracts because Tornado Cash receives a "regular stream of revenue" from the mixing service it provides.  ROA.1511.[4]

---

[4] Plaintiffs' complaint also alleged that OFAC's designation of Tornado Cash violates the First and Fifth Amendments of the U.S. Constitution.  ROA.1502-1503. The district court entered judgment against plaintiffs on those claims, ROA.1513-

*Continued on next page.*

## SUMMARY OF ARGUMENT

**I.**     The district court correctly ruled that OFAC's blocking order is

consistent with IEEPA, which gives OFAC authority to block "any property in which

any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).

OFAC reasonably found that Tornado Cash is an entity subject to IEEPA.  An

entity is defined, in relevant part, as any "association," "group," "or other

organization."  31 C.F.R. §§ 510.305, 510.322, 578.305, 578.313.  Those terms plainly

encompass any collection of individuals who share a common purpose.  As OFAC

explained, Tornado Cash is a corporation in all but name, with a core developer group

that functions as a board of directors and a Decentralized Autonomous Organization

that functions as a group of stockholders.  The DAO's members hold a digital asset

called TORN that operates like stock.  Only TORN holders may vote on Tornado

Cash's governance decisions and receive a share of the fees that Tornado Cash

charges.  Additionally, the value of TORN is correlated with the success and

widespread adoption of Tornado Cash, just like the value of a public company's stock

is correlated with the success and widespread adoption of that company's services.

The core developer group and the DAO therefore share the common purpose of

profiting from the mixing service that Tornado Cash provides.  Indeed, Tornado

---

1515, and plaintiffs have waived their right to appeal those aspects of the judgment,
Br. 21.

Cash's structure is more formal than that of other entities OFAC has properly sanctioned, including terrorist groups such as Al-Qaeda and Hamas.

OFAC also reasonably found that the smart contracts that embody and enable the mixing service are property. Consistent with IEEPA, OFAC's regulations define property to include "services of any nature whatsoever" and "contracts of any nature whatsoever." 31 C.F.R. § 510.323, 578.314. The smart contracts are services because they perform the cryptocurrency mixing service that Tornado Cash offers its customers. They are also contracts because they are unilateral contracts embodying Tornado Cash's offer to pool cryptocurrency pursuant to their terms. That the terms are set by lines of computer code and not on a piece of paper does not undermine this conclusion.

Finally, OFAC reasonably found that foreign persons—including one of Tornado Cash's founders (a Russian national with ties to the Russian intelligence community) and the government of North Korea—hold TORN and therefore have an interest in the mixing service that the smart contracts embody.

**II.**    Plaintiffs' counterarguments—which, if accepted, would leave OFAC powerless against a cryptocurrency mixing service that has laundered over $1 billion worth of cryptocurrencies of criminal origin—lack merit for the reasons the district court explained.

Plaintiffs contend that Tornado Cash is not an entity subject to IEEPA because not everyone in the DAO participates in governance decisions. But that does not

19

undermine OFAC's finding that the DAO's members share a common purpose of profiting from the service that Tornado Cash provides. Indeed, a public corporation does not cease to be an entity simply because most of its stockholders have never voted in a stockholder meeting.

Plaintiffs contend that smart contracts are not "property" because they are not contracts. The premise of this argument is that Tornado Cash is not a party to the smart contracts it has advertised to the world for profit. That premise cannot be reconciled with foundational property-law principles. And even if plaintiffs were correct, plaintiffs ignore OFAC's independent finding that smart contracts are services, which is alone sufficient to satisfy the applicable regulatory definition. Although plaintiffs urge this Court to ignore that definition in favor of their idiosyncratic interpretation of IEEPA, plaintiffs' complaint does not challenge the lawfulness of the definition or ask that the definition be set aside. The definition is therefore binding. Moreover, the traditional tools of statutory interpretation unambiguously foreclose plaintiffs' preferred construction of IEEPA.

Plaintiffs contend that nobody—including Tornado Cash—has any "interest" in the smart contracts. But as two other courts of appeals have recognized, IEEPA's application to "any interest" covers not only legally enforceable interests but also beneficial interests and even interests not defined in traditional common-law terms. Nothing in IEEPA suggests that the statute may be circumvented simply by converting property interests into creative new forms.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo. *Chichakli v. Szubin*, 546 F.3d 315, 316 (5th Cir. 2008). In APA cases, an agency's "factual findings must be upheld as long as they are supported by substantial evidence." *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 453-454 (quoting *Ellis v. Liberty Life Assurance Co. of Bos.*, 394 F.3d 262, 273 (5th Cir. 2004)).

## ARGUMENT

I.    **OFAC Reasonably Blocked Transactions Involving Tornado Cash's Smart Contracts Given Tornado Cash's Support For North Korea And Malicious Cybercriminals.**

A.    **Tornado Cash Is an "Entity" Subject to OFAC's Sanctions Authority.**

OFAC may sanction any "person" who, as relevant here, supports North Korea or supports "malicious cyber-enabled activities" that threaten the United States. 82 Fed. Reg. at 1; 81 Fed. Reg. at 14,943; 80 Fed. Reg. at 18,077. Consistent with IEEPA's broad reach, OFAC has defined the term "person" to encompass any "entity," which includes any "association," "group," "or other organization." 31 C.F.R. §§ 510.305, 510.322, 578.305, 578.313. The plain meaning of "association" is "[a] body of persons who have combined to execute common purpose or advance a common cause." *Association*, 2, Oxford English Dictionary Online (3d ed. 2022),

https://www.oed.com/dictionary/association_n. Similarly, a "group" is a "number of people who associate together . . . or who are linked by a common interest or purpose." *Group*, 3.a., Oxford English Dictionary Online (3d ed. 2023), https://www.oed.com/dictionary/group_n. And an "organization" is an "organized body of people with a particular purpose." *Organization*, 4.a., Oxford English Dictionary Online (3d ed. 2023), https://www.oed.com/dictionary/organization_n.

