No. 23-50669

# In the United States Court of Appeals for the Fifth Circuit

---

JOSEPH VAN LOON; TYLER ALMEIDA; ALEXANDER FISHER;
PRESTON VAN LOON; KEVIN VITALE; NATE WELCH,
PLAINTIFFS-APPELLANTS

*v.*

DEPARTMENT OF THE TREASURY;
OFFICE OF FOREIGN ASSETS CONTROL; JANET YELLEN,
SECRETARY, U.S. DEPARTMENT OF TREASURY,
IN HER OFFICIAL CAPACITY; ANDREA M. GACKI,
IN HER OFFICIAL CAPACITY AS DIRECTOR
OF THE OFFICE OF FOREIGN ASSETS CONTROL,
DEFENDANTS-APPELLEES

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS (CIV. NO. 23-312)
(THE HONORABLE ROBERT L. PITMAN, J.)*

---

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**

---

CHARLES LEWIS AINSWORTH
PARKER, BUNT & AINSWORTH, P.C.
  *100 East Ferguson, Suite 418*
  *Tyler, TX 75702*

KANNON K. SHANMUGAM
BRIAN M. LIPSHUTZ
MATTEO GODI
DAVID A. HOPEN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-50669

---

JOSEPH VAN LOON; TYLER ALMEIDA; ALEXANDER FISHER;
PRESTON VAN LOON; KEVIN VITALE; AND NATE WELCH,
PLAINTIFFS-APPELLANTS

*v.*

DEPARTMENT OF THE TREASURY;
OFFICE OF FOREIGN ASSETS CONTROL;
JANET YELLEN, SECRETARY, U.S. DEPARTMENT
OF TREASURY, IN HER OFFICIAL CAPACITY;
ANDREA M. GACKI, IN HER OFFICIAL CAPACITY
AS DIRECTOR OF THE OFFICE
OF FOREIGN ASSETS CONTROL,
DEFENDANTS-APPELLEES

---

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Appellants:**

Joseph Van Loon; Tyler Almeida; Alexander Fisher; Preston Van Loon; Kevin Vitale; and Nate Welch.

**Appellees:**

Department of the Treasury; Office of Foreign Assets Control; Janet Yellen, Secretary, U.S. Department of Treasury, in her official capacity; and Andrea M. Gacki, Director of the Office of Foreign Assets Control, in her official capacity.

**Amici curiae:**

Andreessen Horowitz; Blockchain Association; DeFi Education Fund; Del Wright; J.W. Verret; Carla L. Reyes; and The Bank Policy Institute.

**Amici curiae in the district court:**

Andreessen Horowitz; Blockchain Association; DeFi Education Fund; Electronic Frontier Foundation; Paradigm Operations LP; and The Bank Policy Institute.

**Attorneys for appellants:**

Kannon K. Shanmugam
Brian M. Lipshutz
Matteo Godi
Jennifer K. Corcoran
David A. Hopen
*Paul, Weiss, Rifkind, Wharton & Garrison LLP*
*2001 K Street, N.W.*
*Washington, DC 20006*

Charles Lewis Ainsworth
*Parker, Bunt & Ainsworth, P.C.*
*100 East Ferguson, Suite 418*
*Tyler, TX 75702*

**Attorneys for appellees:**

Brian M. Boynton
Sharon Swingle
Michael Shih
*U.S. Department of Justice*
*Civil Division, Appellate Section*
*950 Pennsylvania Avenue, N.W., Room 7250*
*Washington, DC 20530*

Stephen J. Elliott
Christopher Robert Healy
Christine L. Coogle
*U.S. Department of Justice, Civil Division*
*1100 L Street, N.W.*
*Washington, DC 20530*

Jaime Esparza
Liane Ngin Noble
*U.S. Attorney's Office for the Western District of Texas*
*903 San Jacinto Boulevard, Suite 334*
*Austin, TX 78701*

**Attorneys for amici curiae:**

Alessio D. Evangelista
Jessie K. Liu
*Skadden, Arps, Slate, Meagher & Flom LLP*
*1440 New York Avenue, N.W.*
*Washington, DC 20005*

Cameron T. Norris
Jeffrey S. Hetzel
*Consovoy McCarthy PLLC*
*1600 Wilson Boulevard, Suite 700*
*Arlington, VA 22209*

Mark R. Rasmussen
*Jones Day*
*2727 North Harwood Street, Suite 500*
*Dallas, TX 75201*

Aaron M. Streett
Matthew M. Hilderbrand
*Baker Botts LLP*
*910 Louisiana Street*
*Houston, TX 77002*

J. Abraham Sutherland
*106 Connally Street*
*Black Mountain, NC 28711*

Eric Tung
*Jones Day*
*555 South Flower Street, 50th Floor*
*Los Angeles, CA 90071*

Laranda Walker
*Susman Godfrey L.L.P.*
*1000 Louisiana Street, Suite 5100*
*Houston, TX 77002*

Alexis Zhang
*Jones Day*
*51 Louisiana Avenue, N.W.*
*Washington, DC 20001*

**Attorneys for amici curiae in the district court:**

James M. Burnham
*King Street Legal, P.L.L.C.*
*800 Connecticut Avenue, N.W., Suite 300*
*Washington, DC 20006*

Cindy Cohn
*Electronic Frontier Foundation*
*815 Eddy Street*
*San Francisco, CA 94109*

Jonathan David Guynn
*Jones Day*
*2727 North Harwood Street, Suite 600*
*Dallas, TX 75201*

John B. Kinchen
*Hughes Arrell Kinchen LLP*
*2211 Norfolk, Suite 405*
*Houston, TX 77098*

Thomas S. Leatherbury
*Thomas S. Leatherbury Law, PLLC*
*1901 North Akard Street*
*Dallas, TX 75201*