OFAC reasonably concluded that Tornado Cash is an "entity" subject to sanctions under this definition. As OFAC explained, the Tornado Cash entity has two components designed to "mimic[] common corporate structures." ROA.918. The first component is Tornado Cash's core developer group, which includes its Russian founders and other associated developers, and which "operate[s] like a board of directors." ROA.918. The group launched the Tornado Cash mixing service, ROA.933, develops "new . . . mixing service features," ROA.933-934, "promote[s]" the service's "popularity in an attempt to increase" its "user base," ROA.933, advertises for engineers and programmers to improve and update Tornado Cash's smart contracts, ROA.934, maintains a "community fund[] from which it offers developers rewards for improving its code," ROA.918, and created Tornado Cash's Decentralized Autonomous Organization, ROA.933.

The second component is the DAO itself. The DAO's principal responsibility is to "influence the ongoing development and maintenance" of the Tornado Cash mixing service by voting on governance measures and approving alterations to

22

Tornado Cash's smart contracts.  ROA.917-918.  The DAO is made up of anyone

who holds TORN, and its members "operate like stockholders."  ROA.918.  TORN

is a digital asset akin to stock that was created by the core developer group and that

serves as the "governance token" of Tornado Cash.  *See generally* ROA.936-942.  Like

stock, TORN grants its holders the right to vote on decisions made by Tornado Cash,

such as whether to implement new types of smart contracts.  ROA.939.  Like stock,

TORN can be traded on secondary exchanges at market prices.  ROA.925, 933.  And

like stock, TORN allows its holders to share in the profits of the Tornado Cash

enterprise.  ROA.966.  "[V]alue generated through use of the Tornado Cash mixing

service" accrues to TORN holders "through distribution of fees and an increase in the

value of TORN."  ROA.966.  This value can be substantial.  In early 2020, for

example, Tornado Cash distributed TORN to its early customers to incentivize more

people to use its mixing service.  ROA.942.  The average distribution was worth

$23,000 as of February 2021; the median user received TORN worth $7,500.

ROA.942.  "The single largest recipient harvested over 2500 tokens worth a

whopping $888,000."  ROA.942 (quotation marks omitted).

     Accordingly, OFAC reasonably found that Tornado Cash's core developer

group and DAO have the common purpose of "profit[ing] from the Tornado Cash

mixing service."  ROA.918; *accord* ROA.940 (statement of Tornado Cash founder

explaining distribution of responsibilities between core developer group and DAO).

Just as a public corporation's board and shareholders work in tandem to support and

profit from the services that the company provides, Tornado Cash's corporation-like structure allows it "to coordinate its operations and provide a valuable service to its users" whose fruits the entity's members together enjoy.  ROA.918.  That structure is more formal than that of other entities OFAC has properly sanctioned, including terrorist groups such as Al-Qaeda and Hamas.

## B.    Tornado Cash's Smart Contracts Are "Property" Subject to Sanctions.

Once an entity has been designated under the relevant executive orders, the designee's property and interests in property are blocked.  82 Fed. Reg. at 1; 81 Fed. Reg. 14,943; *see* 50 U.S.C. § 1702(a)(1)(B) (authorizing the Executive Branch to block transactions involving "*any* property" (emphasis added)).  OFAC's longstanding regulations define "property" to include, among other things, "services of any nature whatsoever" and "contracts of any nature whatsoever."  31 C.F.R. § 510.323, 578.314.

The smart contracts Tornado Cash uses to provide mixing services satisfy this definition of "property" because they are both "services" and "contracts."  A "service" is the "performance of some useful act or series of acts for the benefit of another, usu[ally] for a fee."  *Service*, Black's Law Dictionary (11th ed. 2019).  As Tornado Cash has admitted, its mixing service depends on "smart contract[s] that accept[ cryptocurrency] deposits from one address and enable[] their withdrawal from a different address" while obscuring the link between the depositing and withdrawing wallets.  ROA.952 (quotation marks omitted).  The terms of these mixing transactions

24

are embodied in and executed by Tornado Cash's smart contracts. ROA.918. Without the smart contracts, the mixing service would not exist. And although a useful act need not be accompanied by a fee to qualify as a "service," Tornado Cash levies fees on any transaction involving a relayer. ROA.960. Such transactions make up the overwhelming majority—nearly 84%—of all Tornado Cash withdrawal transactions. ROA.958 & n.113.

Even if the smart contracts are not services, they qualify as property because they are "code-enabled . . . unilateral contracts." ROA.1509. A unilateral contract is one in which only the offeror "makes a promise or undertakes a performance." *Contract*, Black's Law Dictionary. The promise is converted into a binding contract once the offeree "perform[s]" the "act requested" by the offeror. 1 Williston on Contracts § 1:18 (4th ed.), Westlaw (database updated May 2023). By advertising its smart contracts and making them publicly available for anyone to use, Tornado Cash has made an offer to pool cryptocurrency according to the terms set forth by each smart contract's code. A user who initiates a transaction using the smart contract has accepted the offer, causing an enforceable unilateral contract to come into being. *See* Restatement (Second) of Contracts § 45 (Am. Law Inst. 1981) ("Where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created[.]"). The smart contract then "automatically executes" the terms of the agreement. ROA.924. "The fact that smart

25

contracts do so without additional human intervention[] . . . does not affect its status

as [a] type of contract and, thus, a type of property" subject to IEEPA.  ROA.1510.