Jessie K. Liu
Alessio Evangelista
*Skadden, Arps, Slate, Meagher & Flom LLP*
*1440 New York Avenue, N.W.*
*Washington, DC 20005*

Rodrigo Seira
*Paradigm Operations LP*
*548 Market Street*
*San Francisco, CA 94104*

Peter B. Steffensen
*SMU Dedman School of Law, First Amendment Clinic*
*P.O. Box 750116*
*Dallas, TX 75275*

Alexis Swartz
*Lehotsky Keller LLP*
*919 Congress Avenue, Suite 1100*
*Austin, TX 78701*

Eric Tung
*Jones Day*
*555 South Flower Street, 50th Floor*
*Los Angeles, CA 90071*

Katherine Yarger
*Lehotsky Keller LLP*
*700 Colorado Boulevard, Room 407*
*Denver, CO 80220*

Alexis Zhang
*Jones Day*
*51 Louisiana Avenue, N.W.*
*Washington, DC 20001*

/S/ Kannon K. Shanmugam

KANNON K. SHANMUGAM

*Attorney of Record*
*for Appellants Joseph Van Loon,*
*Tyler Almeida, Alexander Fisher,*
*Preston Van Loon, Kevin Vitale,*
*and Nate Welch*

APRIL 15, 2024

# TABLE OF CONTENTS

Page

Argument ...................................................................................4

I.    The designation is unlawful because the Department failed
      to designate a foreign 'national'.........................................4

      A.    The Department was required to identify a group
            that has demonstrated an agreement to pursue
            a common purpose ..................................................4

      B.    The purported Tornado Cash 'entity' has not
            demonstrated an agreement to pursue a common
            purpose ...................................................................4

II.   The designation is unlawful because the immutable smart
      contracts are not 'property' ...............................................10

      A.    'Property' must be capable of being owned ........................11

      B.    The immutable smart contracts are not capable
            of being owned.......................................................15

III.  The designation is unlawful because the purported
      Tornado Cash entity has no 'interest' in the immutable
      smart contracts................................................................22

Conclusion..................................................................................28

Certificate of compliance

# TABLE OF AUTHORITIES

## CASES

*Arcara* v. *Cloud Books, Inc.*, 478 U.S. 697 (1986) ..............................14

*Calcutt* v. *FDIC*, 598 U.S. 623 (2023)..........................................9

*CFTC* v. *Ooki DAO*, Civ. No. 22-5416, 2022 WL 17822445
      (N.D. Cal. Dec. 20, 2022) ...................................................8

*Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*,
      467 U.S. 837 (1984)......................................................11, 13

Page

Cases—continued:

*Chicago Area Military Project* v. *City of Chicago*,
  508 F.2d 921 (7th Cir. 1975).......................................................14

*Dames & Moore* v. *Regan*, 453 U.S. 654 (1981)...............................27

*De Cuellar* v. *Brady*, 881 F.2d 1561 (11th Cir. 1989)........................26

*Doe* v. *Landry*, 909 F.3d 99 (5th Cir. 2018)....................................15

*Freedom From Religion Foundation* v. *Abbott*,
  955 F.3d 417 (5th Cir. 2020).......................................................14

*Global Relief Foundation, Inc.* v. *O'Neill*,
  315 F.3d 748 (7th Cir. 2002).......................................................26

*Hobbs* v. *Hawkins*, 968 F.2d 471 (5th Cir. 1992)..............................14

*Holy Land Foundation for Relief & Development* v. *Ashcroft*,
  333 F.3d 156 (D.C. Cir. 2003).....................................................26

*Kisor* v. *Wilkie*, 139 S. Ct. 2400 (2019) ........................................11

*Michigan* v. *EPA*, 576 U.S. 743 (2015) ..........................................11

*Mohamad* v. *Palestinian Authority*, 566 U.S. 449 (2012) .................27

*Schneider* v. *New Jersey*, 308 U.S. 147 (1939)..................................13

*SEC* v. *Chenery Corp.*, 332 U.S. 194 (1947) ...................................20

*Shinseki* v. *Sanders*, 556 U.S. 396 (2009)........................................9

*Wages & White Lion Investments, L.L.C.* v. *FDA*,
  90 F.4th 357 (5th Cir. 2024),
  *cert. petition filed*, No. 23-1038 (Mar. 19, 2024) ..............................9

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. Amend. I..................................................................13, 14

Page

Statutes and rules—continued:

Administrative Procedure Act,
     5 U.S.C. §§ 551 *et seq.*, 5 U.S.C. §§ 701 *et seq.*:

     5 U.S.C. § 706 ........................................................................9

International Emergency Economic Powers Act,
     50 U.S.C. §§ 1701-1706:

     50 U.S.C. § 1702(a)(1) ........................................................10

     50 U.S.C. § 1702(a)(1)(B)..........................................4, 11, 22

Ariz. Rev. Stat. Ann. § 44-7061(C) ........................................19

Tenn. Code Ann. § 47-10-202(c)..............................................19

31 C.F.R. § 510.323 ....................................................12, 16, 17

31 C.F.R. § 578.314 ....................................................12, 16, 17

66 Fed. Reg. 49,079 (Sept. 25, 2001) ........................................8

71 Fed. Reg. 27,199 (May 10, 2006) ..........................................8

## OTHER AUTHORITIES

*Black's Law Dictionary* (11th ed. 2019) ..........................16, 22

Department of Treasury, Memorandum on Potential Options
     to Strengthen Counter-Terrorist Financing Authorities
     (Nov. 28, 2023) <coincenter.org/app/uploads/2023/
     12/11.28.2023-Counter-TF-Legislative-Proposals.pdf> .............................27

Richard A. Lord, *Williston on Contracts* (4th ed. online)
     (last updated May 2023)......................................................18

Restatement (First) of Property (1936)..............................................26

Restatement (Second) of Contracts (1981)..........................................18

It is now clear that the Department of the Treasury is asserting the unprecedented power to prohibit American citizens from interacting with immutable, open-source software code that cannot be deleted, edited, or controlled in any way. It claims authority to do so under the International Emergency Economic Powers Act (IEEPA), which permits it to regulate only "property" in which a foreign "national" has an "interest." But IEEPA simply does not fit here: the Department cannot settle on a coherent explanation for why it has identified a "national," "property," and an "interest." Because the Department has not satisfied any of those statutory requirements—let alone all three—the judgment of the district court should be reversed as to the first count of the amended complaint.