### C.  Foreign Persons Have an Interest in Tornado Cash's Smart Contracts.

Finally, OFAC reasonably concluded that foreign persons have an interest in

Tornado Cash's smart contracts.  *See* 50 U.S.C. § 1702(a)(1)(B) (authorizing blocking

of "any property in which any foreign country or a national thereof has any interest").

OFAC's regulations define "interest" as "an interest of any nature whatsoever, direct

or indirect."  31 C.F.R. §§ 510.313, 578.309.  Here, the requisite interest is shown in at

least two ways.  First, Tornado Cash receives fees when users conduct withdrawals

using registered relayers, and those fees are distributed to members of the DAO who

have staked their TORN.  ROA.933.  Second, the "use, popularity, and success of the

smart contracts increases the economic value" of the TORN tokens, much like the

value of stock is related to the success of a company's products or services.

ROA.961.

The nature of Tornado Cash's mixing service makes that interest especially

apparent.  "A key principle of Tornado Cash pools"—that is, of the smart contracts

that actually perform the mixing transactions—"is that a user's privacy is derived in

large part from the simultaneous usage of the pool by many other users."  ROA.955.

Otherwise, someone monitoring deposits and withdrawals from the pools could easily

determine "where the withdrawn tokens came from."  ROA.955.  Tornado Cash has

itself emphasized that "maintain[ing] a large number of active deposits" increases anonymity for all users, ROA.954, and that the service is more effective the more deposits are made, ROA.956. Tornado Cash has made considerable efforts to create, improve, and promote its mixing service, further demonstrating that it has an interest in that service. ROA.961-963.

For these reasons, OFAC concluded that foreign persons have an interest in Tornado Cash because TORN tokens are held by Tornado Cash's founders (a group that includes a Russian national with ties to "Russia's primary security agency," ROA.967), and certain other DAO members, ROA.968. OFAC also cited evidence that North Korea holds TORN because of its longstanding use of Tornado Cash for money laundering. ROA.966. Plaintiffs have failed to dispute these findings.[5]

## II.    Plaintiffs' Contrary Arguments Lack Merit.

Plaintiffs challenge little of OFAC's reasoning. For example, plaintiffs do not argue that OFAC's regulations should be set aside as inconsistent with IEEPA. They also do not dispute that North Korean hackers rely on the service provided by Tornado Cash to hide the cryptocurrency they steal. Instead, plaintiffs claim to have

---

[5] One amicus contests this finding on the theory that certain mixing transactions are purely domestic. DeFi Educ. Fund Amicus Br. 11-14. This argument is not before this Court because plaintiffs have not raised it. *Allen v. C & H Distribs., LLC*, 813 F.3d 566, 574 n.7 (5th Cir. 2015). It also lacks merit, as the only court to have considered the argument has held. *Coin Ctr. v. Yellen*, No. 3:22cv20375-TKW-ZCB, 2023 WL 7121095, at *6-7 (N.D. Fla. Oct. 30), *appeal docketed*, No. 23-13698 (11th Cir. Nov. 7, 2023).

identified various loopholes in IEEPA that leave OFAC powerless to act against smart contracts that cybercriminals depend upon to launder their ill-gotten gains.[6]  No such loopholes exist.

### A.    Substantial Evidence Supports OFAC's Finding That Tornado Cash Is an Entity Whose Members Share a Common Purpose.

Plaintiffs contend (Br. 30-33) that, because not everyone who holds TORN actively participates in governance decisions, the DAO's members do not all share a common purpose.  Plaintiffs note that a person may hold TORN for "any number of reasons, including as a purely passive investment."  Br. 31.  But OFAC's regulations do not require that an entity's members share the specific purpose of participating in governance decisions.  As discussed, *supra* pp. 21-22, any common purpose will suffice.  Here, OFAC concluded that the core developer group and the DAO have the common goal of profiting from the mixing service that Tornado Cash provides.  As OFAC found, TORN holders are "similar to stockholders[] who have an interest in the enterprise" and in "benefit[ting] from" its success.  ROA.962.  And a stockholder in a company, even a passive one, undoubtedly has a profit interest that is

---

[6] Plaintiffs argue (Br. 1) that OFAC's blocking order is contrary to the North Korea Sanctions and Policy Enhancement Act of 2016, Pub. L. No. 114-122, § 104, 130 Stat. 93, 99 (codified as amended at 22 U.S.C. § 9214).  OFAC's blocking order did not rely on that statute as a source of authority.  ROA.902.  Moreover, because the Act incorporates IEEPA, 22 U.S.C. § 9214(c), the blocking order is consistent with the Act for the same reasons that it is consistent with IEEPA.

shared not only with other stockholders but also with the company and the board of directors that runs it.

TORN's utility as an "investment opportunity" capable of "generat[ing] returns through trading and staking" proves the point. ROA.939. TORN holders who have staked their tokens are paid a percentage of the fees that Tornado Cash charges for its services. The market value of TORN (whether staked or unstaked) also "appear[s] to correlate with expectations surrounding the success of the smart contracts." ROA.962. Given DAO members' common purpose of profiting from Tornado Cash's mixing service, whether every member of the DAO intends to make governance decisions is irrelevant. As the district court explained, a company's board and stockholders obviously have the common purpose of furthering the company's success even if most stockholders have never participated in a single shareholder vote. ROA.1507.

Plaintiffs acknowledge that "a corporation exists regardless of whether all shareholders vote." Br. 33. They argue, however, that a corporation only qualifies as an "entity" under IEEPA because the definition of "entity" separately includes "corporation[s]"—that is, any group that "has satisfied the formalities required to register as a corporation." *Id.* Plaintiffs cite no authority supporting this counterintuitive appeal to form over function, under which OFAC would presumably lack power over any corporation whose registration documents have expired or are imperfect—to say nothing of groups such as Al-Qaeda and Hamas whose

organizational structure is far more informal.  The more sensible conclusion is that a corporation is an "entity" not merely because it satisfies the technical definition of "corporation" but also because its board and shareholders have a common purpose.