*First*, the Department has failed to identify a foreign "national" under IEEPA, which the Department now clarifies is the only statute under which it is acting. The Department agrees that it must identify a body of persons who have combined to execute a common purpose. But the disparate group of individuals forming the purported Tornado Cash "entity" defined by the Department does not share any common purpose. On appeal, the Department abandons the district court's incorrect conclusion that the sanctioned "entity" is a group of individuals with the common purpose of "developing, promoting, and governing Tornado Cash." ROA.1506. Instead, it now argues that those individuals share the common purpose of *profiting* from Tornado Cash. But the

administrative record does not support the argument that all members of the purported Tornado Cash "entity" share that purpose. Indeed, the Department concedes that only a subset of all TORN holders earn any fees from the Tornado Cash software and thus even conceivably could share in the purpose of profiting. And the administrative record does not even include evidence that every member of the purported "entity" holds TORN in the first place. The Department's reliance on harmless-error review for its overbroad designation is foreclosed by bedrock principles of administrative law.

*Second*, even if the Department had validly designated an "entity," the immutable smart contracts at issue in this appeal would still not be "property." To begin with, there is no need to skip past the plain meaning of the statute and rely on the regulatory definition of "property," because the parties agree that the statutory term unambiguously refers to something that is capable of being owned. The Department fails to identify a single use of the word "property"—hypothetical or otherwise—that refers to something that is incapable of being owned. And even if this Court were to rely on the regulation, the Department has failed to identify any language expanding "property" beyond its common-sense meaning.

Instead of applying IEEPA's plain language, the Department attempts to shoehorn the immutable smart contracts at issue here into the regulatory definition of "property," arguing that they are either a "service" or a "con-

2

tract." An immutable smart contract is not a "service" any more than a lawyer is a service; instead, an immutable smart contract at most *provides* a service. And a so-called smart contract is not a "contract," because it is at most a tool that can be used to form a contract. Regardless, even assuming that ownerless and immutable software code can be used to make legally binding offers, there is nothing in the record to suggest that Tornado Cash made any offers, much less that they became irrevocable.

*Third*, even if the Department had identified a foreign "national" and even if the immutable smart contracts were "property," the Department would still have failed to identify an "interest" in property. The Department argues that the purported entity has an interest in the relayer registry (a separate *mutable* smart contract) and that some TORN holders were well-positioned to profit from use of Tornado Cash. Neither argument demonstrates a legal, equitable, or beneficial interest in the immutable smart contracts at issue here.

The Department has failed to cite any precedent for its designation of Tornado Cash, and that designation has no basis in the text of IEEPA. If the Department wishes to regulate American citizens' use of open-source software code such as Tornado Cash, it should seek authority to do so from Congress—as the Department has recently done. But the Department does not presently have that authority under IEEPA. The district court erred by granting summary judgment to the Department, and its judgment should be reversed.

3

**ARGUMENT**

## I. THE DESIGNATION IS UNLAWFUL BECAUSE THE DEPARTMENT FAILED TO DESIGNATE A FOREIGN 'NATIONAL'

### A. The Department Was Required To Identify A Group That Has Demonstrated An Agreement To Pursue A Common Purpose

IEEPA grants the Department power to designate property belonging to a foreign "national." 50 U.S.C. § 1702(a)(1)(B). The Department argues that it has identified a foreign national in the form of an unincorporated association, which is a body of persons who have combined to execute a common purpose. *See* Department Br. 21-24, 30; Br. of Appellants 26-30.

### B. The Purported Tornado Cash 'Entity' Has Not Demonstrated An Agreement To Pursue A Common Purpose

The Department recognizes that its purported Tornado Cash "entity" is composed of the Tornado Cash founders, other associated developers, and anyone who holds TORN tokens. *See* Department Br. 22-23. The Department can point to no common purpose held by that diverse set of individuals.

1. The district court concluded that the individuals in the proposed "entity" shared the common purpose of "developing, promoting, and governing Tornado Cash." ROA.1506. The district court reasoned that the "voting members"—*i.e.*, TORN holders who had voted on governance proposals— "ha[d] demonstrated an agreement to a common purpose." ROA.1507. The Department does not defend that conclusion on appeal, even though it made the same argument in the district court. As the Department now seems to

accept, TORN holders who intend to vote on governance proposals are a small minority of the holders of TORN, and thus an even smaller minority of the purported Tornado Cash entity as a whole. Br. of Appellant 31-32. Voting by a small group of TORN holders cannot establish a common purpose across the entire "entity" defined by the Department—one consisting of the founders, developers, and anyone who owns one of the 1.5 million TORN tokens in circulation.

2.     The Department instead embraces a different theory to prove the existence of an unincorporated association:  that the Tornado Cash founders and developers, along with anyone who holds a TORN token, share the common purpose of "*profit[ing]* from the Tornado Cash mixing service."  Br. 23 (quoting ROA.918) (emphasis added).  In support, the Department first argues that the members of the purported "entity" have a shared purpose in profiting from the receipt of fees paid by relayers. *See id*.  But as the Department elsewhere acknowledges, only "TORN holders who have staked their tokens" by "essentially[] registering [them] so that [they] may not be sold until subsequently unlocked" receive a share of the fees paid by relayers for the privilege of being listed on the relayer registry.  Br. 12 (citing ROA.1070); *see also* Br. 29.  The Department did not limit its entity definition to TORN holders who chose to stake their tokens for profit; although only a small subset of TORN holders stake their TORN, the Department identified *every* TORN holder as

a member of the entity. Those members of the entity who do not stake TORN do not share the purpose of profiting from the use of relayers identified in the Department's evidentiary memorandum.