Plaintiffs separately argue (Br. 29) that OFAC's findings are insufficient because the DAO's members failed to "somehow manifest" their "consent to pursue" this common purpose.  That vague requirement appears nowhere in the text of IEEPA, the relevant national-emergency declarations and associated executive orders, or OFAC's regulations.  It appears to be derived from a Ninth Circuit case addressing the question whether, under Federal Rule of Civil Procedure 17(b), an "unincorporated association" has the capacity to be sued.  Br. 27-28 (discussing *Southern Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921 (9th Cir. 2014)).  That question does not bear on this case.  In any event, *Zaffina* did not adopt a manifestation requirement; it simply defined an unincorporated association as a "voluntary group . . . formed by mutual consent."  762 F.3d at 927 (quotation omitted).  This standard does not generally require "written formalities," the existence of an "express" agreement, or any other specific form of manifestation.  *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1289-90 (5th Cir. 1994).  Because unincorporated associations "typically are loosely organized," "tacit[]" consent is sufficient.  *Id.*  And at least one court has held that a DAO member's decision to hold a governance token is sufficient evidence of consent.  *Commodity Futures Trading Comm'n v. Ooki DAO*, 3:22-cv-05416-WHO, 2022 WL 17822445, at *6 (N.D. Cal. Dec. 20, 2022) (treating analogous DAO as an

unincorporated association under Federal Rule of Civil Procedure 17(b) even though not every holder of DAO governance tokens actively participated in governance matters).

Plaintiffs' reliance (Br. 27) on *Boyle v. United States*, 556 U.S. 938 (2009), is even more puzzling. Whether a group of people is an "association-in-fact" under federal racketeering law—the question presented by *Boyle*—does not determine whether that group is an "entity" subject to IEEPA. Moreover, *Boyle* defined "association-in-fact" as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 944 (quotation marks omitted). *Boyle* did not hold that this common purpose must be manifested in a particular way, much less proven by whatever unspecified quantum of manifestation plaintiffs believe is required.

Plaintiffs cannot prevail even accepting their idiosyncratic interpretation of the term "entity." Plaintiffs do not dispute that OFAC would have authority to define the Tornado Cash entity as a "smaller group . . . in their individual capacities" or as an "association composed of holders of TORN who took the affirmative steps necessary to vote or contributed to the development of the Tornado Cash software project." Br. 33. But if OFAC could have lawfully designated some group—perhaps the core developer group alone, or the core developer group plus some subset of the DAO— as the Tornado Cash entity, it is common ground that OFAC may block "all real, personal, and any other property and interests in property" of that entity. *See* ROA.905. Tornado Cash's smart contracts would still qualify as property in which

31

that entity has an interest, meaning that OFAC could lawfully block transactions involving those smart contracts. Because accepting plaintiffs' objections to OFAC's description of the Tornado Cash entity would not render the blocking order unlawful, any error in that description is harmless. 5 U.S.C. § 706.

### B. Substantial Evidence Supports OFAC's Finding that Tornado Cash's Smart Contracts Are Property.

Plaintiffs argue (Br. 42-45) that, even if Tornado Cash is an entity, OFAC lacks power to block transactions involving Tornado Cash's smart contracts because the contracts are not "property." As explained, however, IEEPA grants OFAC broad authority over "any property," 50 U.S.C. § 1702(a)(1)(B), which OFAC has long defined to include "services of any nature whatsoever" and "contracts of any nature whatsoever," 31 C.F.R. §§ 510.323, 578.314. Substantial evidence supports OFAC's conclusion that the smart contracts are property under that definition. All of plaintiffs' rejoinders lack merit.

### 1. The Smart Contracts Satisfy OFAC's Definition of Property.

Plaintiffs contest (Br. 43-44) OFAC's finding that Tornado Cash's smart contracts are "contracts of any nature whatsoever." But they ignore OFAC's independent finding that the smart contracts are also "services of any nature whatsoever." Plaintiffs cannot reasonably dispute that the smart contracts offer customers the valuable service of money laundering on demand. Indeed, plaintiffs

concede that the smart contracts at issue "provide . . . services." Br. 11. This concession is fatal to plaintiffs' argument that the smart contracts are not property.

In any event, plaintiffs are wrong that Tornado Cash's smart contracts are not contracts. According to plaintiffs, smart contracts are not contracts because they have "no owner and no operator" and are "not operating on anyone's behalf," meaning that someone who uses a smart contract is not actually contracting with Tornado Cash. Br. 44. But it is black-letter law that "[a]ny conduct from which a reasonable person in the offeree's position would be justified in inferring a promise in return for a requested act . . . amounts to an offer." 1 Williston on Contracts § 4:20. The "intention to make a promise may be manifested . . . by implication" from circumstances such as "course of dealing," "usage of trade," and "course of performance." Restatement (Second) of Contracts § 4(a).

The record demonstrates that Tornado Cash has offered to pool cryptocurrency using smart contracts that any user may accept by activating them. Tornado Cash has advertised these smart contracts to the public by making representations about what the contracts will do once triggered. *See, e.g.*, ROA.952-953 (quoting Tornado Cash website explaining the services that Tornado Cash "offer[s]"); ROA.953-954 (quoting Tornado Cash website promoting the "fundamental privacy guarantees that [its] users enjoy"); ROA.962-963 (describing Tornado Cash blog posts setting forth terms of new smart contracts). The smart contracts are programmed to execute the terms as advertised. ROA.955. And

33

Tornado Cash benefits from the use of its smart contracts, *supra* pp. 26-27, to the point at which it has given out "financial incentives" to attract customers, ROA.918, 939-940. Under these circumstances, plaintiffs cannot reasonably contend that Tornado Cash is not a party to the smart contracts that embody and implement the mixing service it provides. Indeed, at least two States have enacted laws making clear that "[n]o contract relating to a transaction shall be denied legal effect, validity, or enforceability solely because that contract is executed through a smart contract." Tenn. Code. Ann. § 47-10-202(c); *see* Ariz. Rev. Stat. Ann. § 44-7061 (similar).