What is more, as the Department acknowledges, OFAC's "entity" definition sweeps in not just all TORN holders, but also the Tornado Cash "founders and other associated developers." Br. 22. The Department points to no evidence in the administrative record that those individuals held TORN at the time of the designation—let alone that they shared the purpose of profiting from the use of relayers.

The Department next argues that all members of the purported Tornado Cash "entity" have a shared purpose in profiting from increases in the value of TORN. *See* Br. 23. But the mere fact that owners of similar property may expect similar economic outcomes does not mean that they share a common purpose. The Department fails to cite any evidence in the administrative record showing that all members of the purported "entity" shared that purpose. The Department's evidentiary memorandum acknowledged that individuals associated with the development of the Tornado Cash project "asserted that TORN was not an investment opportunity." ROA.939. Those members of the purported entity may well have held TORN solely to use it a governance token, or for some other reason.

Even if holding TORN did somehow demonstrate a common purpose to profit from increases in the value of TORN, that purported purpose would be shared at most only by TORN holders.  In support of its argument, the Department cites page 27 of the evidentiary memorandum, but that page contains no evidence that the developers who are included in the "entity" actually held TORN, let alone that they did so to profit from a general increase in TORN's value.  *See* ROA.940.  And as discussed above, the designation also included as members certain "founders" and "developers."  *See* p. 6, *supra*.  In short, the Department has failed to identify a purpose that is common to *all* members of its sweepingly broad entity.

To remedy that problem, the Department relies (Br. 29-30) on a flawed analogy to corporations.  But it does not dispute that corporations must satisfy certain registration formalities and that the purported Tornado Cash "entity" did not do so.  *See* Br. of Appellants 33-34.  The Department's discussion (Br. 29-30) of a corporation with expired or technically flawed registration documents is thus irrelevant.  Even when corporate formalities fail, the Department can still seek to identify an unincorporated association made up of "a body of persons who have combined to execute [a] common purpose"—a fallback option the Department correctly recognizes.  Br. 21.  Indeed, even the Department concedes that the analogy is beside the point because a corporation's "board and shareholders have a common purpose."  Br. 30.  Contrary to

7

the Department's suggestion, applying the accepted test for an unincorporated association does not elevate "form over function." Br. 29. On this record, the Department simply cannot meet either the test for incorporation or the test for an unincorporated association.

The Department's reference to al-Qaeda and Hamas (Br. 29-30) is no more availing. Plaintiffs have never contended that it is the formality of an organizational structure that matters to the definition of an unincorporated association. What matters is manifestation of a common purpose, and it is undisputed that al-Qaeda and Hamas each has a common purpose. *See* 71 Fed. Reg. 27,199 (May 10, 2006); 66 Fed. Reg. 49,079 (Sept. 25, 2001).

Lastly on this point, the Department's unelaborated citation (Br. 30-31) of *CFTC* v. *Ooki DAO*, Civ. No. 22-5416, 2022 WL 17822445 (N.D. Cal. Dec. 20, 2022), cannot cure the evidentiary memorandum's shortcomings. In that case, the agency alleged the existence of an unincorporated association of "Token Holders that used ('voted') their tokens." *Id*. at *2. And the district court found that those voting token-holders "consent[ed] to the inherent power that came from holding a token and thus being able to play a role in governance choices." *Id*. at *6 (internal quotation marks omitted). The Department has not made such an argument in this case, nor could it: its unprecedentedly broad "entity" definition is not limited to TORN holders who took a specific action, such as voting or staking.

8

3.    In a single paragraph at the end of its discussion of the "national" requirement, the Department argues that the overbroad definition in its designation is "harmless" because it could have identified "some group" with a common purpose. Br. 31-32. But the Department cannot save its designation by hypothetically and retroactively narrowing the scope of its action. True, a court reviewing agency action must take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. But showing prejudice is not "particularly onerous." *Shinseki* v. *Sanders*, 556 U.S. 396, 410 (2009). And under the Administrative Procedure Act, "errors are only harmless where the agency would be *required* to take the same action no matter what." *Wages & White Lion Investments, L.L.C.* v. *FDA*, 90 F.4th 357, 390 (5th Cir. 2024) (en banc), *pet. for cert. pending*, No. 23-1038 (Mar. 19, 2024); *see also Calcutt* v. *FDIC*, 598 U.S. 623, 629-630 (2023). Because the Department has not exercised its discretion to find that a smaller group manifested agreement to pursue a common purpose, the Department's error was prejudicial, and the designation should be set aside.

*    *    *    *    *

The Department made an unprecedented decision: it defined the designated entity not just as the founders and associated developers, and not just as those holders of TORN who took some affirmative action such as voting in governance or locking their tokens for profit, but instead as *both* the founders

9

and developers *and* every holder of the 1.5 million TORN tokens in circulation. Never before has the Department designated an unincorporated entity that was not organized to further a common purpose. Because the Department plainly lacks authority to do so, the district court's judgment should be reversed.