Plaintiffs accord (Br. 43) great significance to Tornado Cash's alleged inability to change the terms of the smart contracts once they become immutable.[7] Even if that were correct, the smart contracts' immutability does not mean that Tornado Cash is not a party to its unilateral offers to pool cryptocurrency using those contracts. In most jurisdictions, a unilateral contract becomes irrevocable and unalterable after certain conditions are met. 1 Williston on Contracts § 5:15 (citing Restatement (Second) of Contracts § 45). Yet no one thinks that the unilateral contract ceases to be a contract at that point. That Tornado Cash has preemptively relinquished its right

---

[7] The record shows that Tornado Cash actively develops new smart contracts to replace older ones. ROA.962-963. Tornado Cash then disconnects the older smart contracts from its public interface. *See* ROA.1102-1107 (listing defunct contracts such as "Tornado.Cash: Mixer 1" and "Tornado Cash: Mixer 2"). Defunct smart contracts are essentially useless because a mixing service relies on widespread usage to obscure the relationship between a deposit and subsequent withdrawal. As a practical matter, therefore, Tornado Cash exercises substantial control over its mixing service notwithstanding the immutability of any given smart contract.

to change its smart contracts and its right to prevent customers from accepting its unilateral offers does not mean Tornado Cash is no longer a contracting party. It just means that Tornado Cash is irrevocably bound to the smart contracts' terms once a customer accepts Tornado Cash's unilateral offer to pool cryptocurrency by triggering them.

### 2.    OFAC's Definition of "Property" Is Binding Law.

With the text of the regulations against them, plaintiffs argue (Br. 36-37) that "[t]here is no reason to consider the agency's regulations" because IEEPA allegedly bars OFAC from treating Tornado Cash's smart contracts as property. Br. 35-36, 42-44. But OFAC's regulations implementing IEEPA, the relevant national-emergency declarations, and associated executive orders—which include OFAC's definition of the statutory term "property"—bind the regulated public and have the force of law. Plaintiffs' complaint does not challenge the definition or urge that the definition must be set aside as contrary to law. ROA.167-171. Having declined to bring any claim that the definition is invalid, plaintiffs cannot now treat the definition as irrelevant.

Plaintiffs could not prevail even putting OFAC's definition of "property" to one side. IEEPA may be applied to "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). Plaintiffs define the term "property" as "something that can be owned," Br. 36, and then argue that the term "ownership" must be equated with the rights of exclusion and control, Br. 42.

Plaintiffs conclude that, because Tornado Cash has divested itself of those rights by making its smart contracts immutable, the smart contracts cannot be property.

IEEPA does not, however, reduce "property" or "ownership" to the right of exclusion and the right of control. The term "property" refers to "the rights in a valued resource such as land, chattel, or an intangible," and can be applied "to every kind of valuable right and interest that can be made the subject of ownership." *Property*, Black's Law Dictionary (quotation marks omitted). The term "ownership" refers to "[t]he bundle of rights allowing one to use, manage, and enjoy property." *Ownership*, Black's Law Dictionary. Exclusion and control are some of the "most essential sticks" in that bundle. *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)). But they are not the only sticks in the bundle. A parcel of land is still property even if its owner has no legal right to exclude anyone from it—for example, if the property is encumbered by an easement granting the public a "permanent and continuous right to pass to and fro, so that the real property may continuously be traversed." *Cf. Nollan v. California Coastal Comm'n*, 483 U.S. 825, 832 (1987). And assets in trust are still property even if the beneficiary has no legal right to control them—for example, if the assets are "under the control of an independent trustee with the provision that the [beneficiary] is to have no knowledge of how those assets are managed." *Cf. Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1031 (Fed. Cir. 2022) (quotation marks omitted).

In sum, "[o]wnership does not always mean absolute dominion." *Marsh v. Alabama*, 326 U.S. 501, 506 (1946).

The text of IEEPA reflects this commonsense understanding. IEEPA covers "*any* property" in which foreigners have any interest, without further qualification or modification. 50 U.S.C. § 1702(a)(1)(B) (emphasis added). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citation omitted); *accord Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 218-19 (2008) (explaining that the word "any" naturally "suggests a broad meaning"). By limiting the phrase "any property" to property subject to the right of exclusion and the right of control, plaintiffs seek to "narrow [the] provision's reach by inserting words Congress chose to omit." *See Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020). But courts may not "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).

The purpose of IEEPA underscores what the text makes clear. Blocking orders protect the Nation by "shutter[ing] all domestic operations" of a foreign entity that poses an "'unusual and extraordinary threat'" to the United States. *United States v. El-Mezain*, 664 F.3d 467, 540-41 (5th Cir. 2011) (quoting 50 U.S.C. § 1701(a)). They also place "control of foreign assets in the hands of the President." *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981) (quotation marks omitted). "Such orders permit the President to maintain the foreign assets at his disposal for use in negotiating the

resolution of a declared national emergency." *Id.* Permitting entities to escape IEEPA by creatively reconfiguring their property interests runs counter to Congress's decision to give the Executive Branch the tools it needs to defend the United States' national and economic security.