## II. THE DESIGNATION IS UNLAWFUL BECAUSE THE IMMUTABLE SMART CONTRACTS ARE NOT 'PROPERTY'

IEEPA authorizes the Department to designate "any *property* in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1) (emphasis added). As the Department ultimately concedes, the unambiguous meaning of "property" is something that is capable of being owned. *See*, *e.g.*, Br. 36 (quoting dictionary definitions of "property" and "ownership"); Br. 40 (arguing that the constitutional-avoidance canon does not apply because IEEPA is unambiguous). Every item in the Department's lengthy regulatory definition of "property" is something that is capable of being owned. And even under the regulation, an immutable smart contract is neither a "service" nor a "contract," let alone anything else that can be owned. Because immutable smart contracts are incapable of being owned, they are not "property." *See* Br. of Appellants 42-47.[1]

---

[1] Because the Department has abandoned any reliance on the North Korea Act, *see* Br. 28 n.6, it has also abandoned any argument that its designation is valid if it identifies a valid "person" but not "property" in which that person

## A. 'Property' Must Be Capable Of Being Owned

Because the statutory term "property" is unambiguous, there is no need to turn to the Department's regulations, let alone to afford deference to them. In any event, the regulatory definition, just like the statutory term, plainly equates "property" with something that is capable of being owned. *See* Br. of Appellants 35-41; Andreessen Horowitz Br. 14-16; Blockchain Br. 18-19.

1.    The Department skips straight past the statutory text to its regulatory definition (Br. 24-26, 35-39), but the role for that definition is limited. The Department never explains what level of deference is warranted, but it appears not to endorse the district court's invocation of "an even greater degree of deference than the *Chevron* standard." ROA.1505; *see* Br. of Appellants 41. And *Chevron* and *Kisor* deference are inappropriate because—as the Department concedes (Br. 36, 40)—the term "property" is unambiguous in both the statute and the regulation. *See Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984); *Kisor* v. *Wilkie*, 139 S. Ct. 2400, 2415 (2019).[2]

---

has an "interest."  IEEPA unambiguously does not permit the Department merely to identify a "national."  *See* 50 U.S.C. § 1702(a)(1)(B).

[2] Although the Court can resolve this case based on the plain meaning of IEEPA, plaintiffs preserve for further review their argument that *Chevron* and *Kisor* are inconsistent with the text of the Constitution and the Administrative Procedure Act. *See, e.g., Michigan* v. *EPA*, 576 U.S. 743, 760-764 (2015) (Thomas, J., concurring); *Kisor*, 139 S. Ct. at 2425-2448 (Gorsuch, J., concurring in the judgment).  Two cases presenting the question whether *Chevron*

The Department fails to establish that the statutory term "property" extends beyond things that are capable of being owned.  *See* Br. of Appellants 35-36.  It narrowly focuses (Br. 36-37) on plaintiffs' discussion of property over which an owner does not hold a particular right, such as exclusion or control.  But plaintiffs discussed exclusion and control merely to illustrate that no one can ever hold those rights in an immutable smart contract.  *See* Br. of Appellants 42-43.  The examples cited by the Department (Br. 36)—land encumbered by an easement and an asset in a trust—are still capable of being owned, even if it is not legally possible for owners to exercise certain rights.  That is quite different from software code over which no one has a legal or technical ability to exercise *any* dominion or control.

2.    In any event, the Department's regulation reflects the plain meaning of "property."  *See* 31 C.F.R. §§ 510.323, 578.314.  As the Department notes, its regulations give ample examples of property—such as "contracts," "services," "patents," and "copyrights"—and the Department never attempts to argue that any of them is incapable of being owned.  *See* Br. of Appellants 35-36, 38-40.  Nor does the Department dispute that, if there were ambiguity about whether any one of those things is capable of being owned, the ambiguity would be resolved by the canon *noscitur a sociis* (on the theory that the many

---

should be overruled are now pending before the Supreme Court.  *See Relentless, Inc.* v. *Department of Commerce*, No. 22-1219 (argued Jan. 17, 2024); *Loper-Bright Enterprises* v. *Raimondo*, No. 22-451 (argued Jan. 17, 2024).

other examples in the regulation are capable of being owned). *See id.* at 36. Indeed, at one point the Department appears to concede that its regulatory definition "does not meaningfully differ" from the plain meaning of "property" under IEEPA. *See* Br. 39.

The Department nonetheless contends (Br. 39-40) that the phrase "of any nature whatsoever" expands the meaning of "property" beyond things that are capable of being owned. But as a matter of basic logic, if what makes something "property" is the ability to own it, then property "of any nature whatsoever" must also be capable of being owned. The Department fails to cite a single example in which Congress, the courts, or (before this case) the Department has treated something incapable of being owned as "property of any nature whatsoever."

3.    Finally, to the extent that the meaning of "property" under IEEPA proved ambiguous, any such ambiguity would be resolved once the term was interpreted to avoid constitutional doubts, without any need to resort to *Chevron* deference. *See* Br. of Appellants 38-39; Blockchain Br. 25-26.

As an initial matter, the Department's action implicates the First Amendment. The Department argues that its action "does not prohibit plain-tiffs—or anyone else—from donating any money to any cause." Br. 41. But the Department has no authority to abridge plaintiffs' "liberty of expression" "on the plea that it may be exercised in some other place," *Schneider* v. *New*

*Jersey*, 308 U.S. 147, 163 (1939); *see also Hobbs* v. *Hawkins*, 968 F.2d 471, 481 (5th Cir. 1992); *Chicago Area Military Project* v. *City of Chicago*, 508 F.2d 921, 926 (7th Cir. 1975). Nor does the Department identify a source for its self-proclaimed authority to require law-abiding American citizens to obtain a license before engaging in protected speech. *See* Br. 43; *cf. Freedom From Religion Foundation* v. *Abbott*, 955 F.3d 417, 427 (5th Cir. 2020).

The Department next repeats the district court's conclusion that the designation "does not 'restrict interaction with the [immutable smart contracts'] open-source code unless those interactions amount to a transaction.'" Br. 41 n.8 (alteration in original) (quoting ROA.1514). But it is unclear how someone could be free to interact with open-source code that, in response to every interaction from individual users, is programmed to perform only one function that would potentially trigger criminal penalties. *See* Br. of Appellants 10. And it is also unclear how plaintiffs are supposed to know what rises to the level of a "transaction."