This case vividly illustrates the danger. Tornado Cash appears to have designed its mixing service specifically to evade sanctions. ROA.972, 978. Accepting plaintiffs' narrow understanding of IEEPA would reward Tornado Cash's gamesmanship—leaving OFAC helpless to act against a money-laundering service that malicious cybercriminals such as the Lazarus Group rely upon to fund North Korea's nuclear and missile programs.

Plaintiffs have failed to identify a single reason why Congress would have intended this perverse result. They simply assert (Br. 47) that, if IEEPA applies to Tornado Cash's smart contracts, OFAC would have limitless authority over "concepts" such as "[a] particular physics equation, a public-domain image, or any idea or public good." But smart contracts are not like public-domain concepts in which no one has any discernible interest. Tornado Cash profits from—and therefore has an interest in—the smart contracts that embody the mixing service it provides. Thus, the smart contracts are better analogized to patented processes or copyrighted works that entitle their creators to some benefit. And patents and "copyrights" are indisputably covered by IEEPA. 31 C.F.R. §§ 510.323, 578.314 ("The terms *property* and *property interest* include . . . patents[ and] copyrights[.]").

To sum up, OFAC's definition of "property" does not meaningfully differ from IEEPA's text, and both the statute and the regulations are broad enough to apply here.  But this Court should respect OFAC's definition to the extent any doubt remains on this score.  Given Congress's express delegation to the Executive Branch to promulgate definitional regulations, this Court and others have held that OFAC's interpretation is entitled to deference.  *See Paradissiotis v. Rubin*, 171 F.3d 983, 987 (5th Cir. 1999); *accord Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 701 (D.C. Cir. 1994); *De Cuellar v. Brady*, 881 F.2d 1561, 1565 (11th Cir. 1989).

### 3.     Plaintiffs' Criticisms of OFAC's Definition Are Insubstantial.

Despite first urging (Br. 37) this Court to ignore OFAC's definition of "property," plaintiffs later advise (Br. 36, 40) the Court to apply the definition as if it were identical to plaintiffs' construction of IEEPA.  But the definition's language sweeps far more broadly than that—covering, among other things, "services of any nature whatsoever" and "contracts of any nature whatsoever."  31 C.F.R. §§ 510.323, 578.314.  That language plainly extends beyond only those services or contracts that are subject to the rights of exclusion or control.

Plaintiffs criticize OFAC's definition as "circular" because it supposedly defines "property" as "any . . . property."  Br. 40-41 (alteration in original) (quoting 31 C.F.R. §§510.323, 578.314).  That is not what the definition says, as evinced by plaintiffs' omission of 161 of the definition's 163 words.  *See* 31 C.F.R. §§ 510.323, 578.314.

The language plaintiffs quote covers "any *other* property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." *Id.* (emphasis added).  This catchall, which follows a list of general and specific forms of property, ensures that the definition captures the breadth of the statutory phrase "any property."  50 U.S.C. § 1702(a)(1)(B).  Its presence in the definition further undercuts plaintiffs' argument that the definition reflects plaintiffs' narrow interpretation of the term "property."

### 4.    This Case Does Not Implicate Any Grave and Doubtful Constitutional Question.

Plaintiffs argue (Br. 38-39, 40) that their interpretation of the term "property" is compelled by the canon of constitutional avoidance.  But that canon "comes into play only when[] . . . [a] statute is found to be susceptible of more than one construction."  *Clark v. Martinez,* 543 U.S. 371, 385 (2005).  Nothing in IEEPA supports plaintiffs' view that, by granting the Executive Branch authority over "*any* property*,*" 50 U.S.C. § 1702(a)(1)(B) (emphasis added), Congress only meant to grant the Executive Branch authority over *some* property.  The same is true for OFAC's regulations, which define "property" as capaciously as IEEPA allows.

Even if IEEPA or the applicable regulations were ambiguous, the avoidance canon would not apply because the case does not implicate any grave and doubtful question of constitutional law.  *See Jones v. United States*, 526 U.S. 227, 239 (1999).  Plaintiffs posit (Br. 39) that applying IEEPA to Tornado Cash's smart contracts might

violate the First Amendment by prohibiting people from "mak[ing] donations to support important political and social causes." But the district court rejected that same First Amendment claim on the merits. ROA.1513-1514. Plaintiffs' decision to waive their right to appeal that part of the judgment, Br. 21, undermines their argument that OFAC's order "raises serious constitutional questions," Br. 38.[8]

The district court's reasoning confirms that plaintiffs' First Amendment argument is insubstantial. OFAC's blocking order does not prohibit plaintiffs—or anyone else—from donating any money to any cause. The order merely prohibits potential donors from donating money using Tornado Cash's mixing service. And the First Amendment does not protect "the right to [donate money] through any particular . . . service of [the donor's] choosing." ROA.1513.

No authority supports plaintiffs' suggestion that an order shuttering a particular money-transfer service for fraud or other misconduct would implicate the First Amendment rights of customers who would like to use that service to make donations. After all, "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986). First Amendment scrutiny applies "only where it was conduct with a

---

[8] Plaintiffs argue (Br. 39) that OFAC's order might be unconstitutional because it prohibits people from "develop[ing] code to facilitate improved uses of the Ethereum network." As the district court observed, this "characterization is misleading." ROA.1514. The order does not "restrict interaction with the [smart contracts'] open-source code unless those interactions amount to a transaction." ROA.1514.

significant expressive element that drew the legal remedy in the first place[] . . . or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity." *Id.* at 706-07 (footnote omitted). Here, OFAC blocked Tornado Cash's mixing service for reasons unrelated to any expressive activity by anyone.