The Department further argues that its action is free from First Amendment scrutiny because it was taken "for reasons unrelated to any expressive activity by anyone." Br. 42. That argument is based on a case involving sexual activity that "manifest[ed] absolutely no element of protected expression." *Arcara* v. *Cloud Books, Inc.*, 478 U.S. 697, 705 (1986). Where, as here, the government regulates "conduct with incidental effects on speech," the regu-

14

lation must be "narrowly tailored to serve [a] substantial governmental interest[]." *Doe* v. *Landry*, 909 F.3d 99, 108 (5th Cir. 2018).

Finally on this point, the Department claims (Br. 42-43) that the designation of Tornado Cash is narrowly tailored. The Department apparently designated Tornado Cash to prevent money laundering. *See id.* But the Department's pursuit of that interest was anything but narrowly tailored. Despite labeling Tornado Cash a "for-profit money laundering service" and arguing that the Department needed to designate Tornado Cash to prevent money laundering, the Department has mustered only three examples of money laundering out of the millions of transactions that Tornado Cash processes. *See* ROA.969-978. Although the Department argues that "blocking all transactions involving [Tornado Cash] ensures that criminals cannot disguise their illegal transactions," Br. 43, it fails to explain why that same argument would not allow it to sanction any bank that inadvertently facilitated money laundering on a handful of occasions. And even more problematically, it never explains why existing designations of the Lazarus Group and other North Korean entities are insufficient to achieve the Department's interests in this area.

## B.    The Immutable Smart Contracts Are Not Capable Of Being Owned

There is no dispute in the administrative record that a subset of the designated smart contracts cannot be altered or controlled by anyone. *See* Br. of Appellants 42-43. The Department offers no reason why an immutable smart

contract is capable of being owned.  It instead contends (Br. 24-25) that each immutable smart contract falls within the regulatory definition of "property" because it is both a "service" (an argument that the district court did not adopt) and a "contract" (an argument that the district court erroneously adopted).  In the alternative, the Department contends (Br. 38) that the immutable smart contracts are "property" because they are akin to patents and copyrights (an argument that the Department makes for the first time).  An immutable smart contract is none of those things.  *See* Br. of Appellants 43-45; Andreessen Horowitz Br. 17-20; Blockchain Br. 19-21; Professors Br. 17-22.

1.    The Department's primary argument on appeal, which the district court did not adopt, is that the immutable smart contracts are "services" because they "provide mixing services."  Br. 24; *see* 31 C.F.R. §§ 510.323, 578.314.  To state that argument is to refute it.

The immutable smart contracts may *provide* a service, but they are not *themselves* a service.  As the Department acknowledges, a "service" is the "performance of some useful act or series of acts."  Br. 24 (quoting *Black's Law Dictionary* 1644 (11th ed. 2019)).  A service is not the entity or thing that performs the "useful act."  So the fact that the immutable smart contracts may perform a service does not establish that they themselves are the "service." *See, e.g.*, *Black's Law Dictionary* 1644.

It is certainly possible to own the right to a "service." For example, one can own the right to trash-removal service through a prepaid agreement that can be transferred, modified, and withheld from others. But just because one can own the right to trash-removal service does not mean that the people who perform that service, such as trash-removal employees, are themselves a "service." By the Department's logic, anyone or anything that performs a useful act is a service and, therefore, property. That conclusion defies both common sense and the plain meaning of "property" and "service," and the Department fails to cite a single precedent for its flawed interpretation of "service."

2.    The Department next defends (Br. 25) the district court's conclusion that the immutable smart contracts are a "code-enabled species of unilateral contracts." ROA.1509; *see* 31 C.F.R. § 31 C.F.R. §§ 510.323, 578.314. But despite the misleading name, smart contracts are not themselves legal contracts. As software code, smart contracts can at most facilitate the creation of a legal contract. *See* Br. of Appellants 43-44.

The Department's analysis fails to account for the fact that the smart contracts at issue were made immutable through a public process. This Court need not decide whether a mutable smart contract constitutes an offer or whether a user creates a legally enforceable contract when he initiates a transaction. *See* Department Br. 36. Even assuming those premises, any offers embodied in the *mutable* smart contracts were revoked when they were made

17

*immutable* through a public process that began with a trusted setup ceremony in which over 1,100 users participated.  *See* ROA.310.  No one can control those smart contracts, which cannot make a legally binding offer on behalf of anyone.

The Department responds by noting that "a unilateral contract becomes irrevocable and unalterable after certain conditions are met." Br. 34.  But even assuming that ownerless and immutable software code can make legally binding offers in the first place, an offer "may be revoked by the offeror at any time prior to the creation of a contract by acceptance." 1 Richard A. Lord, *Williston on Contracts* § 5:10 (4th ed. online) (last updated May 2023); *see also* Restatement (Second) of Contracts § 42 (1981) (stating that "[a]n offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract").  The Department cites a discussion of irrevocable offers in *Williston on Contracts*, *see* Br. 34, but that discussion involved limitations on revocation "once part performance has been rendered." 1 *Williston on Contracts* § 5:15; *see also* Restatement (Second) of Contracts § 45 (stating that, "[w]here an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it").  The Department never explains what the "part performance" is in the context of the immutable smart contracts at issue here.