Even if OFAC's blocking order implicates the First Amendment, any burden on speech would be at most an incidental one arising from generally applicable and content-neutral laws. Such a law is constitutional "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

Plaintiffs do not dispute that the act of blocking transactions involving property and property interests of designated entities is within the constitutional power of the federal government. Plaintiffs also do not dispute that the government's interest in remediating threats to the national security and national economy is an important one unrelated to any First Amendment-protected activity. Plaintiffs argue (Br. 38) only that the order is too broad. But the order is precisely tailored to effectuate the purposes of IEEPA: to protect the United States by fully depriving a designated entity of access to its property and interests in property. *Supra* pp. 37-38.

42

Plaintiffs' suggestion (Br. 38-39) that the order should be limited only to unlawful uses of Tornado Cash's mixing service ignores the reason the service exists: to "give[] customers the ability to obfuscate their transactions . . . regardless of the source of funds, illicit or otherwise." ROA.952. Presumptively blocking all transactions involving that service ensures that criminals cannot disguise their illegal transactions as legal ones. And the blocking order leaves open many other ways for plaintiffs to donate money to the causes they support. For example, plaintiffs may apply for licenses to engage in specific transactions involving Tornado Cash's smart contracts. *See supra* p. 16. Plaintiffs may also continue using "other services that may allow them privacy" for their donations. ROA.1513.[9]

### C. Substantial Evidence Supports OFAC's Conclusion that Tornado Cash Has an Interest in Its Smart Contracts.

Finally, plaintiffs contend (Br. 48) that OFAC lacks authority to block transactions involving Tornado Cash's smart contracts because it is allegedly impossible for anyone—including the Tornado Cash entity—to have any interest in those contracts. More than substantial evidence supports OFAC's contrary finding, as both courts to address this issue have concluded. ROA.1510-1513; *accord Coin Ctr.*

---

[9] One amicus additionally invokes the rule of lenity and the major-questions doctrine. Blockchain Ass'n Amicus Br. 24-25, 28. These arguments are not before this Court because plaintiffs have not raised them. And the arguments lack merit for the reasons set forth in *Coin Center*, 2023 WL 7121095, at *7.

*v. Yellen*, No. 3:22cv20375-TKW-ZCB, 2023 WL 7121095 (N.D. Fla. Oct. 30), *appeal docketed*, No. 23-13698 (11th Cir. Nov. 7, 2023).

Courts have consistently recognized that IEEPA reaches not only a "'legally enforceable' interest" but also a "beneficial interest, or an interest not defined in traditional common law terms." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162-63 (D.C. Cir. 2003); *accord Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002). As those courts have explained, the text of IEEPA imposes "no limit on the scope of the interest," and "[t]he interest need not be a legally protected one in order to be caught within the net" of IEEPA. *Holy Land*, 333 F.3d at 162-63; *Global Relief*, 315 F.3d at 753 (emphasizing that "the focus must be on how assets could be controlled and used, not on bare legal ownership"). Those cases held that Hamas had an "interest" in property that was owned and possessed by organizations in the United States, even though Hamas had no legal claim to that property. *See Holy Land*, 333 F.3d at 162-63; *Global Relief*, 315 F.3d at 752-53. This expansive view of "interest" follows from IEEPA's purposes—to protect the United States' national and economic security and to "'give the President means to control assets that could be used by enemy aliens.'" *Holy Land*, 333 F.3d at 163 (quoting *Global Relief*, 315 F.3d at 753); *supra* pp. 37-38. These purposes are "at least as much" implicated when someone holds some "interest not defined in traditional common law terms as it is by a legal interest which might be a pure fiction." *Id.*

44

The courts' interpretation comports with decades of practice. Acting under Congress's express delegation to prescribe "regulations, including regulations prescribing definitions," 50 U.S.C. § 1704, OFAC has defined the term "interest," "when used with respect to property," to mean "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. §§ 510.313, 578.309. The Executive Branch has defined "interest" in this manner since shortly after Congress added the phrase "any property in which any foreign country or a national thereof has any interest" to IEEPA's predecessor statute, the Trading With the Enemy Act, in 1941. *See* First War Powers Act, 1941, Pub. L. No. 77-354, tit. III, sec. 301, § 1(B), 55 Stat. 838, 839-40. The first general regulations issued to implement the 1941 amendment contained substantively the same definition in use today. 15 Fed. Reg. 9040, 9042 (Dec. 19, 1950). Subsequent Cuba-specific regulations repeated that definition. 28 Fed. Reg. 6974, 6977 (July 9, 1963).

When enacting IEEPA, Congress adopted the relevant language from the Trading With the Enemy Act and left it unchanged. *See Regan v. Wald*, 468 U.S. 222, 232-33, 232 n.16, 233 n.17 (1984) (referring to the "sweeping statutory language" of the Trading With the Enemy Act and noting that IEEPA "tracks the language" of that statute). Congress specified that regulations issued to implement sanctions regimes predating IEEPA would remain in effect. *See id.* at 225, 233-34. And an identical regulatory definition was adopted shortly after IEEPA's enactment. 44 Fed. Reg. 75,352, 75,352 (Dec. 19, 1979). This longstanding and consistent interpretation

confirms that the statutory phrase "any interest" really means "any interest." *See, e.g.,* *Davis v. United States*, 495 U.S. 472, 484 (1990); *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 274-75 (1974). And OFAC's interpretation would warrant deference even assuming that the phrase was ambiguous. *Supra* p. 39.

These principles support OFAC's conclusion that Tornado Cash has an interest in its mixing service—and therefore in the smart contracts that enable the service to be provided and without which the service would not exist. As OFAC found, "Tornado Cash receives a regular stream of revenue from the smart contracts in the form of TORN tokens transferred to the DAO for relayer-enabled transactions." ROA.1511. More generally, the value of TORN—that is, of Tornado Cash's equivalent of stock—is linked to the "ongoing use of the service" that Tornado Cash operates. ROA.919.