The Department notes (Br. 34) that some States have passed laws recognizing that enforceable contracts may be formed or executed through smart contracts. But all those laws assume the existence of an otherwise binding contract. For example, Tennessee law provides that "[n]o contract relating to a transaction shall be denied legal effect, validity, or enforceability solely because that contract is executed through a smart contract." Tenn. Code Ann. § 47-10-202(c). And Arizona law provides that "[a] contract relating to a transaction may not be denied legal effect, validity or enforceability solely because that contract contains a smart contract term." Ariz. Rev. Stat. Ann. § 44-7061(C). Neither those provisions nor any reported cases applying them addresses the question here, which is whether an immutable smart contract is a "contract" in the first place.

There is no support in the administrative record for the Department's argument that the purported Tornado Cash entity is somehow using the immutable smart contracts to form legal contracts with the users of the Tornado Cash software. The Department cites only evidence that individuals have "advertised these smart contracts" and "benefit[ed] from the use of [Tornado Cash] smart contracts." Department Br. 33-34. But that does not alter the immutable nature of the smart contracts at issue in this appeal. And placing advertisements and deriving indirect benefits from immutable smart contracts

do not constitute making an offer through those immutable smart contracts for purposes of contract law.

Lastly on the subject of contracts, the Department argues that immutable smart contracts are property because "Tornado Cash actively develops new smart contracts to replace older ones" and "then disconnects the older smart contracts from its public interface." Br. 34 n.7. As plaintiffs have explained (Br. 46), that argument is unsound for several reasons. *First*, the immutable smart contracts were made ownerless and immutable before the DAO existed and have never been upgraded or replaced. *See, e.g.*, ROA.1027, 1063, 1119, 1201, 1203-1204. *Second*, the possibility that someone could create a new smart contract does not prove that an existing immutable smart contract can be owned. *Third*, the fact that the user interface can be disconnected from a particular smart contract shows at most that the *user interface* is someone's property.

3.     The Department also makes a passing suggestion (Br. 38) that the immutable smart contracts are property because they may be "analogized to patented processes or copyrighted works." That new argument lacks merit for three reasons. *First*, that argument is absent from the Department's evidentiary memorandum justifying the designation and thus cannot be used as justification. *See SEC* v. *Chenery Corp.*, 332 U.S. 194, 196 (1947). *Second*, the premise of the Department's analogy—that immutable smart contracts

20

"entitle their creators to some benefit," Br. 38—is at odds with the administrative record, given that immutable smart contracts do not entitle their creator to anything, unlike copyrights or patents. *Third*, even if immutable smart contracts were somehow analogous to copyrights or patents, being analogous to property does not make something property.

4.     Finally, the Department resorts to policy concerns, but those concerns are overblown. The Department is not "helpless to act against . . . malicious cybercriminals such as the Lazarus Group," Br. 38, because it designated the Lazarus Group and all of its property well before the action at issue here. *See* ROA.912. Nor is it possible that Tornado Cash was "designed . . . specifically to evade sanctions," Br. 38, when the smart contracts at issue here were rendered immutable years before Tornado Cash was the subject of the unprecedented OFAC designation at interest in this case.

What is more, the Department is unable to explain how its newfound assertion of power over ownerless, immutable software code avoids the troubling consequence that any intangible concept could be forbidden. The Department posits (Br. 38) that immutable smart contracts are different because no one profits or benefits from public-domain concepts. But artists may profit from incorporating a public-domain image into their work and writers may sell more copyrighted novels if they have placed other works in the public domain.

21

Because smart contracts are incapable of being owned, they are not "property," and the judgment below should be reversed on that ground as well.

## III. THE DESIGNATION IS UNLAWFUL BECAUSE THE PURPORTED TORNADO CASH ENTITY HAS NO 'INTEREST' IN THE IMMUTABLE SMART CONTRACTS

Under IEEPA, the Department's authority extends only to "property in which any foreign country or a national thereof has any *interest*." 50 U.S.C. § 1702(a)(1)(B) (emphasis added). When used in conjunction with "property," the term "interest" encompasses only legal, equitable, and beneficial interests. *See* Br. of Appellants 48-50. On that much, the Department agrees. *See* Br. 44. And the only question as to the "interest" requirement is whether Tornado Cash has a beneficial interest in the immutable smart contracts. Although the Department never offers its own definition of "beneficial interest," the term's ordinary meaning is a "right or expectancy in something (such as a trust or an estate) as opposed to legal title." *Black's Law Dictionary* 149. Under that or any other conceivable definition, the purported Tornado Cash "entity" does not have a beneficial interest in property in the immutable smart contracts. *See* Br. of Appellants 53-56; DeFi Br. 5-8, 14-19; Professors Br. 21-22.

1.    The Department first argues that the Tornado Cash "entity" has an interest in the immutable smart contracts because "Tornado Cash receives fees when users conduct withdrawals using registered relayers." Br. 26. But that argument asks the wrong question. Even assuming that the ability to

control the relayer registry demonstrates a property interest in the (mutable) relayer registry smart contract, it does not demonstrate a property interest in the separate immutable smart contracts at issue here, which no one can control or transfer.

The Department decries that fact as "empty formalism," Br. 46, but it misapprehends the facts in its own administrative record. The immutable smart contracts do not confer any fees directly to the Tornado Cash "entity." *See* ROA.933. As the Department has conceded, many people use the immutable smart contracts without involving any relayer, and such transactions do not result in any commissions. *See* Br. 47. An interest in the relayer registry is thus insufficient to establish an interest in the separate, immutable, owner-less smart contracts.

The Department's relayer theory suffers from an additional flaw. By the Department's own concession, the foreign nationals on which it relies for purposes of establishing an interest must have staked their TORN in the mutable governance smart contract in order to receive any fees from the relayers. *See* Br. 26. The Department cites evidence that certain foreign nationals *hold* TORN, *see* Br. 27, but it has missed a necessary link in the chain by failing to cite any record evidence that those foreign nationals chose to stake their TORN and thus actually receive relayer fees.