Plaintiffs respond (Br. 51-52) that Tornado Cash does not benefit from the smart contracts that perform its service's core mixing functions because the contractual provisions entitling Tornado Cash to relayer fees technically appear in other smart contracts. But the district court saw through this appeal to empty formalism. ROA.1511. Tornado Cash has designed its service to make it impossible for a user to initiate a relayer-assisted withdrawal without also triggering the relevant fee-payment provisions (wherever such provisions may be located). ROA.959 (quoting Tornado Cash website explaining that, "[w]hen a relayer is used in the Tornado Cash pool," Tornado Cash "automatically collects" a relayer fee). OFAC's

definition of "interest"—which covers "an interest of any nature whatsoever, *direct or indirect*," ROA.1511 (emphasis added) (quotation marks omitted)—forecloses Tornado Cash's efforts to disguise its interest by routing payment through other smart contracts.

Plaintiffs downplay (Br. 52) these fee provisions by noting that Tornado Cash does not charge fees for the small percentage of mixing transactions that do not involve a relayer. But that does not mean Tornado Cash lacks an interest in those transactions. Tornado Cash has an interest not only in the receipt of relayer fees but also in the use of its service writ large, as the service's "efficacy . . . depends on a critical mass of users depositing funds to its pool smart contracts." ROA.964. And the record indicates that the value of TORN—Tornado Cash's stock—correlates to the success of that service. ROA.962. As the district court found, this relationship is not "hypothetical" or "remote." ROA.1511. In any event, plaintiffs have failed to cite, and we are not aware of, any case holding that an interest must generate a net-positive amount of revenue to qualify as an "interest" under IEEPA. At least one court of appeals has concluded otherwise. In *De Cuellar*, the Eleventh Circuit considered whether an American holding Cuban bonds secured by a "sinking fund" in the United States could redeem those bonds. 881 F.2d at 1563-64. The court held that OFAC had properly blocked that transaction because Cuba retained a "contingent reversionary interest" in whatever amount remained in the fund after the bonds were redeemed. *Id.* at 1566. The court reached that conclusion

notwithstanding the fact that permitting the redemption would have *reduced* the amount of money remaining in the fund for Cuba to collect.

Plaintiffs argue (Br. 52-53) that Tornado Cash's interest in the success of its service is too attenuated to qualify as an "interest" under IEEPA. They analogize (Br. 54) this case to one in which OFAC "designate[s] Americans' cars as property" because a sanctioned foreign entity is likely to benefit from "higher demand for oil" and cars use oil. But Tornado Cash's mixing service is not merely a complementary good that tangentially affects the market price of TORN. It is the core service that Tornado Cash offers. To reiterate, Tornado Cash's ability to anonymize cryptocurrency transfers is tied to the existence of a critical mass of users. The increased anonymity provided by a larger userbase bolsters the service's efficacy regardless of whether its users employ relayers. *See* ROA.956 (quoting Tornado Cash blog post linking anonymity to the "total amount of deposits made" and advising customers to "mingle with the crowd"). The value of the service is reflected in the value of TORN, which serves as Tornado Cash's equivalent of stock. ROA.962. This explains why Tornado Cash has gone to such lengths to increase its userbase, including by offering TORN as a reward to attract new customers. The record thus contains more than enough evidence to sustain OFAC's conclusion that Tornado Cash has an interest in the use of its mixing service.

Plaintiffs dispute (Br. 55) OFAC's finding that the value of TORN "appear[s] to correlate with" the "success of the smart contracts," ROA.962. But that finding is

likewise supported by more than substantial evidence. For example, the value of TORN "surged 94 percent" after Tornado Cash updated its smart contracts to allow for relayer-assisted withdrawals. ROA.940. By contrast, TORN "lost more than half of its . . . value" after OFAC first designated Tornado Cash in August 2022. ROA.1019-1020. The fact that TORN's market value may be affected by factors other than the success of its service does not prove that Tornado Cash lacks any interest in that service. The same can be said about the market value of stock issued by any publicly traded company. Yet plaintiffs cannot seriously contend that a company and its stockholders have no interest in the success of the goods or services the company offers to its customers.

That Tornado Cash is not formally registered as a corporation (Br. 33-34) does not alter the analysis. As OFAC found, Tornado Cash is modeled after a public company. ROA.918. This structure is far more formal than that of terrorist entities such as Al-Qaeda and Hamas that OFAC has properly sanctioned. Thanks to TORN, Tornado Cash benefits from, and therefore has an interest in, the mixing service it develops, maintains, and markets to the world. The smart contracts that embody and execute this service allow Tornado Cash's users to launder cryptocurrency on demand. And cybercriminals have used the service to funnel at least $600 million in stolen cryptocurrency toward North Korea's nuclear and missile programs. Tornado Cash, in short, is exactly the sort of entity that Congress gave the Executive Branch authority to protect against through sanctions.

# CONCLUSION

For these reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

JAIME ESPARZA
  *United States Attorney*

SHARON SWINGLE

  */s/ Michael Shih*
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*
  *michael.shih@usdoj.gov*

March 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,090 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Michael Shih*
MICHAEL SHIH

**ADDENDUM**

# TABLE OF CONTENTS

50 U.S.C. § 1702 ................................................................................................................ A1

## 50 U.S.C. § 1702

## § 1702. Presidential Authorities

(a) In general

(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and,

(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

(2) In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the

form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

(3) Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

(b) Exceptions to grant of authority

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—

(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

(2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or

(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 4604 of this title, or under section 4605 of this title to the extent

that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of title 18; or

(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

(c) Classified information

In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.