2.    The Department pivots to a different supposed interest that the district court did not accept: that "the use, popularity, and success of the smart contracts increases the economic value of the TORN tokens." Br. 26 (internal quotation marks and citation omitted). But that alternative theory is neither supported by the administrative record nor sufficient to show an interest in property.

Beginning with the administrative record, there is ample evidence that the value of TORN actually went *down* as usage of the smart contracts increased. *See* Br. of Appellants 55. In response, the Department cites two examples that allegedly support its theory of a positive correlation between smart contract usage and TORN price. Neither supports that theory.

*First*, the Department claims that "the value of TORN 'surged 94 percent'" after a governance vote that permitted TORN holders to become relayers by staking TORN. Br. 49. But the vote in question created a new and unique reason to hold TORN—to become a relayer—and it is thus no surprise that demand for TORN increased soon thereafter. Nothing in the record suggests that this change in the market price correlated at all with the immutable smart contracts becoming more "successful."

*Second*, the Department argues that the price of TORN went down after it designated Tornado Cash. *See* Br. 49. But that designation inaccurately declared *all* TORN holders to be "members" of a group accused of money

24

laundering for North Korea. It should be no surprise that such a designation may have reduced the price of TORN. If anything, that example—like the previous one—serves only to further demonstrate that the price of TORN tended to be driven by external events like governance changes and government action, and not by the "use, popularity, and success" of the immutable smart contracts.

But even if the record supported the finding of a correlation between smart contract usage and TORN price, it would still not establish a beneficial interest in the immutable smart contracts. Rather, it would just be another way in which TORN holders may have been well-positioned to profit from the success of the immutable smart contracts. That does not prove that TORN holders had a cognizable property interest in those contracts as IEEPA requires.

3.    In the end, the Department tries to rely on the proximity and foreseeability of TORN holders' potential profits. As plaintiffs have noted, the Department's interpretation of "interest" would give OFAC a sweeping right to sanction *any* property—even fully American-owned property—the use of which might confer profits on foreigners. *See* Br. of Appellants 54. In response, the Department suggests (Br. 48) the Court might draw lines between "complementary good[s] that tangentially affect[] the market price" and "core service[s]," which presumably affect foreigners' economic welfare more

directly. The Department neither explains those concepts nor suggests how a court might in practice actually draw such lines. But the argument makes one thing clear: the Department views "interest" as a test of economic causation, not a legal, equitable, or beneficial property interest that IEEPA requires. *See* Br. of Appellants 52-53.

4. The Department points vaguely to "decades of practice" to support its position, Br. 45, but the only examples it offers before the designation under review did not expand the term "interest" beyond the categories of legal, equitable, or beneficial interests.

In *De Cuellar* v. *Brady*, 881 F.2d 1561 (1989), the Eleventh Circuit upheld the blocking of Cuban bonds secured by a "sinking fund" on the ground that Cuba retained a "contingent reversionary interest" in the post-redemption fund. *See id.* at 1566. But a contingent reversionary interest is a legally enforceable property interest. *See, e.g.*, Restatement (First) of Property § 154 (1936). The decision in *De Cuellar* thus has nothing to say about expected economic gains that are not legal, equitable, or beneficial "interests."

The other decisions that the Department cites on this point appeared to conclude that the agency had identified a beneficial interest in property. *See Holy Land Foundation for Relief & Development* v. *Ashcroft*, 333 F.3d 156, 163 (D.C. Cir. 2003); *Global Relief Foundation, Inc.* v. *O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002). Those courts did not hold that the possibility of receiving

future indirect profits constitutes a beneficial interest. *See* Br. of Appellants 53-54.[3]

*     *     *     *     *

The Department closes its brief by arguing that Tornado Cash "is exactly the sort of entity that Congress gave the Executive Branch authority to protect against through sanctions." Br. 49. But IEEPA says otherwise. The Department tries to fashion a blank check for itself based on "national and economic security." Br. 44. While no one disputes the importance of those interests, they "simply cannot overcome the force of the plain text," *Mohamad* v. *Palestinian Authority*, 566 U.S. 449, 460 (2012), which limits presidential power to the confines of the statute. *See Dames & Moore* v. *Regan*, 453 U.S. 654, 672-673 (1981). It is precisely because the statute fails to contemplate ownerless, immutable smart contracts that the Department must contort statutory text and piece together tenuous causal chains.

It may well be that the Department needs new tools to navigate a changing world, as it has recently requested from Congress. *See* Department of the Treasury, Memorandum on Potential Options to Strengthen Counter-Terrorist Financing Authorities 3 (Nov. 28, 2023) <coincenter.org/app/uploads/2023/12/11.28.2023-Counter-TF-Legislative-Proposals.pdf> (requesting "explicit

---

[3] The Department has abandoned the argument that the purported entity has an interest in the immutable smart contracts because it regarded them "as having value." ROA.961.

IEEPA authority to designate blockchain nodes or other elements of crypto-currency transactions" and referring to "Tornado Cash" as an "Existing Gap/Risk"). Until Congress acts, however, the Department cannot seize that authority under a statute that simply does not extend to the circumstances presented here.

## CONCLUSION

The judgment of the district court should be reversed as to the first count of the amended complaint.

Respectfully submitted,

/s/ Kannon K. Shanmugam

CHARLES LEWIS AINSWORTH
PARKER, BUNT & AINSWORTH, P.C.
  *100 East Ferguson, Suite 418*
  *Tyler, TX 75702*

KANNON K. SHANMUGAM
BRIAN M. LIPSHUTZ
MATTEO GODI
DAVID A. HOPEN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*

APRIL 15, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, a member of the Bar of this Court and counsel for appellants, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Fifth Circuit Rule 32.3, that the attached Reply Brief of Plaintiffs-Appellants is proportionately spaced, has a typeface of 14 points or more, and contains 6,468 words.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

APRIL 15, 2024